## ORAL ARGUMENT NOT YET SCHEDULED

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE THIRD CIRCUIT

---
### NOS. 21-3068, 21-3205, 21-3243 (CONSOLIDATED)
---

PJM POWER PROVIDERS GROUP, ET AL.
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

---
### ON PETITIONS FOR REVIEW OF ORDERS OF THE
### FEDERAL ENERGY REGULATORY COMMISSION
---

## FINAL BRIEF OF THE STATE ENTITY INTERVENORS IN SUPPORT OF RESPONDENT

Matthew J. Platkin
Acting Attorney General of New Jersey

David Apy
Assistant Attorney General
R.J. HUGHES JUSTICE COMPLEX
25 Market Street, P.O. Box 112
Trenton, N.J. 08625
Tel. (609) 815-2278

***Attorneys for the New Jersey Board of Public Utilities***

Scott H. Strauss
Peter J. Hopkins
Jeffrey A. Schwarz
Amber L. Martin Stone
SPIEGEL & MCDIARMID LLP
1875 Eye Street NW, Suite 700
Washington, DC 20006
Tel. (202) 879-4000

***Attorneys for New Jersey Division of Rate Counsel, Office of the People's Counsel for the District of Columbia, Maryland Office of the People's Counsel, and Delaware Division of the Public Advocate***

September 9, 2022

*\*Additional counsel listed inside cover*

H. Robert Erwin, Jr.
General Counsel

Miles H. Mitchell
Deputy General Counsel
William Donald Schaefer Tower
6 St. Paul Street, 16th Floor
Baltimore, MD 21202
Tel. (410) 767-2972
Ransom E. Ted Davis
Associate General Counsel
Tel. (410) 767-8076

***Attorneys for Public Service
Commission of Maryland***

Kwame Raoul
Attorney General of the State of Illinois

Sarah A. Hunger
Deputy Solicitor General
OFFICE OF THE ILLINOIS ATTORNEY
   GENERAL
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
Tel. (312) 814-5202

***Attorneys for
the People of the State of Illinois
Illinois Commerce Commission***

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and L.A.R. 26.1, state entity intervenors state as follows:

The Delaware Division of the Public Advocate, Illinois Commerce Commission, Maryland Office of People's Counsel, Maryland Public Service Commission, New Jersey Board of Public Utilities, New Jersey Division of Rate Counsel, Office of the People's Counsel for the District of Columbia, and People of the State of Illinois (collectively State Entities) are governmental parties and therefore are exempt from the reporting requirements of Rule 26.1 of the Federal Rules of Appellate Procedure. They have neither a parent corporation nor publicly held stock.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iv

GLOSSARY ................................................................................................ ix

RELATED CASES & PROCEEDINGS ...................................................... 1

STATEMENT OF FACTS ........................................................................... 1

STANDARD OF REVIEW .......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 1

ARGUMENT ................................................................................................ 5

I.    The FPA does not require FERC to police the impacts of state
      generation policies on other states. .................................................. 5

      A.  The FPA and the dormant Commerce Clause are aimed at
          different concerns. .................................................................... 6

      B.  The FPA's prohibition against undue discrimination does
          not derive from the dormant Commerce Clause ...................... 12

      C.  Generation Petitioners' construction of the FPA as a
          pseudo dormant Commerce Clause is not administrable. ......... 18

II.   Even under the Generators' discrimination framework, their
      demands fail on the merits. .............................................................. 21

      A.  The Focused MOPR does not allow one state to direct the
          energy policies of another. ....................................................... 21

      B.  The Focused MOPR does not discriminate against states
          that rely upon competitive markets. ......................................... 24

      C.  The Focused MOPR is consistent with precedent. ................... 26

      D.  The Focused MOPR does not discriminate against
          merchant generators. ................................................................ 30

III. The Commission's acceptance of the Focused MOPR as just and reasonable is not contrary to law or arbitrary and capricious. ........................................................................... 33

CONCLUSION ............................................................................... 42

CERTIFICATE OF COMPLIANCE ............................................... 44

CERTIFICATION OF BAR MEMBERSHIP ................................. 45

VIRUS CERTIFICATION ............................................................. 46

STATUTORY ADDENDUM ........................................................ A-1

    49 U.S.C. § 1 *et. seq.* (1934) ................................................ A-2

    Transportation Act, 1920, ch. 91, § 418, 41 Stat. 456 .......... A-26

# TABLE OF AUTHORITIES

**FEDERAL COURT CASES**

*Ameren Servs. Co. v. FERC*, 893 F.3d 786 (D.C. Cir. 2018) ..................................35

*Ark.-La. Gas Co. v. Hall,* 453 U.S. 571 (1981) ......................................................28

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ..........................................22, 23

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..........................................25

*City of Vernon v. FERC*, 845 F.2d 1042 (D.C. Cir. 1988) ......................................14

*Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp.3d 554 (S.D.N.Y. 2017), *aff'd*, 906 F.3d 41 (2d Cir. 2018) ...........................................................31

*Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41 (2d Cir. 2018) ........29, 33, 37

*"Complex" Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992 (D.C. Cir. 1999) ....................................................................................................14

*Consol. Edison Co. v. FERC*, 676 F.2d 763 (D.C. Cir. 1982) .................................14

*Elec. Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018) .......................8, 29

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ......................................35

*Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169 (10th Cir. 2015)..........7, 8, 9, 13

*FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016) ................................15, 33

*Gulf States Utils. Co. v. FPC*, 411 U.S. 747 (1973) ............................................ 8-9

*Hughes v. Talen Energy Marketing LLC*, 578 U.S. 150 (2016) ........................19, 28

*In re NTE Conn., LLC*, 26 F.4th 980 (D.C. Cir. 2022)...........................................30

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994).................. 6-7

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 532 (2008) *Nat'l Ass'n of Regul. Util. Comm'rs. v. FERC*, 964 F.3d 1177 (D.C. Cir. 2020) ............................................................. 10

*New England Power Generators Ass'n v. FERC,* 757 F.3d 283 (D.C. Cir. 2014) ........................................................................................................... 12

*New Jersey Board of Public Utilities v. FERC,*
744 F.3d 74 (3rd Cir. 2014) ........................................................ 12, 16, 36, 38

*New York v. FERC*, 535 U.S. 1 (2002) ............................................................ 7, 28

*NextEra Energy Res., LLC v. FERC*, 898 F.3d 14 (D.C. Cir. 2018) ................ 37, 38

*Nw. Cent. Pipeline Co. v. State Corp. Comm'n of Kan.*, 489 U.S. 493 (1989) ... 7, 28

*Nw. Pub. Serv. Co. v. Mont.-Dakota Utils. Co.*, 181 F.2d 19 (8th Cir. 1950),
*aff'd sub*, 341 U.S. 246 (1951) ............................................................. 13

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 384-85 (2015) ...................................... 27

*Pa. Water & Power Co.* v. *FPC*, 343 U.S. 414 (1952) .......................................... 41

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ............................................................................. 19

*PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) .......................... 18

*Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927) ......................................................... 15-16, 17, 27

*Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187 (1st Cir. 1994) ................... 13

*St. Michaels Utils. Comm'n. v. FPC*, 377 F.2d 912 (4th Cir. 1967) .......... 10, 13, 14

*Utah Power & Light Co. v. Pfost*, 286 U.S. 165 (1932) ................................. 17, 27

*Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239 (D.C. Cir. 2007) ............................ 36

**FEDERAL AGENCY CASES**

*Am. Elec. Power Serv. Corp.*, 67 FERC ¶ 61,168 (1994)........................................10

*Edison Elec. Inst.*, 69 FERC ¶ 61,344 (1994)..........................................................37

Electric Storage Participation in Markets Operated by Regional
   Transmission Organizations and Independent System Operators, Order
   No. 841, 162 FERC ¶ 61,127 (2018) (subsequent history omitted)...................10

*ISO New England Inc.*, 179 FERC ¶ 61,139 (2022).................................................41

*N.Y. Indep. Sys. Operator, Inc.*, 179 FERC ¶ 61,102 (2022) ................................41

*N.Y. State Pub. Serv. Comm'n v. N.Y. Indep. Sys. Operator*, *Inc.*, 158 FERC
   ¶ 61,137 (2017), *on reh'g*, 170 FERC ¶ 61,120, *on reh'g*, 173 FERC ¶
   61,022, *clarified*, 171 FERC ¶ 61,114 (2020) ....................................................20

Promoting Wholesale Competition Through Open Access Non-
   Discriminatory Transmission Services by Public Utilities; Recovery of
   Stranded Costs by Public Utilities and Transmitting Utilities, Order
   No. 888, 75 FERC ¶ 61,080, *clarified*, 76 FERC ¶
   61,009 (1996), *modified*, Order No. 888-A, 78 FERC ¶ 61,220, *order on
   reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order
   No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part and remanded in part
   sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d
   667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S.
   1 (2002)................................................................................................................24

Remedying Undue Discrimination Through Open Access Transmission
   Serv. & Standard Elec. Mkt. Design, Notice of Proposed Rulemaking,
   100 FERC ¶ 61,138 (2002), *proceeding terminated*, 112 FERC ¶ 61,073
   (2005)....................................................................................................................9

*S. Cal. Edison Co.*, 71 FERC ¶ 61,269 (1995), *overruled in part on other
   grounds sub nom. Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, P 30
   (2010)..................................................................................................................37

Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, Order No. 1000, 136 FERC ¶ 61,051 (2011), *reh'g denied*, Order No. 1000-A, 139 FERC ¶ 61,132, *on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *review denied sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (per curiam) ......37

*WSPP Inc.*, 139 FERC ¶ 61,061 (2012) ................................................................37

## FEDERAL STATUTES

Energy Policy Act of 1992, Pub. L. No. 102-486, § 731, 106 Stat. 2776, 2921 ....................................................................................................................25

Federal Power Act, Public Utility Act of 1935, tit. II, 49 Stat. 847 ................*passim*

    § 201(b)(1), 16 U.S.C. § 824(b)(1) .............................................15, 17, 22, 29, 33

    § 202, 16 U.S.C. § 824a .............................................................................34

    § 205(b), 16 U.S.C. § 824d(b) ............................................................ 6, 8, 9-10

    § 206(a), 16 U.S.C. § 824e(a) ..................................................... 3, 6, 8, 9-10, 15

    § 313, 16 U.S.C. § 825*l*(b) ........................................................................35

Interstate Commerce Act (ICA), 49 U.S.C. § 1 *et seq.* (1934) (repealed) ...........3, 13

    49 U.S.C. § 13(4) (1934) ..........................................................................15

    49 U.S.C. § 15(1) (1934) ..............................................................3, 9, 13, 14, 15

Natural Gas Act, 15 U.S.C. § 717 *et seq.* .............................................................28

Transportation Act, 1920, ch. 91, § 418, 41 Stat. 456, 484-85 ................................14

## FEDERAL COURT RULES

Fed. R. App. P. 26.1 .......................................................................................i

L.A.R. 26.1 ..................................................................................................i

Page(s)

**FEDERAL LEGISLATIVE DOCUMENTS**

H.R. Rep. No. 74-1318 (1935) ........................................................17, 27

S. Rep. No. 74-621 (1935) ............................................................17, 27

**MISCELLANEOUS**

Comments of New England Power Generators Association, *ISO New England Inc.*, No. ER22-1528-000 (Apr. 21, 2022), eLibrary No. 20220421-5259 ........................................................................42

*Danly Office White Paper: The Requirement That Competitive Markets Be Protected from the Exercise of Market Power Applied to RTO Capacity Markets. Supplement* (June 17, 2021), https://www.ferc.gov/media/white-paper-commissioner-james-danly-requirement-competitive-markets-be-protected-exercise ........................................................ 32-33

Emily Persico et al., *Buried Out of Sight: Uncovering Pennsylvania's Hidden Fossil Fuel Subsidies* 2 (Feb. 2021), https://www.pennfuture.org/Files/Admin/PF_FossilFuel_Report_final_2.12.21.pdf (last visited Aug. 2, 2022) ........................................................21

Jeremy Pelzer, *Ohioans Still Paying Massive Coal Plant Subsidies Under House Bill 6*, Cleveland.com (Oct. 9, 2021), https://www.cleveland.com/open/2021/10/ohioans-still-paying-massive-coal-plant-subsidies-under-house-bill-6.html ......................................21

Joel Eisen, *FERC's Expansive Authority to Transform the Electric Grid*, 49 U.C. Davis L. Rev. 1783 (2016) ......................................................14

Sylwia Bialek & Burcin Unel, N.Y.U. School of Law Inst. for Pol'y Integrity, Electricity Policy Insights, *Capacity Markets and Externalities: Avoiding Unnecessary and Problematic Reforms* 6 (Apr. 2018), https://policyintegrity.org/files/publications/Capacity_Markets_and_Externalities_Report.pdf ........................................................22

# GLOSSARY

| | |
|---|---|
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| EPSA | Petitioner Electric Power Supply Association |
| Expanded MOPR | A PJM capacity auction rule, ordered by FERC in December 2019, that imposed broad administrative price-mitigation on nearly all state-sponsored resources—new and existing—participating in the PJM capacity auction, with certain exceptions |
| Focused MOPR | PJM's July 30, 2021 rate filing which took effect by operation of law on September 29, 2021, replacing the Expanded MOPR and narrowing the MOPR's focus to prevent the exercise of buyer-side market power or the participation of state-sponsored resources impermissibly conditioned on PJM market participation |
| Generators | Collectively, petitioners P3 and EPSA |
| IMM | Independent Market Monitor—the entity responsible for monitoring the wholesale markets administered by PJM in order to prevent market manipulation or abuse |
| Joint Statement | Statement of Chairman Glick and Commissioner Clements, R. 125, JA0037 |
| MOPR | Minimum Offer Price Rule—a capacity auction rule that sets minimum offer prices for resource capacity bids |
| P3 | Petitioner PJM Power Providers Group |
| PJM | PJM Interconnection, L.L.C.—the FERC-regulated regional transmission organization that also administers the wholesale capacity, energy, and ancillary services markets for thirteen states plus the District of Columbia |
| PJM capacity auction or capacity market | A wholesale market administered by PJM and designed to ensure adequate electric |

| | |
|---|---|
| | capacity (i.e., the ability to produce electricity on demand) is available to meet projected electric load (i.e., consumer demand) at least cost. The PJM capacity auction is administered on a three-year-forward basis. |
| State Entities | A subset of intervenors supporting FERC consisting of the Delaware Division of the Public Advocate, Illinois Commerce Commission, Maryland Office of People's Counsel, Maryland Public Service Commission, New Jersey Board of Public Utilities, New Jersey Division of Rate Counsel, Office of the People's Counsel for the District of Columbia, and People of the State of Illinois |
| ZECs | Zero-emission credits—credits created by state-programs intended to compensate eligible resources for the production of a specified amount of greenhouse gas emissions-free electricity |

## RELATED CASES & PROCEEDINGS

State Entities incorporate the Statement of Related Cases and Proceedings provided in the brief of Respondent Federal Energy Regulatory Commission (FERC).

## STATEMENT OF FACTS

State Entities incorporate the Statement of Facts contained in the brief of Respondent FERC.

## STANDARD OF REVIEW

State Entities incorporate the Standard of Review provided in the brief of Respondent FERC.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Federal Power Act (FPA) provides for public utilities to set their own rates subject to review by FERC, which is charged with implementing the FPA's requirements that rates be just, reasonable, and not unduly discriminatory. Absent FERC action to the contrary, wholesale rate filings take effect by operation of law. PJM Interconnection, L.L.C. (PJM) is a public utility that operates the interstate transmission grid and administers markets for the sale at wholesale of electric energy and capacity within its footprint across thirteen states and the District of Columbia. Exercising its rate authority, PJM opted to change the rules governing resource bidding into PJM's forward-looking capacity auction. The changes would allow sellers to reflect in their offers the effects of state policies, including those

intended to support clean-energy resources and counteract the failure to price environmental externalities. PJM's proposal would thereby ensure resource adequacy while avoiding requiring customers to pay for excess capacity.

In doing so, PJM abandoned a short-lived and controversial rule that sought to prevent those state policies from affecting wholesale auction outcomes. Dozens of parties challenged the previous rule change. Those petitions have been held in abeyance in the Seventh Circuit pending the outcome of this case. Petitioners PJM Power Providers Group (P3) and Electric Power Supply Association (EPSA) (collectively Generators) are generator trade associations whose members benefitted from the capacity market price increases and inefficiencies created by the prior rule now before the Seventh Circuit.

With only four Commissioners voting and splitting two against two, PJM's rule change took effect by operation of law, following which Generators and the Ohio and Pennsylvania commissions sought review in this Circuit.

FERC's acceptance of PJM's "Focused" minimum offer price rule (MOPR) easily survives review. As explained in the joint Statement of Chairman Glick and Commissioner Clements (R.125, JA0037, hereafter Joint Statement), the Focused MOPR replaces PJM's short-lived Expanded MOPR, which sought to nullify the effect of state generation programs, such as those to create demand and revenue for the generation of electricity free of greenhouse-gas emissions, and restores PJM's

MOPR to "its original purpose: eliminating the incentive that large net buyers of capacity may have to take uneconomic action to decrease capacity prices." *Id.* P 3, JA0037; *see generally id.* PP 1-22, JA0037-0050. The Focused MOPR thereby removes an artificial obstacle in PJM's capacity market that targets the incidental effects of state policies on generation resources. *See id.* P 62, JA0071.

Generators err in claiming that the Focused MOPR is unduly discriminatory because it results in some PJM states imposing their generation policies on other PJM states. The premise of this contention—that the FPA section 206(a), 16 U.S.C. § 824e(a), prohibition against unduly discriminatory practices amounts to an imitation dormant Commerce Clause requiring FERC to prevent any state's generation policy from affecting any other state in PJM's market—is both unsupported and unworkable. The text, purpose, and history of FPA section 206(a), which was modelled after a corresponding provision of the Interstate Commerce Act, 49 U.S.C. § 15(1) (1934),[1] show that the provision is directed against *public utilities*—not *states*—and prohibits those private, regulated entities from engaging in undue discrimination in connection with their wholesale sale or transmission of electricity in interstate commerce.

---

[1] The provisions of 49 U.S.C. § 1 *et seq.* (1934) have been repealed and are not readily available. A copy of these provisions is included in the Statutory Addendum to this brief.

By contrast, the dormant Commerce Clause protects against state action that unduly interferes with interstate commerce. The restriction is enforced by suits against the states in federal court—not by litigating public utility rate filings under the FPA. And federal courts have been clear that a state does not run afoul of the Commerce Clause when exercising police powers reserved under the FPA to regulate local generation. While such state regulation will impact generation supply and may have an incidental effect on PJM's wholesale markets, those results are part of the natural interplay between federal and state authority under the FPA.

Further, nothing in the FPA's requirements that rates be just and reasonable and not unduly discriminatory mandates the mitigation of state-sponsored resources in PJM's capacity markets. The courts of appeals, including this Court, have found that in regulating resource participation in wholesale markets, FERC has leeway to strike a balance between the interests of generators and consumers, including concerns about over- and under-mitigation. The Focused MOPR recognizes the market realities of state-sponsored resources pursuant to states' express authority to regulate generation and facilitates the participation of those resources in PJM's capacity auction, while meeting the objectives of ensuring resource adequacy—guaranteeing enough electric supply to keep the lights on—at

least cost. Joint Statement PP 3, 62, 82, JA0037, JA0071, JA0085. Petitioners have raised no valid argument to the contrary.

The Focused MOPR furthers the objectives of the FPA. It protects against billions of dollars in excess costs that would otherwise be imposed on consumers under the Expanded MOPR and sends accurate price signals reflecting the market realities of the generation supply available to serve the PJM market. And it harmonizes federal and state policy, consistent with the collaborative federalism that inheres in the FPA. The Focused MOPR is lawful, and the Commission order approving it should be affirmed.

## ARGUMENT

## I. THE FPA DOES NOT REQUIRE FERC TO POLICE THE IMPACTS OF STATE GENERATION POLICIES ON OTHER STATES.

Generators EPSA and P3 are private trade associations representing merchant generators whose facilities are located within the PJM regional market. Seeking to wrap themselves in the flag of states' rights, they argue that the Focused MOPR impermissibly discriminates against certain states because it allegedly creates a market structure that allows one state to "impose its policy preferences on another State," violating state sovereignty. EPSA Br. 13, 34-43; P3 Br. 43, 42-46.[2]

---

[2] Notably, although EPSA assures the court (EPSA Br. 45) that the Focused MOPR's alleged imperiling of state sovereignty "will undoubtedly be discussed in

This argument is meritless. There is no basis for the claim that the FPA functions as a pseudo dormant Commerce Clause that requires FERC to police the impact of state generation policies on other states. To the contrary, the FPA's text and history, administrability concerns, and a wealth of case law and agency practice all conclusively refute Generators' unprecedented construction of the statute.

### A. The FPA and the dormant Commerce Clause are aimed at different concerns.

Generators contend that the FPA's prohibition on unduly discriminatory or preferential rates, *see* 16 U.S.C. §§ 824d(b), 824e(a) (FPA sections 205 and 206), "incorporates the Commerce Clause principle that 'no single State' may 'impose its own policy choice on neighboring States.'" P3 Br. 43; EPSA Br. at 34, 38.[3] Not so. Although Part II of the FPA has been on the books for nearly nine decades,[4] Generators cite no Commission or court decision endorsing their theory.

This omission is no surprise, as acceptance of Generators' interpretation would effect a "fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation" into an entirely different kind. *MCI Telecomms. Corp. v.*

---

greater detail" by the Petitioner Pennsylvania and Ohio Commissions, the Pennsylvania and Ohio brief never advances this argument.

[3] While Commissioner Christie seemingly shares that view, his Statement cites no support for this position. R.126, P 10, JA0130 (quoting R.62, at 4, JA0450).

[4] "The FPA was enacted as Title II of the Public Utility Act of 1935, 49 Stat. 847. Title I of the Public Utility Act—not at issue here—regulated financial practices of interstate holding companies that controlled a large number of public utilities." *New York v. FERC*, 535 U.S. 1, 3 n.3 (2002).

*Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994). The dormant Commerce Clause and the FPA are aimed at different actors and different conduct. As explained below, the FPA's anti-discrimination provision was modeled after a similar provision in the Interstate Commerce Act, and is intended to prevent price discrimination by electric *utilities* in their sales to different groups of buyers, such as through preferential charges or hidden discounts. The provision was not intended to impose indirect limits on how *states* regulate generation under their expressly reserved authority to do so. In short, the FPA includes no requirement that utility rates be structured to prevent the policies of one state from affecting other states. Nor could it sensibly do so. *See* section I.C., *infra*.

A comparison between the precepts of the dormant Commerce Clause and the purpose and text of the FPA makes these distinctions plain. The purpose of the dormant Commerce Clause is to police *state* conduct. Specifically, the doctrine affords courts the "authority to strike down [as unconstitutional] state laws that, in their judgment, unduly interfere with interstate commerce." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1171 (10th Cir. 2015) (*Epel*). *See also Nw. Cent. Pipeline Co. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 523-26 (1989). It is not a monolithic body of law and instead, "[d]ormant commerce clause cases are said to come in three varieties," *Epel*, 793 F.3d at 1171, including those addressing state laws that "control 'extraterritorial' conduct.'" *Id.* at 1172. The gravamen of

Petitioners' objection is grounded in this "least understood" and "most dormant" body of law, *id.*, prohibiting state laws "'that directly control[] [out-of-state] commerce.'" EPSA Br. 37 (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). Such claims involve "'tying the prices of . . . in-state products to out-of-state prices,'" *Epel*, 793 F.3d at 1174 (quoting *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)), and must be distinguished from the myriad number of uncontroversial state laws that have an incidental impact on interstate commerce. "The Commerce Clause does not 'cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, [just because] the legislation might indirectly affect the commerce of the country.'" *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 524-25 (7th Cir. 2018) (*Star*) (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997)).

In contrast to the dormant Commerce Clause, the purpose of FPA sections 205 and 206 is to regulate *utility* conduct—specifically as it concerns the rates, terms, and conditions of sales at wholesale and transmission of electricity in interstate commerce. 16 U.S.C. §§ 824d, 824e. In explaining the impetus for the FPA, the Supreme Court noted that it "was passed in the context of, and in response to, great concentrations of economic and even political power vested in power trusts, and the absence of antitrust enforcement to restrain the growth and practices of public utility holding companies." *Gulf States Utils. Co. v. FPC*,

411 U.S. 747, 758 (1973). Enactment of the FPA thus "had two primary and related purposes: to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Id.*[5] The plain language of FPA section 205(b) is consistent with these objectives, prohibiting any "public utility" from "grant[ing] any undue preference or advantage to any person . . . ." 16 U.S.C. § 824d(b). And FPA section 206(a), modeled on the Interstate Commerce Act, 49 U.S.C. § 15(1), prohibits any "public utility" from imposing "any rule, regulation, practice, or contract affecting such rate, charge, or classification [that] is . . . unduly discriminatory or preferential" with respect to a jurisdictional wholesale sale or the interstate transmission of electricity. 16 U.S.C. § 824e(a). The wording is crystal clear: unlike the Commerce Clause cases that focus on state laws that "discriminate against out-of-staters," *Epel* at 1174, the FPA prohibits only "*public utility*" conduct that is "unduly discriminatory," 16 U.S.C. § 824e(a) (emphasis added). Nothing in FPA sections

---

[5] Remedying Undue Discrimination Through Open Access Transmission Serv. & Standard Elec. Mkt. Design, Notice of Proposed Rulemaking, 100 FERC ¶ 61,138, P 100 (2002) ("The primary purposes of the Federal Power Act [or Part II of the Public Utility Act] are to curb abusive practices by public utilities and to protect customers from excessive rates and charges."), *proceeding terminated*, 112 FERC ¶ 61,073 (2005).

205 or 206 speaks to, or in any way limits, the authority of states to enact their own generation policies, nor do those provisions require FERC to police those policies.

Applying the FPA's prohibition against undue discrimination, the Commission and the courts focus only on the conduct of "public utilit[ies]" providing jurisdictional services. For example, the Commission has exercised its authority under the FPA to prohibit undue discrimination by examining "whether . . . factual differences . . . justify classifications among customers and differences among the rates charged them." *St. Michaels Utils. Comm'n. v. FPC*, 377 F.2d 912, 915 (4th Cir. 1967). And FERC has read the undue discrimination provision of the FPA to require a utility to "offer third parties access on the same or comparable basis, and under the same or comparable terms and conditions, as the transmission provider's uses of its system." *Am. Elec. Power Serv. Corp.*, 67 FERC ¶ 61,168, at 61,490 (1994). In all cases, the focus of FERC's authority to address discriminatory conduct has been assessing the actions of the utilities subject to Commission regulation—and their impacts on utility rates, customers, and market access[6]—and not the extent to which one state's laws and policies might be burdening another.

---

[6] *See e.g., Nat'l Ass'n of Regul. Util. Comm'rs. v. FERC*, 964 F.3d 1177 (D.C. Cir. 2020) (affirming FERC's exercise of FPA section 206 authority in Electric Storage Participation in Markets Operated by Regional Transmission Organizations and Independent System Operators, Order No. 841, 162 FERC ¶ 61,127 (2018) (subsequent history omitted) "to remove existing barriers to the participation of

The Joint Statement correctly applied the FPA's text and history when it rejected arguments that would transform the FPA into an ersatz dormant Commerce Clause law. *See* Joint Statement P 65 n.141, JA0074. Consistent with the discussion above, the Joint Statement explains that there is no case "describ[ing] the FPA's purpose as being primarily about second guessing state policy choices—even 'self-serving' ones—or limiting the effects of state policy choices to instate transactions." *Id.* And because the Commission's task is to regulate the rates and rate practices of public utilities, consistent with the text and context of the FPA's undue discrimination provision, "that is how it should be." *Id.* In short, as has always been understood,

> [t]he Commission's role is to regulate rates and the penumbra of practices that directly affect those rates, not to act as a federal check on the inevitable effects that come when a state in a multi-state market, like PJM, exercises its reserved authority under the FPA. Those interstate effects are part and parcel with the scale, diversity, and other benefits that come with participation in the larger interstate market.

*Id.* Generators' view of FERC as an agency that polices dormant Commerce Clause concerns—an argument that none of the states participating in these proceedings advance—lacks support.

---

electric storage resources . . . in the Regional Transmission Organization and Independent System Operator markets . . .").

Despite P3's claims (P3 Br. 45-46), neither *New Jersey Board of Public Utilities v. FERC*, 744 F.3d 74 (3rd Cir. 2014) (*NJBPU*) nor *New England Power Generators Ass'n v. FERC,* 757 F.3d 283 (D.C. Cir. 2014) (*NEPGA*), supports its case. Each upheld FERC's authority to require the re-setting of generator bids in interstate auctions when FERC reasonably deemed that step necessary to produce just and reasonable rates. Neither announced a sweeping rule that FERC always must find that step necessary or even appropriate. Nor did either case announce that FERC must purge the interstate markets of all out-of-state effects of in-state generation regulation. To the contrary, *NJBPU* and *NEPGA* affirmed what the courts viewed as reasonable exercises of FERC's discretion in regulating wholesale electric rates. And the acceptance of policy choices made by different FERCs and supported by different records does not require the current Commission to leave in place market designs that nullify the impact of state energy policy choices on wholesale rates.

## B. *The FPA's prohibition against undue discrimination does not derive from the dormant Commerce Clause*

EPSA argues (EPSA Br. 38-39) that the phrase "undue discrimination" requires FERC to countermand the effect of state policies on other states because, in 1935, the word "discrimination" was itself "a legal term of art" under the dormant Commerce Clause jurisprudence as it existed at that time. But that position itself runs into problems of both text and history.

The textual problem is profound: EPSA admits (EPSA Br. 41) it seeks to equate two different terms as a single term of art—"undue discrimination" from the FPA and "discrimination" in dormant Commerce Clause jurisprudence—contrary to how statutory interpretation normally works. *See, e.g.*, *Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187, 1193-94 (1st Cir. 1994) (finding significant when Congress "adopts different language" from the alleged term of art). That is particularly so in this context, where (as *Epel* teaches) under the dormant Commerce Clause the terms "discrimination," "undue burden," and "extraterritoriality," refer to wholly separate and distinct concepts. If a reference to "undue discrimination" is EPSA's best argument for turning the FPA into a quasi-dormant Commerce Clause statute for the first time, that is a thin reed indeed.

EPSA's argument is also historically inaccurate. As the Fourth Circuit found a half-century ago, the FPA's prohibition against undue discrimination was not cloned from the dormant Commerce Clause but was instead "closely modeled on the Interstate Commerce Acts [(ICA)], 49 U.S.C.A. § 1 *et seq*." *St. Michaels Utils. Comm'n*, 377 F.2d at 915.[7] The specific ICA corollary to the FPA's prohibition against undue discrimination was ICA section 15(1), which authorized the

---

[7] *See also Nw. Pub. Serv. Co. v. Mont.-Dakota Utils. Co.*, 181 F.2d 19, 22 (8th Cir. 1950) ("[t]he plan or scheme of the Federal Power Act is analogous to that of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq."), *aff'd sub*, 341 U.S. 246 (1951).

Interstate Commerce Commission to regulate rates found to be "unjust or unreasonable or unjustly discriminatory or unduly preferential" with respect to the interstate transportation of goods and passengers. 49 U.S.C. § 15(1) (1934)[8]; *see also* Joel Eisen, *FERC's Expansive Authority to Transform the Electric Grid*, 49 U.C. Davis L. Rev. 1783, 1807 (2016) ("FPA section 206(a), . . . mirrored ICA section 15").

Both statutes prohibited undue discrimination by regulated companies in an effort to "'insur[e] equality of treatment on rates for substantially similar services.'" *St. Michaels Utils. Comm'n.*, 377 F.2d at 915 (quoting *United States v. Chicago Heights Trucking Co.*, 310 U.S. 344, 351 (1940). That the FPA was based on the ICA's prohibition on carrier discrimination thus supports reading the FPA's "undue discrimination" provision as preventing *utilities* from discriminating among similarly situated ratepayers—and provides still more evidence that this provision has nothing to do with mandating FERC to counteract states' intrastate policies.[9]

---

[8] S*ee also* Transportation Act, 1920, ch. 91, § 418, 41 Stat. 456, 484-85 (amending section 15 of the Interstate Commerce Act to provide the language codified at 49 U.S.C. § 15 (1934)) (included in the Statutory Addendum to this brief).

[9] *See also "Complex" Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1012 (D.C. Cir. 1999) (citing *Tenn. Gas Pipeline Co. v. FERC*, 860 F.2d 446, 452 n.9 (D.C. Cir. 1988)); *City of Vernon v. FERC*, 845 F.2d 1042, 1046-47 (D.C. Cir. 1988); *Consol. Edison Co. v. FERC*, 676 F.2d 763, 773 & n.31 (D.C. Cir. 1982).

EPSA's counterargument on this score is unavailing. Faced with the obvious parallels between the language of FPA section 206(a) and ICA section 15(1), EPSA points to a different provision of the ICA as the claimed origin of the FPA's prohibition against undue discrimination. EPSA asserts (EPSA Br. 38-39) that *another* portion of the ICA, 49 U.S.C. § 13(4), does encompass "State-against-State policies." But that separate ICA section concerns the Interstate Commerce Commission's direct regulation of *intrastate* rates—and the FPA has no counterpart provision to section 13(4). Instead, in enacting Part II of the FPA, Congress expressly placed regulation of intrastate transactions beyond FERC's reach. *See* 16 U.S.C. § 824(b)(1) (Except as specifically provided, "[t]he Commission . . . shall not have jurisdiction . . . over facilities used for the generation of electric energy or over facilities used in local distribution *or only for the transmission of electric energy in intrastate commerce*, or over facilities for the transmission of electric energy consumed wholly by the transmitter.") (emphasis added); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016) (*EPSA*) ("[T]he Commission may not regulate either within-state wholesale sales or, more pertinent here, retail sales of electricity (*i.e.*, sales directly to users). State utility commissions continue to oversee those transactions.") (citation omitted).

Generators identify one dormant Commerce Clause case that influenced the passage of Part II of the FPA: *Public Utilities Commission of Rhode Island*

*v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927) (*Attleboro*). But *Attleboro* does not support Generator Petitioner's argument because it is not a "discrimination" case at all. EPSA Br. at 40; P3 Br. at 42. To the contrary, *Attleboro* concerned the state of Rhode Island's *extra-jurisdictional* regulation of an interstate sale of electricity, which the Court concluded was an impermissible "burden on interstate commerce." *Attleboro*, 273 U.S. at 90. As *Attleboro* explained, no state had the authority to regulate the interstate sale because "the paramount interest in the interstate business carried on between the two companies is not local to either [Rhode Island or Massachusetts], but is essentially national in character." *Id*. To the extent that regulation of such sales was necessary, the Court explained, "it can only be attained by the exercise of the power vested in Congress." *Id*.[10] So when Congress acted to fill the regulatory gap uncovered by *Attleboro*, it did so by creating a federal regulatory scheme that regulates the interstate rates charged, and services provided, by "public utilities"—not the conduct of state legislatures. This history provides no basis to think that the FPA's regulatory scheme, with its express focus on the national regulation of public utilities, also addressed the impact of state *intrastate* policies.

---

[10] "In 1927 the Supreme Court held in *Public Utilities Commission v. Attleboro Steam & Electric Co.,* 273 U.S. 83 47 S.Ct. 294, 71 L.Ed. 549 (1927), that only Congress, and not the states, could regulate the sale of electrical power in interstate commerce." *NJBPU*, 744 F.3d at 80.

Unlike *Attleboro*, Generators' discrimination objections are not directed against state efforts to regulate interstate sales, but instead focus on state support for a "prefer[red] . . . generation mix," EPSA Br. 44, a power reserved to the states under the FPA and never prohibited by the dormant Commerce Clause. 16 U.S.C. § 824(b)(1). Just five years after deciding *Attleboro*, the same Court rejected a dormant Commerce Clause challenge to Idaho's power to tax the generation of electricity produced in that state even though the electricity was transmitted for sale in Utah. *Utah Power & Light Co. v. Pfost*, 286 U.S. 165, 177-78, 181-82 (1932) (*Pfost*). The *Pfost* Court explained that the "process of generation is . . . essentially local," even if the electricity is immediately sold in interstate commerce. *Id*. at 181. The FPA carried forward the lines drawn by *Attleboro* and *Pfost*. Congress considered removing state authority over facilities that "produce energy for interstate" wholesale sales, S. Rep. No. 74-621, at 48 (1935), but chose not to "usurp[]" that authority, H.R. Rep. No. 74-1318, at 8 (1935). Instead, it preserved state authority over generation while empowering FERC to regulate wholesale sales. Consistent with this scheme of legislation, neither Congress nor the courts have found that the FPA requires FERC to nullify the out-of-state effects of within state generation laws. As this Court has explained:

> When a state regulates within its sphere of authority, the regulation's incidental effect on interstate commerce does not render the regulation invalid. *Nw. Cent. Pipeline Corp*., 489 U.S. at 514. . . . The states may select the type

of generation to be built—wind or solar, gas or coal—
and where to build the facility. . . . The states' regulatory
choices accumulate into the available supply transacted
through the interstate market. The Federal Power Act
grants FERC exclusive control over whether interstate
rates are "just and reasonable," but FERC's authority
over interstate rates does not carry with it exclusive
control over any and every force that influences interstate
rates. Unless and until Congress determines otherwise,
the states maintain a regulatory role in the nation's
electric energy markets.

*PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 255 (3d Cir. 2014). Thus,

nothing supports Generators' claim that the FPA's undue discrimination provision

was intended to have the effect of prohibiting any out-of-state effects of state

generation laws.

### C. *Generation Petitioners' construction of the FPA as a pseudo dormant Commerce Clause is not administrable.*

Generators' interpretation of the undue discrimination prohibition is not just

atextual and ahistorical. It is also contradictory and unworkable.

States that enact policies to address greenhouse gas emissions and those that

do not do so are each making policy choices that impact the market, and those

policies may have downstream impacts beyond their respective borders.[11] As

EPSA acknowledges, "'underlying all the relations of the states to each other, is

---

[11] Indeed, there are a myriad of state generation policies that indirectly impact
regional wholesale markets. Generators claim that FERC must favor those states in
PJM that have restructured their markets and rely on retail competition at the
expense of those states that have maintained a traditional reliance upon vertically
integrated utilities and exclusive service area franchises.

that of equality of right. Each stands on the same level with all the rest.'" EPSA Br.

35 (quoting *Kansas v. Colorado*, 206 U.S. 46, 97 (1907)). The same is true under

the FPA: every state enjoys the right to "control . . . in-state 'facilities used for the

generation of electric energy,'" *Hughes v. Talen Energy Marketing LLC*, 578 U.S.

150, 154 (2016) (quoting 16 U.S.C. § 824(b)(1)), including "questions of need . . .

and other related state concerns," *Pac. Gas & Elec. Co. v. State Energy Res.*

*Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983). There is no basis (in the

text of the FPA or otherwise) for mandating special treatment for one set of state

resource decisions and not others, yet that is what Generators propose that FERC

must do.

Assigning this job to FERC would place it in an impossible position. As the

Joint Statement explained, requiring that the Commission pick and choose the state

policies that are acceptable for purposes of wholesale market design is a "futile

quest":[12]

> In using the MOPR to block the economic effects of state
> policies from flowing through to the capacity market, the
> Commission embarked on an arbitrary and ultimately
> futile quest to neutralize the indirect but inevitable effects
> of state policies, arrogating to itself the role that
> Congress reserved for the states. That is true even where
> the Commission claims that its only "policy" is to block
> the effects of state policies, not the state policies
> themselves. After all, a federal policy of eliminating the

---

[12] Joint Statement P 19, JA0048.

> effects of state policies is itself a form of public policy—
> just not one that Congress gave the Commission
> authority to pursue.

*Id*. The same concerns were raised several years ago by then-FERC Chairman Bay,

who observed that efforts to "mitigate" the interstate-market effects of valid state

regulations "suffer[] from a troubling lack of coherence that calls into question the

soundness of [the] underlying rationale." *N.Y. State Pub. Serv. Comm'n v. N.Y.

Indep. Sys. Operator*, *Inc.*, 158 FERC ¶ 61,137, at 61,865 (2017) (Bay, Comm'r,

concurring), *on reh'g*, 170 FERC ¶ 61,120, *on reh'g*, 173 FERC ¶ 61,022,

*clarified*, 171 FERC ¶ 61,114 (2020).

In an interstate market, market outcomes will inevitably reflect the supply

and demand effects of the policies of all participating states. The decision to

participate in an interstate market is to accept that one's economic fortunes will be

influenced by the policy decisions of all the states in that market. Those states

adopting policies that create demand for clean energy will necessarily promote the

addition of new renewable resources.[13] States that promote the extraction, delivery,

---

[13] Some states have enacted cap-and-trade programs to limit emissions and force producers to internalize more of the cost of burning fossil fuels. FERC routinely allows generators subject to such laws to include in their wholesale market bids the costs of securing needed emissions allowances—a step that increases market clearing prices. Generators P3 and EPSA do not contend that FERC must nullify the effects of State laws that increase market prices, only those that reduce them.

and consumption of fossil fuels affect the market just as profoundly.[14] That is the natural interplay of the collaborative federalism at the heart of the FPA.

## II. EVEN UNDER THE GENERATORS' DISCRIMINATION FRAMEWORK, THEIR DEMANDS FAIL ON THE MERITS.

Even if this Court finds the FPA does encompass dormant Commerce Clause concerns, Generators' claims would still fail.

### A. The Focused MOPR does not allow one state to direct the energy policies of another.

Generators acknowledge that the PJM states can set their own generation policies, but claim that FERC must mitigate any impact those choices may have on the region-wide capacity prices. Absent mitigation, EPSA says that the Focused MOPR will "ultimately push" non-sponsoring states "either to subsidize their own

---

[14] According to one recent report, Pennsylvania provided $3.8 billion in fossil fuel subsidies in fiscal year 2019 through tax credits and other forms of tax relief, while allowing the industry to escape responsibility for $11.1 billion of costs imposed on the state and its residents. Emily Persico et al., *Buried Out of Sight: Uncovering Pennsylvania's Hidden Fossil Fuel Subsidies* 2 (Feb. 2021), https://www.pennfuture.org/Files/Admin/PF_FossilFuel_Report_final_2.12.21.pdf (last visited Aug. 2, 2022). Ohio ratepayers are anticipated to pay an estimated $1.8 billion in subsidies through 2030 to support two coal plants pursuant to state law HB6. Jeremy Pelzer, *Ohioans Still Paying Massive Coal Plant Subsidies Under House Bill 6*, Cleveland.com (Oct. 9, 2021), https://www.cleveland.com/open/2021/10/ohioans-still-paying-massive-coal-plant-subsidies-under-house-bill-6.html.

preferred generators simply to keep pace, or to allow otherwise economic generators to retire prematurely." EPSA Br. at 44.[15]

This claim does not withstand scrutiny. On its face, the Focused MOPR neither imposes nor facilitates extraterritorial mandates. Each of the PJM states is free to exercise its individual authority, preserved under FPA section 201 and confirmed by the courts, to adopt generation policies preferred by their respective citizenry. 16 U.S.C. § 824(b)(1). Far from efforts to "intrude upon other States' jurisdiction" through the "abus[e of] FERC-regulated markets," P3 Br. 43, state-enacted clean energy programs represent sovereign-specific decisions about how much of a generation-related product consumers must buy to accomplish a policy goal within that sovereign's jurisdiction.[16] Those state determinations are

---

[15] Generators ignore that fossil fueled resources have for decades enjoyed hundreds of billions in governmental subsidies. Joint Statement P 57 n.123, JA0069. *See also* Sylwia Bialek & Burcin Unel, N.Y.U. School of Law Inst. for Pol'y Integrity, Electricity Policy Insights, *Capacity Markets and Externalities: Avoiding Unnecessary and Problematic Reforms* 6 (Apr. 2018), https://policyintegrity.org/files/publications/Capacity_Markets_and_Externalities_Report.pdf ("[M]arket outcomes are not efficient when market transactions fail to take into account the cost of damage they cause to third parties through a 'negative externality.'") One might fairly describe the extensive subsidies given to fossil-fueled resources as an important contributor to the need for corrective clean-energy subsidies. *Id.* at 7 ("[P]olicy makers can address negative externalities by subsidizing resources that do not produce the externality . . . . [C]orrective subsidies . . . are an important and desirable tool for policymakers [and] are clearly distinguishable from 'traditional' rent-seeking subsidies . . . .").

[16] The citation by both P3 (P3 Br. 43) and EPSA (EPSA Br. 34) to *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) is inapposite. The Supreme Court there struck a

shaped by myriad factors other than PJM capacity prices, including retail regulatory structures, transmission access, fuel availability, technological advances, environmental considerations, and resource preferences. And these policy choices create demand—including for emission-free generation.[17] Suppliers with generation resources that can satisfy that demand earn revenue for doing so, which in turn reduces their net cost and competitive offer price to supply capacity in the PJM auction. Joint Statement P 43, JA0060.

The Joint Statement correctly explains that "indirect cross-border price effects are an inevitable consequence of any form of state regulation. The reality is that states in an interstate market cannot be wholly insulated from legally valid policy choices of other states." Joint Statement P 63, JA0073. The Statement goes on to explain that "[t]he FPA requires the Commission to ensure 'just and reasonable' rates, not eliminate any factor that could reduce prices or be labelled 'price suppression.'" *Id.* P 65, JA0074.

---

state punitive damage award as excessive, finding that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id*. at 572. Nothing of the kind is going on here. For example, Maryland can make its own decisions about energy policy, but its choices do not dictate the actions to be taken by Illinois or Ohio—or vice-versa. The Focused MOPR does not change the reality that the PJM states are "co-equal sovereigns." EPSA Br. 35.

[17] The Joint Statement (P 74, JA0080) notes that "[m]any legitimate actions can take the form of providing additional revenue to an owner of generation, including paying them for products or attributes other than capacity—which is exactly what PJM contends non-conditional state support should be treated as."

**B.  The Focused MOPR does not discriminate against states that rely upon competitive markets.**

PJM is a regional transmission organization built upon the foundation of open-access transmission set out in Order No. 888, FERC's seminal rule to open the electric power industry to competition. As the Commission there explained, "all power generation technologies have different costs," and "sellers come to the power markets with a variety of advantages and disadvantages" conferred by state and federal law. Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, 75 FERC ¶ 61,080, FERC Stats. & Regs. at 31,890, *clarified*, 76 FERC ¶ 61,009 (1996), *modified*, Order No. 888-A, 78 FERC ¶ 61,220, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part and remanded in part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). Promoting wholesale competition requires market rules that are fair and non-discriminatory. It does not require that FERC nullify the wholesale market effect of economic benefits and burdens created by other laws.[18] This is particularly true of benefits and burdens resulting from state or

---

[18] *Id.* at 31,901 (Hoecker, Comm'r, concurring): "[S]tate authority is traditionally employed to ensure that power production conforms to local economic,

local laws regarding environmental protection. At the same time that Congress acted to open the wholesale electric industry to competition in the Energy Policy Act of 1992, Congress directed that "[n]othing in this title shall be construed as affecting or intending to affect, or in any way to interfere with, the authority of any State or local government relating to environmental protection or the siting of facilities." Energy Policy Act of 1992, Pub. L. No. 102-486, § 731, 106 Stat. 2776, 2921.

Generators' challenge to the Focused MOPR seeks to turn competition law upside down by protecting a favored group of competitors—incumbent carbon-emitting merchant generators—at the expense of competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).[19] P3 contends that the Focused MOPR discriminates against states that rely upon competitive price signals to attract

---

environmental, and resource diversity policy preferences. . . . To the extent that state requirements to own or purchase a certain amount of generation from, say, renewable source are enshrined in utility supply portfolios, those states have direct influence on the economic and environmental consequences of energy consumption in that jurisdiction. Moreover, such requirements ought to be compatible with open access transmission. However, it will be important that state authority over resource procurement be exercised on a not unduly discriminatory basis. In other words, a PUC may not treat in-state and out-of-state suppliers differently. If access over the network is non-discriminatory in nature, the federal regulatory and constitutional interests are arguably satisfied.").

[19] *See also* Joint Statement P 62, JA0071-0072 ("the Commission's role is to ensure just and reasonable rates, not protect individual competitors or particular business models") (citing *El Paso Elec. Co. v. Sw. Pub. Serv. Co.*, 68 FERC ¶ 61,182, at 61,939 n.41 (1994)).

sufficient supply. To the contrary, the Focused MOPR sends accurate price signals that reflect the realities of the costs associated with capacity available to serve market needs. And while implementation of the Focused MOPR may change the region's going-forward resource mix, there is nothing anti-competitive about that. The structure reflects the exercise of state prerogatives, and allows for generator market participation that reflects the specific attributes, advantages, and disadvantages that each resource brings to the market.

More broadly, the addition of appropriately lower-cost supply facilitated by the Focused MOPR is inherently pro-competitive. The revenues that generators earn for producing greenhouse-gas-emission free electricity are indistinguishable as a matter of law from other out-of-market generation revenues such as the sale of steam heat or coal ash. As explained in the Joint Statement (P 7, JA0039), "[w]here a capacity offer is low for legitimate rather than anti-competitive reasons, artificially raising that offer *hurts* competition, potentially pushing the offeror out of the market and forcing capacity prices above the competitive level."

### C.     The Focused MOPR is consistent with precedent.

The Focused MOPR's treatment of state-sponsored generation is in accord with the FPA's preservation of state authority to regulate the generation and retail sale of electric energy and with decisions of the Supreme Court and the courts of appeals, which hold that when a state acts within the scope of its reserved statutory

authority, the resulting impacts on wholesale prices are incidental, and do not count as an actionable distortion, let alone a discriminatory burden on interstate commerce. Joint Statement P 65, JA0074.

As noted above, in the 1920s and '30s, the Supreme Court held states powerless to set rates for interstate electricity sales, *Attleboro*, 273 U.S. at 90, but upheld state authority to tax the generation of electricity even though the energy would be sold out of state, *Pfost*, 286 U.S. at 177-78, 181-82. Congress considered displacing state authority over facilities that produce energy for interstate sales, but decided instead to preserve it. S. Rep. No. 74-621, at 48 (1935); H.R. Rep. No. 74-1318, at 8 (1935). Thus, the FPA gives FERC authority over interstate transmission and sales for resale of electric energy, but not over "facilities used for the generation of electric energy" unless "specifically provided." 16 U.S.C. § 824(b)(1). The FPA also preserved state authority to regulate "other sale[s] of electric energy," *id*., including retail sales to end users. *EPSA*, 577 U.S. at 264.

In drawing these lines, Congress knew that the interlocking state and federal fields were not "hermetically sealed" (*id.* at 281), and that actions in each would affect conditions in the other. Even so, Congress drew the statute "'with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 384-85 (2015) (quoting *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507,

517-518 (1947)). Thus, the Supreme Court has made clear that states "may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain." *Hughes,* 578 U.S. at 164. And consistent with this precept, dormant Commerce Clause challenges predicated upon the impact of statutorily reserved state authority on FERC-regulated markets have routinely failed.

In *Northwest Central*, the Supreme Court rejected claims that Kansas's effort to regulate natural gas production, though authorized by the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, nonetheless ran afoul of the dormant Commerce Clause because of the regulation's admitted impact on wholesale prices.[20] The Court explained:

> [w]e are not prepared to render meaningless Congress' sweeping saving of power over production to the States by holding that a regulation . . . aimed at producers [under state jurisdiction] . . . *per se* violates the dormant Commerce Clause because purchasers have to take it into account in deciding whence to take gas and may as a result increase takes from in-state producers.

489 U.S. at 524.

---

[20] Cases under the Natural Gas Act and the Federal Power Act typically are read *in pari materia*—that is, in the same way when they involve similar provisions. *See, e.g., Ark.-La. Gas Co. v. Hall,* 453 U.S. 571, 577 n.7 (1981) (noting that courts have an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes").

The Seventh Circuit reached the same conclusion in *Star*, where it rejected a claim (brought by Petitioner EPSA and others) that an Illinois program to support certain nuclear units discriminated against FERC-regulated interstate transactions:

> Plaintiffs observe that the credits are bound to help some Illinois firms and contend that this condemns them. But this amounts to saying that the powers reserved to the states by § 824(b)(1) are denied to the states by the Constitution, because state regulatory authority is limited to the state's territory. On this view, whenever Illinois, or any other state, takes some step that will increase or reduce the state's aggregate generation capacity, or affect the price of energy, then the state policy is invalid. That can't be right; it would be the end of federalism. The Commerce Clause does not "cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, [just because] the legislation might indirectly affect the commerce of the country."

904 F.3d at 524-25 (quoting *Gen. Motors Corp.*, 519 U.S. at 306).[21]

The Second Circuit subsequently reached the same conclusion concerning a Commerce Clause challenge to the FERC market impacts of a similar nuclear plant support program adopted by New York. The Second Circuit upheld the program because that was a permissible "incidental effect resulting from New York's regulation of producers." *Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 57 (2d Cir. 2018) (*Zibelman*).

---

[21] Similarly, the Seventh Circuit observes: "[f]or decades the Supreme Court has attempted to confine both the Commission and the states to their proper roles, while acknowledging that each use of authorized power necessarily affects tasks that have been assigned elsewhere." *Id.* at 523.

The cases display a consistent recognition that intrastate generation regulation produces natural and permissible incidental effects on interstate markets. There is no reason to invent a FERC obligation to negate those effects.

### D. The Focused MOPR does not discriminate against merchant generators.

P3 contends that its members have a statutory right to be protected against competition from state-sponsored resources. P3 Br. 39. But it cannot identify anything in the FPA that supports this position, and the Joint Statement correctly rejects it:

> [W]e disagree with arguments that this supposed "artificial price suppression" leads to undue discrimination against unsubsidized resources. All resources receiving a capacity supply obligation generally receive the same capacity market clearing price. To the extent that certain resources may receive more or less total compensation *due to* payments from states, they would not be similarly situated for the purposes of the FPA.

Joint Statement P 57 n.117, JA0068. This is correct because the markets for generation attributes and wholesale capacity are separate and distinct.[22]

---

[22] The wholesale capacity market is a commodity market, and the source of the capacity is irrelevant as long as the supplier satisfies its obligations. "'[C]apacity' [is] . . . the ability to produce electricity." *In re NTE Conn., LLC*, 26 F.4th 980, 984 (D.C. Cir. 2022). By comparison, states control *how* electricity is produced. Electric generation varies by fuel type, environmental impacts, and siting considerations. States can compensate generators for producing non-greenhouse-gas-emitting electricity and these attribute payments are separate from the wholesale capacity market. As the district court explained in upholding New

The resources selling capacity in the FERC-regulated auctions may be similarly situated in their ability to provide capacity. But there is no undue discrimination in the wholesale market because the resources' capacity sales are subject to the same rules and, if the resources clear, they receive the same price for their capacity sales. The question here is whether the rules for the FERC-regulated market must try to nullify (some of) the ways in which state policies affect different resources' costs and revenues. The answer is "no." Nor is there any reason to set FERC on such a quixotic course, marring the FPA's cooperative federalism scheme by requiring FERC to pick which state policies to promote and which to negate and bringing it into constant conflict with the states.

While resources may be similarly situated to provide capacity, they are *not* similarly situated in their ability to provide other needed products or services such as energy and ancillary services regulated by FERC or environmental attributes regulated by the states. Under FERC's market design, capacity offer prices are the residual amounts that resources need to be profitable *above* the amounts available to them for selling other products and services. There is no reason to treat state-

---

York's program to provide zero-emission credits (ZECs) for the generation of clean energy, "the ZEC sales and the wholesale sales of energy or capacity are entirely separate transactions, with the ZEC sales occurring independently of the wholesale auction and neither one conditioned on the other." *Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp.3d 554, 572 (S.D.N.Y. 2017), *aff'd*, 906 F.3d 41 (2d Cir. 2018).

regulated environmental revenue differently from FERC-regulated ancillary-service revenue.

Those resources in the state generation market that receive revenues for producing electricity without emitting greenhouse gases are different from those resources that receive no such payments because they emit greenhouse gases. Nothing in the FPA requires FERC to disfavor those state-sponsored resources that come to the capacity market with the advantage of these environmental revenues, in order to benefit those resources that have failed to produce clean energy and not earned similar revenues.

Contrary to P3's claimed entitlement to protectionism, the relevant appellate case law rejects its position and makes clear that "courts have upheld Commission approvals of both expansion and contraction of buyer-side market power protections in particular RTO/ISO capacity markets." Joint Statement P 71 & nn.155-57, JA0078 (discussing case law) (footnotes omitted). Indeed, it is unsound to equate state sponsorship of desired generating resources with the exercise of buyer-side market power for the simple but irrefutable reason that the states are not acting as wholesale buyers.[23]

---

[23] The dissent "does not even engage with PJM's reasoning for concluding that the sovereign act of a state to adopt legally valid policies are not the equivalent of buyer-side market power." Joint Statement P 73, JA0080. In a White Paper issued prior to his dissent, Commissioner Danly conceded that "[i]t is of course true that states do not directly purchase power." *Danly Office White Paper: The*

## III. THE COMMISSION'S ACCEPTANCE OF THE FOCUSED MOPR AS JUST AND REASONABLE IS NOT CONTRARY TO LAW OR ARBITRARY AND CAPRICIOUS.

While both FERC and other intervenors have ably discussed why approval of the Focused MOPR was just and reasonable, the State Entities highlight a few points relating to their well-established authority and experience under the FPA.

*First*, the FPA's "just and reasonable" provision does not impose on FERC a statutory obligation to negate the indirect effects on wholesale markets of the states' regulation of generation. After all, the FPA expressly reserves to states authority over generation, 16 U.S.C. § 824(b)(1), which necessarily affects power generators' decisions about the prices at which they sell power or capacity, and thus necessarily also indirectly affects wholesale markets. *See EPSA*, 577 U.S. at 281 ("It is a fact of economic life that the wholesale and retail markets in electricity, as in every other known product, are not hermetically sealed from each other."); *Zibelman*, 906 F.3d at 57. Nor is this an abstract point—as described in the Joint Statement, many PJM states have adopted policies to promote renewable and emission-free generation, consistent with their authority. *See* Joint Statement PP 50-52 & n.102, JA0063-0066. And this all makes sense in light of the FPA's aim, which was to "assur[e] an abundant supply of electric energy throughout the

---

*Requirement That Competitive Markets Be Protected from the Exercise of Market Power Applied to RTO Capacity Markets. Supplement* at 1 (June 17, 2021), https://www.ferc.gov/media/white-paper-commissioner-james-danly-requirement-competitive-markets-be-protected-exercise.

33

United States with the greatest possible economy," 16 U.S.C. § 824a, not to undermine the states' own generation policies. FERC Br. 91-99; Joint Statement P 79, JA0083.

Not only does the Focused MOPR best respect the FPA's statutory allocation of authority between state and federal governments, but it also allows FERC to avoid making thorny decisions about where, and how, to counteract a diverse array of state generation policies. Indeed, because the FPA does not require FERC to counteract the indirect economic effects of state policies on wholesale markets, FERC does not need to engage in any "arbitrary and burdensome line-drawing" exercise to decide which state policies (including tax benefits) are valid and which are not—that exercise neither respects longstanding state authority nor promotes administrability. *See* Joint Statement P 57, JA0068 (acknowledging that, in approving Expanded MOPR, FERC had "created exemptions for a whole host of policies, without explaining why some policies 'suppress' wholesale prices, while others do not") (footnote omitted). That leaves FERC free to instead appropriately focus on the proper fundamentals—namely, "ensuring resource adequacy at least-cost." *Id.* P 79, JA0083. The Focused MOPR does so. *Id.* PP 3, 62, 82, JA0037, JA0071, JA0085. Petitioners do not even argue that the Focused MOPR will fail to do so. As FERC notes, "[t]he Generators advance no reliability argument . . . ."

FERC Br. 98.[24] Such an argument would fail in any event because nothing in the record overrides the Joint Statement's contrary findings (P 62, JA0071), including, that PJM's implementation of its new Electric Load Carrying Capacity accreditation construct will "ensure that PJM has adequate capacity as the resource mix changes." *Id.* P 82, JA0085.

*Second*, while the Commission has sometimes decided to counteract the effect of state policies, its decisions are not a straitjacket. The Commission is free to change its mind and adopt a new policy—so long as FERC acknowledges that it is doing so and justifies the change. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."). FERC has done so here. As the Joint Statement explains, "[t]he Focused MOPR . . . rights the wrongs created by the Commission's most recent orders on the topic, which imposed on PJM an 'Expanded MOPR.'" Joint Statement P 2, JA0037. The Expanded MOPR

---

[24] State Petitioners are jurisdictionally barred from claiming that FERC's failure to counteract the impact of sponsored resources will cause "electric reliability [to] suffer[] because capacity is underbuilt," State Pets. Br. 26, because they failed to raise it on rehearing with the "specificity" required by statute, and instead made only a general cross-reference to their prior pleading. R.131, at 17, JA1828. *See generally Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (pursuant to 16 U.S.C. § 825*l*(b) "[p]etitioner[] must raise each argument with 'specificity,'; objections may not be preserved either 'indirectly,' or 'implicitly.'") (citations omitted). In any event, the Joint Statement rejects this contention. Joint Statement PP 62, 82, JA0071, JA0085.

"created a Byzantine system of administrative pricing—unprecedented in both scope and complexity—that would have imposed on consumers billions of dollars in unjustified costs . . . ." *Id.* The Focused MOPR "restores PJM's MOPR to its original purpose: eliminating the incentive that large net buyers of capacity may have to take uneconomic action to decrease capacity prices." *Id.* P 3. Petitioners' challenges fail as FERC has acknowledged its policy change and has provided a reasoned basis for it.

FERC's decision to adopt a new policy that appropriately preserves the states' FPA authority and avoids administrability problems is consistent with its established discretion to formulate just and reasonable wholesale tariffs based on a balancing of different affected interests. *See* FERC Br. at 90-91; *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 532 (2008) (explaining that what constitutes a just and reasonable rate "is obviously incapable of precise judicial definition," and so courts "afford great deference to the Commission in its rate decisions"); *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 256 (D.C. Cir. 2007) (agreeing that "'matters of rate design are technical and involve policy judgments at the core of FERC's regulatory responsibilities") (quoting *Me. Pub. Utils. Comm'n v. FERC,* 454 F.3d 278, 287 (D.C. Cir. 2006)); *NJBPU*, 744 F.3d at 109 (same); Joint Statement P 71, JA0078-0079 (noting courts defer to FERC's decisions on how to balance "competing

interests," even when it "strik[es] a different balance" over time in response to evolving "assessments of competing interests").

Petitioners' contrary view turns on a mistaken reading of FERC decisions and case law reviewing those decisions. Petitioner cannot identify a single case holding that the FPA actually *requires* FERC to counteract states' policies regulating power generation, and a wealth of FERC decisions are to the contrary. *See NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 23 (D.C. Cir. 2018) (*NextEra*) (compiling cases approving FERC support for and mitigation of state subsidies); *Zibelman*, 906 F.3d at 56; Joint Statement PP 8, 71, 72, JA0040, JA0078-0080. In reality, FERC's decisions expressly and repeatedly respect the states' authority over generation, including their creation of programs to create demand and revenue for eligible resources' clean-energy attributes. *See, e.g., WSPP Inc.*, 139 FERC ¶ 61,061 (2012) (disclaiming jurisdiction over renewable energy certificates sales unbundled from wholesale energy sales); *Edison Elec. Inst.*, 69 FERC ¶ 61,344 (1994); *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, at 62,080 (1995), *overruled in part on other grounds sub nom. Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, P 30 (2010); Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, Order No. 1000, 136 FERC ¶ 61,051, PP 109, 111 (2011), *reh'g denied*, Order No. 1000-A, 139 FERC ¶ 61,132, *on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *review denied*

*sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (per curiam).

As FERC (FERC Br. at 90-91), the other intervenors supporting FERC (PJM and Supporting Stakeholders Br. at 45-47, 51, 55), and the Joint Statement (P 71, JA0078) appropriately explain, Petitioners' own cases have never held that the FPA requires FERC to insulate wholesale markets from the economic effects of all state policies that support certain types of generation. Their reliance on *NJBPU* and *NEPGA* (P3 Br. at 44-46; EPSA Br. at 46; IMM Br. at 4, n.5) is therefore misplaced. *See generally NextEra*, 898 F.3d at 20-25. In particular, *NJBPU* reflected a decision by FERC to embark on a change from a prior policy and rescind a prior exemption for certain resources. *See* 744 F.3d at 98 (considering whether FERC adequately justified rescinding exemption it previously deemed just and reasonable). And this Court's acceptance of that particular change in no way prevents the agency from changing policy in the future, as this Court made clear. *See id.* at 100 ("Courts have repeatedly held that an agency may alter its policies despite the absence of a change in circumstances."). Indeed, that provides the critical context for understanding this Court's observation that the States affected there were "free to make their own decisions regarding how to satisfy their capacity needs, but they '[would] appropriately bear the costs of [those] decision[s],' including possibly having to pay twice for capacity." 744 F.3d at 97

(quoting *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009)) (citation omitted). Far from holding that the FPA requires mitigation, as Petitioners suggest, this Court was doing no more than explaining why FERC *could* adopt the particular mitigation policy it chose, not holding that it *must* do so, much less do so in perpetuity.

*Third*, the Joint Statement's explanation of the merits of this new policy was sensible and consistent with the interests of states and consumers. FERC correctly understood the Focused MOPR does not *cause* auction price "distortion" for states and consumers in the PJM area, but instead *avoids* the distortions caused by a more expansive mitigation protocol that require wholesale customers to pay higher prices for unnecessary capacity. Indeed, in its submission to FERC proposing the Focused MOPR, PJM had explained in detail why expansive mitigation does not work:

> if, due to the extensive scope of the [Expanded] MOPR, capacity prices do not reflect actions taken by states and by Self-Supply Entities to support resources that the Expanded MOPR excludes from the auction, then capacity prices will incentivize resources to be built that are not needed to maintain reliability. If the entities taking these actions remain in the capacity market, the market will produce prices that do not reflect actual supply and demand fundamentals. If investors respond to such inaccurate price signals, the results will be systematic over-procurement.

R.2, Transmittal Letter at 11, JA0181. Indeed, PJM's initial FERC filing included

testimony from PJM's Senior Director of Economics, who elaborated on the benefits of a Focused MOPR to consumers, explaining that allowing auction prices to reflect fully the impact of state subsidies:

> should not be interpreted as a harmful secondary impact of one state's policies on other states. Rather, the reduction in prices is a natural consequence of the PJM market appropriately reflecting state policies and customer preferences for certain types of resources. Such state subsidies only lower total costs for consumers in other states.

R.2, attach. E, ¶ 17 n.3 (Graf Aff.), JA0404. For this reason, reverting to the Expanded MOPR, which under section 205 was the alternative to allowing the Focused MOPR to take effect, means "'more resources and more expense for consumers.'" *Id.* Transmittal Letter at 11 (quoting R.2, attach. C ¶ 74 (Cranston Aff.), JA0371.

The Joint Statement likewise made a series of findings that are in accord. As FERC explained, the Expanded MOPR worked against clean-energy resources by preventing them from clearing the capacity market. *See* Joint Statement PP 10-12, JA0042-0044. Despite these efforts, states would not abandon their clean energy policies, meaning those clean-energy resources will still be there to provide resource adequacy to the PJM system. As a result, the market would send inaccurate signals to generators, "imped[ing] the basic purpose of the capacity market." *Id.* P 54, JA0066. These signals would cause a ripple effect that harms

scarcity pricing in related PJM markets. *Id.* PJM and FERC would be unable to rely on the markets to produce efficient outcomes, and the markets would procure more resources than needed to meet demand. *Id.* P 14, JA0045. Moreover, the Expanded MOPR would have a real and direct effect on consumer prices because state-supported resources are able to offer reliability to the market at a lower cost than the alternative. The Joint Statement finds that the Expanded MOPR would force consumers to pay $1.0-2.6 billion annually for redundant capacity—a number that could rise to $3.4 billion by 2030. *Id.* P 50, JA0063-0064. The Focused MOPR thus "avoid[s] the significant drawbacks of Expanded MOPR," *id.* P 46, JA0061, and this efficient market will help lower costs for all consumers in PJM, not just in those states with clean-energy programs. *Id.* P 63, JA0073. That is quintessentially just and reasonable because the FPA aims "to protect power consumers against excessive prices." *Pa. Water & Power Co.* v. *FPC*, 343 U.S. 414, 418 (1952).

*Finally*, the Commission's approval of the Focused MOPR does not stand in a vacuum. Consistent with the acceptance of PJM's Focused MOPR proposal, the Commission has more recently approved (through majority-voted orders) revisions to buyer-side mitigation protocols in New York and New England that similarly allow generators who receive state revenues to take them into account in developing their capacity market bids. *See N.Y. Indep. Sys. Operator, Inc.*, 179

41

FERC ¶ 61,102 (2022); *ISO New England Inc.*, 179 FERC ¶ 61,139 (2022). No generator (including EPSA, a party to the proceeding) protested the revisions in New York, and in New England, the New England Power Generators Association supported those changes. *See* Comments of New England Power Generators Association, *ISO New England Inc*., No. ER22-1528-000 (Apr. 21, 2022), eLibrary No. 20220421-5259. Unless PJM is to stand alone—such that FERC has to counteract state generation policies by New Jersey but not by Connecticut—then the acceptance of PJM's analogous change should be affirmed.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Respondent's FERC Brief, and the brief of Intervenors PJM Interconnection, L.L.C. and Supporting Stakeholders, the Court should deny the petitions.

Respectfully submitted,

Matthew J. Platkin
Acting Attorney General of New Jersey

*/s/ David Apy*

David Apy
Assistant Attorney General
R.J. HUGHES JUSTICE COMPLEX
25 Market Street, P.O. Box 112
Trenton, N.J. 08625
Tel. (609) 815-2278

*Attorneys for the New Jersey Board of Public Utilities*

*/s/ Scott H. Strauss*

Scott H. Strauss
Peter J. Hopkins
Jeffrey A. Schwarz
Amber L. Martin Stone
SPIEGEL & MCDIARMID LLP
1875 Eye Street NW, Suite 700
Washington, DC 20006
Tel. (202) 879-4000

*Attorneys for New Jersey Division of Rate Counsel, Office of the People's Counsel for the District of Columbia, Maryland Office of the People's Counsel, and Delaware Division of the Public Advocate*

H. Robert Erwin, Jr.
General Counsel

*/s/ Miles H. Mitchell*

Miles H. Mitchell
Deputy General Counsel
William Donald Schaefer Tower
6 St. Paul Street, 16th Floor
Baltimore, MD 21202
Tel. (410) 767-2972
Ransom E. Ted Davis
Associate General Counsel
Tel. (410) 767-8076

*Attorneys for Public Service Commission of Maryland*

Kwame Raoul
Attorney General of the State of Illinois

*/s/ Sarah A. Hunger*

Sarah A. Hunger
Deputy Solicitor General
OFFICE OF THE ILLINOIS ATTORNEY
  GENERAL
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
Tel. (312) 814-5202

*Attorneys for*
*the People of the State of Illinois*
*Illinois Commerce Commission*

September 9, 2022

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the under-signed counsel certifies that this brief:

(i)    complies with Rule 32(a)(7)(B) and the briefing schedule approved by this Court (*see* Dkt. 101, 104) because it contains 10,331 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f), and Respondent-Intervenors' briefs collectively contain fewer than 26,000 words;

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 365 and is set in Times New Roman in a size equal to 14-point font; and

(iii)    complies with L.A.R. 31.1(c), because the text of this electronic brief is identical to the text of the paper copies.

Dated: September 9, 2022                            */s/ Scott H. Strauss*

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to the requirement in L.A.R. 28.3(d), I, Scott H. Strauss, certify that I am a member of the bar of this Court.

Dated: September 9, 2022                                      */s/ Scott H. Strauss*

**VIRUS CERTIFICATION**

In accordance with L.A.R. 31.1(c), the foregoing brief has been scanned and determined to be virus free using Webroot SecureAnywhere.


Dated:  September 9, 2022                    */s/ Scott H. Strauss*

# STATUTORY ADDENDUM

# TITLE 49.—TRANSPORTATION

Chap.                                          Sec.
1. Interstate Commerce Act.................................... 1
2. Legislation supplementary to "Interstate Commerce Act"...... 41
3. Termination of Federal Control............................ 71
4. Bills of lading........................................... 81
5. Inland waterways transportation.......................... 141
6. Air commerce............................................. 171
7. Coordination of interstate railroad transportation....... 250

## Chapter 1.—INTERSTATE COMMERCE ACT

Sec.
1. Regulation in general; car service; alteration of line.
   (1) Carriers subject to regulation.
   (2) Transportation subject to regulation.
   (3) Definitions.
   (4) Duty to furnish transportation and establish through routes; division of joint rates.
   (5) Just and reasonable charges required; classification of messages and rates; exchange of services.
   (6) Classification of property for transportation; regulations and practices.
   (7) Free transportation for passengers prohibited; exceptions; penalty.
   (8) Transportation of commodity manufactured or produced by railroad forbidden.
   (9) Switch connections and tracks.
   (10) "Car service" defined.
   (11) Duty to furnish car service; rules and regulations.
   (12) Distribution of coal cars; failure to prorate; penalty.
   (13) Rules and regulations as to car service to be filed, etc.
   (14) Establishment by commission of rules, etc., as to car service.
   (15) Powers of commission in case of emergency.
   (16) Rerouting of traffic on failure of initial carrier to serve public.
   (17) Directions of commission as to car service; disobedience; rights of States.
   (18) Extension or abandonment of lines; certificate required.
   (19) Application for certificate of commission; notice and hearing.
   (20) Issuance of certificate by commission; unlawful extension or abandonment of lines.
   (21) Power of commission to require adequate facilities or extension of line; penalty.
   (22) Construction, etc., of spurs, switches, etc., within State.
2. Special rates and rebates prohibited.
3. Preferences; interchange of traffic; terminal facilities.
   (1) Undue preferences or prejudices prohibited.
   (2) Payment of freight as prerequisite to delivery.
   (3) Interchange of traffic.
   (4) Terminal facilities; use of and compensation for.
4. Long and short haul charges; competition with water routes.
   (1) Charges for long and short hauls and on through route.
   (2) Competition of railroads with water routes; change of rates.
5. Combinations and consolidations of carriers.
   (1) Pooling; division of traffic or earnings.
   (2) Consolidation of railroads into limited number of systems.
   (3) Tentative plan of consolidation; hearings; adoption and publication.
   (4) Consolidation by agreement; purchase, lease, operating contract, or acquisition of control.
   (5) Control by corporation not a carrier; when considered a "carrier."
   (6) Control effected by other than prescribed methods forbidden.
   (7) Transactions deemed to effectuate control or management.
   (8) Affiliation with a carrier; conditions deemed to constitute.
   (9) "Control" construed.
   (10) Investigations by Commission of violations of provisions relating to consolidation, control, etc.
   (11) Investigation of effect of holding stock of carrier as affecting control; restricting voting power.
   (12) Suspension of proceedings on opening consolidation plan for modification.
   (13) District courts invested with injunctive and mandatory jurisdiction.
   (14) Supplemental orders.
   (15) Carriers affected relieved from antitrust laws, etc.
   (16) Separability clause.
   (17) "Person" and "carrier" defined.

Page 2211

Sec.
5. Combinations and consolidations of carriers—Con.
   (18) Acquisition or consolidation of telephone companies.
   (19) Having interest in competing carrier by water prohibited.
   (20) Determination of fact of competition; hearings; orders.
   (21) Continuation of water service permitted; filing of rates, schedules, and practices.
5a. Combinations and consolidations existing prior to June 16, 1933.
6. Schedules and statements of rates, etc., joint rail and water transportation.
   (1) Schedule of rates, fares, and charges; filing and posting.
   (2) Schedule of rates through foreign country.
   (3) Change in rates, fares, etc.; notice required; simplification of schedules.
   (4) Joint tariffs.
   (5) Copies of traffic contracts to be filed.
   (6) Forms of schedules prescribed by commission.
   (7) Transportation without filing and publishing rates forbidden; rebates; privileges.
   (8) Preference to shipments for United States.
   (9) Schedule lacking notice of effective date.
   (10) Penalty for failure to comply with regulations.
   (11) Failing to give or misstating rates; penalty.
   (12) Name of resident agent to be posted; request for information.
   (13) Jurisdiction of commission over transportation by rail and water.
7. Combinations to prevent continuous carriage of freight prohibited.
8. Liability in damages to persons injured by violation of law.
9. Remedies of persons damaged; election; witnesses.
10. Violation of regulations by carrier; discrimination; penalties.
   (1) Violation by carrier or officer; penalty.
   (2) False billing or classification by carrier; penalty.
   (3) Obtaining lower rates by false billing, etc., or by false claim; penalty.
   (4) Inducing unjust discrimination; penalty; liability for damages.
11. Interstate Commerce Commission; appointment, term, and qualifications of commissioners.
12. Authority and duties of commission; witnesses; depositions.
   (1) Authority, duties, and proceedings of commission; witnesses.
   (2) Attendance of witnesses and production of documents.
   (3) Compelling attendance and testimony of witnesses, etc.
   (4) Depositions.
   (5) Oath; subscription of testimony on deposition.
   (6) Deposition in foreign country; filing of depositions.
   (7) Fees for depositions.
13. Complaints to and investigations by commission.
   (1) Complaint to commission of violation of law by carrier; reparation; investigation.
   (2) Complaint by State commission; inquiry on commission's own motion.
   (3) Investigation involving State regulations; conference of State and interstate commissions.
   (4) Duty of commission where State regulations result in discrimination.
14. Reports and decisions of commission.
   (1) Reports of investigations by commission.
   (2) Record of reports; copies.
   (3) Publication of reports and decisions; printing and distribution of annual reports.
15. Determination of rates, routes, etc.; routing of traffic; disclosures, etc.
   (1) Commission empowered to determine and prescribe rates, classifications, etc.
   (2) Orders of commission.
   (3) Establishment of through routes, joint classifications, joint rates, fares, etc.
   (4) Through routes to embrace entire length of railroad; temporary through routes.
   (5) Transportation of livestock in carload lots; services included.
   (6) Commission to establish just divisions of joint rates, fares, or charges; adjustments.
   (7) Commission to determine lawfulness of new rates; suspension; refunds.
   (8) Shipper's choice of route to be observed.
   (9) Liability of carriers where property is delivered contrary to routing instructions.
   (10) Direction of unrouted traffic by commission.
   (11) Disclosure or solicitation of information concerning shipments unlawful; exceptions.

Sec.
15. Determination of rates, routes, etc.—Continued.
    (12) Penalty for violation of preceding provisions.
    (13) Allowance for service or facilities furnished by shipper.
    (14) Other powers of commission not excluded.
15a. Fair return for carriers.
15b. Collection of excess income discontinued; general railroad contingent fund liquidated; distribution of moneys; computation of tax liabilities.
16. Orders of commission and enforcement thereof; forfeitures.
    (1) Orders by commission for payment of damages.
    (2) Proceedings in courts to enforce orders; costs; attorney's fee.
    (3) Limitation of actions.
    (4) Joinder of parties; process; judgment.
    (5) Service of orders of commission.
    (6) Suspension or modification of orders.
    (7) Compliance with orders.
    (8) Failure of carrier or officer to obey orders; penalty.
    (9) Suit for recovery of forfeiture.
    (10) District attorneys to prosecute for forfeitures; costs and expenses.
    (11) Employment of attorneys by commission.
    (12) Proceedings to enforce orders other than for payment of money.
    (13) Copies of schedules, tariffs, contracts, etc., kept as public records; evidence.
16a. Rehearings by commission; stay; decisions.
17. Proceedings of commission; divisions and operation thereunder.
    (1) Conduct of proceedings; seal; oaths; quorum; rules; records.
    (2) Divisions of commission; assignment thereto and service thereon.
    (3) Reference of matters to divisions.
    (4) Powers of divisions; effects of orders, decisions, or reports; rehearings.
    (5) Powers of commission not divested.
    (6) Reference of matters to commissioner or board of employees; effect of orders, decisions, or reports; rehearings.
18. Employees; appointment and compensation; witness fees; expenses.
    (1) Commissioners' salaries; secretary and employees; compensation; witness fees.
    (2) Expenses of commission.
19. Office and sessions.
19a. Valuation of property of carriers.
    (a) Physical valuation of property of carriers; classification and inventory.
    (b) Cost of property; elements considered in determination; gifts, grants, etc.
    (c) Investigation; procedure and forms.
    (d) Time for beginning investigation; reports to Congress.
    (e) Aid of carrier required; rules and regulations; inspection of records.
    (f) Valuation of extensions and improvements; revisions; reports.
    (g) Reports and information to be furnished by carriers.
    (h) Notice of completion of tentative valuation; protests; finality of report.
    (i) Protests; hearings; changes in valuations; final valuation and classification.
    (j) Effect of evidence as to values; modification of orders.
    (k) Receivers and trustees of carriers affected; noncompliance with law; penalty.
    (l) Mandamus to compel compliance with law.
20. Reports, records, and accounts of carriers; mandamus; liability of initial carrier for loss, etc.
    (1) Annual reports of carriers; contents; uniform accounts.
    (2) Period covered by and time for making reports; monthly and special reports; penalty for omissions.
    (3) Recovery of forfeitures.
    (4) Administration of oath.
    (5) Forms of accounts and records; depreciation charges; access to records, etc., by commission.
    (6) Failure to keep accounts and records, or submit same to inspection; penalty.
    (7) False entries, destruction of, or failure to make entries, etc.; penalty; proviso.
    (8) Examiner divulging facts or information; penalty.
    (9) Jurisdiction to compel compliance by mandamus.
    (10) Special agents or examiners.
    (11) Liability of initial carrier for loss; limitation of liability; notice and filing of claim.
    (12) Recovery by initial carrier from connecting carrier.
20a. Securities of carriers; issuance, etc.
    (1) Carrier defined.
    (2) Issuance of securities; assumption of obligations; authorization.
    (3) Scope of commission's authority.
    (4) Form and contents of application; oath and signature.
    (5) Disposition of securities described in application, etc.
    (6) Notice of application to governors of States; intervention; hearings.

Sec.
20a. Securities of carriers; issuance, etc.—Continued.
    (7) Jurisdiction of commission as exclusive and plenary.
    (8) Guaranty of securities.
    (9) Issue of short-term notes; certificate of notification; proviso.
    (10) Reports by carriers as to securities or proceeds.
    (11) Securities issued contrary to law void; effect; penalty.
    (12) Restrictions on actions of officers and directors; penalty.
21. Annual report of commission.
22. Restrictions; interchangeable mileage or scrip.
    (1) Restrictions.
    (2) Sale of interchangeable mileage or scrip.
    (3) Penalty for failure to comply.
25. Schedules and rates of water carriers in foreign commerce.
    (1) Schedules to be filed by carriers by water in foreign commerce.
    (2) Quotation of rates by carriers by water; reservation of space.
    (3) Modification; publication and distribution of schedules; rules.
    (4) Bills of lading; form and contents; liability of initial carrier.
    (5) Bill of lading as "arrangement for continuous carriage."
26. Installation of safety devices directed; negligence; penalty.
27. Citation.

## Section 1. Regulation in general; car service; alteration of line.

(1) *Carriers subject to regulation.*—The provisions of this chapter shall apply to common carriers engaged in—

(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; or

(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water—

From one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation or transmission takes place within the United States.

(2) *Transportation subject to regulation.*—The provisions of this chapter shall also apply to such transportation of passengers and property and transmission of intelligence, but only insofar as such transportation or transmission takes place within the United States, but shall not apply—

(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid:

(b) or

(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this chapter except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district.

(3) *Definitions.*—The term "common carrier" as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. Wherever the word "carrier" is used in this chapter it shall be held to mean "common carrier." The term "railroad" as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all

switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term "transportation" as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported.

(*4*) *Duty to furnish transportation and establish through routes; division of joint rates.*—It shall be the duty of every common carrier subject to this chapter engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates, fares, and charges applicable thereto, and to provide reasonable facilities for operating through routes and to make reasonable rules and regulations with respect to the operation of through routes, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof as between the carriers subject to this chapter participating therein which shall not unduly prefer or prejudice any of such participating carriers.

(*5*) *Just and reasonable charges required; classification of messages, and rates; exchange of services.*— All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: *And provided further,* That nothing in this chapter shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers for the exchange of services.

(*6*) *Classification of property for transportation; regulations and practices.*—It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful.

(*7*) *Free transportation for passengers prohibited; exceptions; penalty.*—No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees and their families, its officers, agents, surgeons, physicians, and attorneys at law; to ministers of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals and charitable and eleemosynary institutions, and persons exclusively engaged in charitable and eleemosynary work; to indigent, destitute and homeless persons, and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors'

Homes, including those about to enter and those returning home after discharge; to necessary caretakers of livestock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to Railway Mail Service employees, post-office inspectors, customs inspectors, and immigration inspectors; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks and physicians and nurses attending such persons: *Provided,* That this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employees of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation: *and provided further,* That this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employees, and their families of such telegraph, telephone, and cable lines, and the officers, agents, employees and their families of other common carriers subject to the provisions of this chapter: *Provided further,* That the term "employees" as used in this paragraph shall include furloughed, pensioned, and superannuated employees, persons who have become disabled or infirm in the service of any such common carrier, and the remains of a person killed in the employment of a carrier and exemployees traveling for the purpose of entering the service of any such common carrier; and the term "families" as used in this paragraph shall include the families of those persons named in this proviso, also the families of persons killed, and the widows during widowhood and minor children during minority of persons who died, while in the service of any such common carrier. Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty. Jurisdiction of offenses under this provision shall be the same as that provided for offenses in sections 41, 42, and 43 of chapter 2 of this title.

(*8*) *Transportation of commodity manufactured or produced by railroad forbidden.*—It shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier.

(*9*) *Switch connections and tracks.*—Any common carrier subject to the provisions of this chapter, upon application of any lateral, branch line of railroad, or of any shipper tendering interstate traffic for transportation, shall construct, maintain, and operate upon reasonable terms a switch connection with any such lateral, branch line of railroad, or private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of the same; and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or against any such shipper. If any common carrier shall fail to install and operate any such switch or connection as aforesaid, on application therefor in writing by any shipper or owner of such lateral, branch line of railroad, such shipper or owner of such lateral branch line of railroad, may make complaint to the commission, as provided in section 13 of this chapter, and the commission shall hear and investigate the same and shall deter-

mine as to the safety and practicability thereof and justification and reasonable compensation therefor, and the commission may make an order, as provided in section 15 of this chapter, directing the common carrier to comply with the provisions of this section in accordance with such order, and such order shall be enforced as hereinafter provided for the enforcement of all other orders by the commission, other than orders for the payment of money.

*(10) "Car service" defined.*—The term "car service" in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter.

*(11) Duty to furnish car service; rules and regulations.*—It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.

*(12) Distribution of coal cars; failure to prorate; penalty.*—It shall also be the duty of every carrier by railroad to make just and reasonable distribution of cars for transportation of coal among the coal mines served by it, whether located upon its line or lines or customarily dependent upon it for car supply. During any period when the supply of cars available for such service does not equal the requirements of such mines it shall be the duty of the carrier to maintain and apply just and reasonable ratings of such mines and to count each and every car furnished to or used by any such mine for transportation of coal against 'the mine. Failure or refusal so to do shall be unlawful, and in respect of each car not so counted shall be deemed a separate offense, and the carrier, receiver, or operating trustee so failing or refusing shall forfeit to the United States the sum of $100 for each offense, which may be recovered in a civil action brought by the United States.

*(13) Rules and regulations as to car service to be filed, etc.*—The commission is authorized by general or special orders to require all carriers by railroad subject to this chapter, or any of them, to file with it from time to time their rules and regulations with respect to car service, and fine commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this chapter relating thereto.

*(14) Establishment by commission of rules, etc., as to car service.*—The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this chapter, including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it, and the penalties or other sanctions for nonobservance of such rules, regulations or practices.

*(15) Powers of commission in case of emergency.*—Whenever the commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the commission; (b) to make such just and reasonable directions with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such

emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the commission may after hearing determine find to be just and reasonable; (c) to require such joint or common use of terminals, including main-line track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the commission may after subsequent hearing find to be just and reasonable; and (d) to give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, at such time and for such periods as it may determine, and to modify, change, suspend, or annul them. In time of war or threatened war the President may certify to the commission that it is essential to the national defense and security that certain traffic shall have preference or priority in transportation, and the commission shall, under the power herein conferred, direct that such preference or priority be afforded.

*(16) Rerouting of traffic on failure of initial carrier to serve public.*—Whenever the commission is of opinion that any carrier by railroad subject to this chapter is for any reason unable to transport the traffic offered it so as properly to serve the public, it may, upon the same procedure as provided in paragraph (15), make such just and reasonable directions with respect to the handling, routing, and movement of the traffic of such carrier and its distribution over other lines of roads, as in the opinion of the commission will best promote the service in the interest of the public and the commerce of the people, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the commission may after subsequent hearing find to be just and reasonable.

*(17) Directions of commission as to car service; disobedience; rights of States.*—The directions of the commission as to car service and to the matters referred to in paragraphs (15) and (16) may be made through and by such agents or agencies as the commission shall designate and appoint for that purpose. It shall be the duty of all carriers by railroad subject to this chapter, and of their officers, agents, and employees, to obey strictly and conform promptly to such orders or directions of the commission, and in case of failure or refusal on the part of any carrier, receiver, or operating trustee to comply with any such order or direction such carrier, receiver, or trustee shall be liable to a penalty of not less than $100 nor more than $500 for each such offense and $50 for each and every day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action brought by the United States: *Provided, however,* That nothing in this chapter shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except insofar as such requirement is inconsistent with any lawful order of the commission made under the provisions of this chapter.

*(18) Extension or abandonment of lines; certificate required.*—No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the

present or future public convenience and necessity permit of such abandonment.

(19) *Application for certificate of commission; notice and hearing.*—The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the commission may from time to time prescribe, and the provisions of this chapter shall apply to all such proceedings. Upon receipt of any application for such certificate the commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which such additional or extended line of railroad is proposed to be constructed or operated, or all or any portion of a line of railroad, or the operation thereof, is proposed to be abandoned, with the right to be heard as hereinafter provided with respect to the hearing of complaints or the issuance of securities; and said notice shall also be published for three consecutive weeks in some newspaper of general circulation in each county in or through which said line of railroad is constructed or operates.

(20) *Issuance of certificate by commission; unlawful extension or abandonment of lines.*—The commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both.

(21) *Power of commission to require adequate facilities or extension of line; penalty.*—The commission may, after hearing, in a proceeding upon complaint or upon its own initiative without complaint, to authorize or require by order any carrier by railroad subject to this chapter, party to such proceeding, to provide itself with safe and adequate facilities for performing as a common carrier its car service as that term is used in this chapter, and to extend its line or lines: *Provided,* That no such authorization or order shall be made unless the commission finds, as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier subject to this chapter which refuses or neglects to comply with any order of the commission made in pursuance of this paragraph shall be liable to a penalty of $100 for each day during which such refusal or neglect continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

(22) *Construction, etc., of spurs, switches, etc., within State.*—The authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways,

which are not operated as a part or parts of a general steam railroad system of transportation. (Feb. 4, 1887, c. 104, § 1, 24 Stat. 379; June 29, 1906, c. 3591, § 1, 34 Stat. 584; Apr. 13, 1908, c. 143, 35 Stat. 60; June 18, 1910, c. 309, § 7, 36 Stat. 544; May 29, 1917, c. 22, 40 Stat. 101; Feb. 28, 1920, c. 91, §§ 400–403, 41 Stat. 474–475; and June 19, 1934, c. 652, § 602 (b), 48 Stat. 1102.)

The provisions of this section, insofar as they related to communication by wire or wireless, or to telegraph, telephone, or cable companies operating by wire or wireless, except the last proviso of (5) and the provisions of (7), were repealed by the Communications Act of June 19, 1934, c. 652, § 602 (b), 48 Stat. 1102, see Chapter 5 of Title 47.

**§ 2. Special rates and rebates prohibited.** If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful. (Feb. 4, 1887, c. 104, § 2, 24 Stat. 379; Feb. 28, 1920, c. 91, § 404, 41 Stat. 479; June 19, 1934, c. 652, § 602 (b), 48 Stat. 1102.)

The provisions of this section, insofar as they related to communication by wire or wireless, or to telegraph, telephone, or cable companies operating by wire or wireless, were repealed by the Communications Act of June 19, 1934, c. 652, § 602 (b), 48 Stat. 1102, see Chapter 5 of Title 47.

**§ 3. Preferences; interchange of traffic; terminal facilities.** (1) *Undue preferences or prejudices prohibited.*—It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

(2) *Payment of freight as prerequisite to delivery.*—No carrier by railroad subject to the provisions of this chapter shall deliver or relinquish possession at destination of any freight transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the commission may from time to time prescribe to govern the settlement of all such rates and charges and to prevent unjust discrimination: *Provided,* That the provisions of this paragraph shall not be construed to prohibit any carrier from extending credit in connection with rates and charges on freight transported for the United States, for any department, bureau, or agency thereof, or for any State or Territory or political subdivision thereof, or for the District of Columbia. Where carriers by railroad are instructed by a shipper or consignor to deliver property transported by such carriers to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of such property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only and has no beneficial title in the property, and (b) prior to delivery of the property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title, and, in the case of a shipment reconsigned or diverted to a point other than that specified in the original bill of lading, has also notified the delivering carrier in writing of the name and address of the beneficial owner of the property. In such cases the shipper or consignor, or, in the case of a shipment so reconsigned

or diverted, the beneficial owner, shall be liable for such additional charges, irrespective of any provisions to the contrary in the bill of lading or in the contract under which the shipment was made. An action for the enforcement of such liability may be begun within the period provided in paragraph (3) of section 16 of this title or before the expiration of six months after final judgment against the carrier in an action against the consignee begun within the period provided in paragraph (3) of section 16. If the consignee has given to the carrier erroneous information as to who the beneficial owner is, such consignee shall himself be liable for such additional charges, notwithstanding the foregoing provisions of this paragraph. An action for the enforcement of such liability may be begun within the period provided in paragraph (3) of section 16 or before the expiration of six months after final judgment against the carrier in an action against the beneficial owner named by the consignee begun within the period provided in paragraph (3) of section 16.

(*3*) *Interchange of traffic.*—All carriers engaged in the transportation of passengers or property, subject to the provisions of this chapter, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper.

(*4*) *Terminal facilities; use of and compensation for.*—If the commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings. Such compensation shall be paid or adequately secured before the enjoyment of the use may be commenced. If under this paragraph the use of such terminal facilities of any carrier is required to be given to another carrier or other carriers, and the carrier whose terminal facilities are required to be so used is not satisfied with the terms fixed for such use, or if the amount of compensation so fixed is not duly and promptly paid, the carrier whose terminal facilities have thus been required to be given to another carrier or other carriers shall be entitled to recover, by suit or action against such other carrier or carriers, proper damages for any injuries sustained by it as the result of compliance with such requirement, or just compensation for such use, or both, as the case may be. (Feb. 4, 1887, c. 104, § 3, 24 Stat. 380; Feb. 28, 1920, c. 91, § 405, 41 Stat. 479; Mar. 4, 1927, c. 510, § 1, 44 Stat. 1447.)

§ 4. Long and short haul charges; competition with water routes. (*1*) *Charges for long and short hauls and on through route.*—It shall be unlawful for any common carrier subject to the provisions of this chapter to "charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this chapter, but this shall not be construed as authorizing any common carrier within the terms of this chapter to charge or receive as great compensation for a shorter as for a longer distance: *Provided,* That upon application to the commission such common carrier

may in special cases, after investigation, be authorized by the commission to charge less for longer than for shorter distances for the transportation of passengers or property; and the commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section; but in exercising the authority conferred upon it in this proviso the commission shall not permit the establishment of any charge to or from the more distant point that is not reasonably compensatory for the service performed; and if a circuitous rail line or route is, because of such circuity, granted authority to meet the charges of a more direct line or route to or from competitive points and to maintain higher charges to or from intermediate points on its line, the authority shall not include intermediate points as to which the haul of the petitioning line or route is not longer than that of the direct line or route between the competitive points; and no such authorization shall be granted on account of merely potential water competition not actually in existence: *And provided further,* That rates, fares, or charges existing on February 28, 1920, by virtue of orders of the commission or as to which application had theretofore been filed with the commission and not acted upon, shall not be required to be changed by reason of the provisions of this section until the further order of or a determination by the commission.

(*2*) *Competition of railroads with water routes; change of rates.*—Wherever a carrier by railroad shall in competition with a water route or routes reduce the rates on the carriage of any species of freight to or from competitive points, it shall not be permitted to increase such rates unless after hearing by the commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition. (Feb. 4, 1887, c. 104, § 4, 24 Stat. 380; June 18, 1910, c. 309, § 8, 36 Stat. 547; Feb. 28, 1920, c. 91, § 406, 41 Stat. 480.)

§ 5. Combinations and consolidations of carriers. (*1*) *Pooling; division of traffic or earnings.*—Except upon specific approval by order of the commission as in this section provided, and except as provided in paragraph (16) of section 1 of this chapter, it shall be unlawful for any common carrier subject to this chapter to enter into any contract, agreement, or combination with any other common carrier or carriers for the pooling of freights of different and competing railroads, or to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof; and in any case of an agreement for the pooling of freights as aforesaid each day of its continuance shall be deemed a separate offense: *Provided,* That whenever the commission is of opinion, after hearing upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this chapter, or upon its own initiative, that the division of their traffic or earnings, to the extent indicated by the commission, will be in the interest of better service to the public, or economy in operation, and will not unduly restrain competition, the commission shall have authority by order to approve and authorize, if assented to by all the carriers involved, such division of traffic or earnings, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the commission to be just and reasonable in the premises.

(*2*) *Consolidation of railroads into limited number of systems.*—The commission shall as soon as practicable prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems. In the division of such railways into such systems under such plan, competition shall be preserved as fully as possible and wherever practicable the existing routes and channels of trade and commerce shall be maintained. Subject to the foregoing requirements, the several systems shall be so arranged that the cost of transportation as between competitive systems and as related to the values of the properties through which' the service is rendered shall be the same, so

far as practicable, so that these systems can employ uniform rates in the movement of competitive traffic and under efficient management earn substantially the same rate of return upon the value of their respective railway properties.

(3) *Tentative plan of consolidation; hearings; adoption and publication.*—When the Commission has agreed upon a tentative plan, it shall give the same due publicity, and upon reasonable notice, including notice to the governor of each State, shall hear all persons who may file or present objections thereto. The commission is authorized to prescribe a procedure for such hearings and to fix a time for bringing them to a close. After the hearings are at an end, the commission shall adopt a plan for such consolidation and publish the same; but it may at any time thereafter, upon its own motion or upon application, reopen the subject for such changes or modifications as in its judgment will promote the public interest.

(4) *Consolidation by agreement; purchase, lease, operating contract, or acquisition of control.*—(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b), for two or more carriers to consolidate or merge their properties, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through purchase of its stock; or for a corporation which is not a carrier to acquire control of two or more carriers through ownership of their stock; or for a corporation which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock.

(b) Whenever a consolidation, merger, purchase, lease, operating contract, or acquisition of control is proposed under subdivision (a), the carrier or carriers or corporation seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants, of the time and place for a public hearing. If after such hearing the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation, merger, purchase, lease, operating contract, or acquisition of control will be in harmony with and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3), and will promote the public interest, it may enter an order approving and authorizing such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon the terms and conditions and with the modifications so found to be just and reasonable.

(5) *Control by corporation not a carrier; when considered a "carrier."*—Whenever a corporation which is not a carrier is authorized, by an order entered under paragraph (4), to acquire control of any carrier or of two or more carriers, such corporation thereafter shall, to the extent provided by the Commission, for the purposes of paragraphs (1) to (10), inclusive, of section 20 (relating to reports, accounts, and so forth, of carriers), including the penalties applicable in the case of violations of such paragraphs, be considered as a common carrier subject to the provisions of this chapter, and for the purposes of paragraphs (2) to (11), inclusive, of section 20a (relating to issues of securities and assumptions of liability of carriers), including the penalties applicable in the case of violations of such paragraphs, be considered as a "carrier" as such term is defined in paragraph (1) of such section, and be treated as such by the Commission in the administration of the paragraphs specified. In the application of such provisions of section 20a in the case of any such corporation the Commission shall authorize the issue or

assumption applied for only if it finds that such issue or assumption is consistent with the proper performance by each carrier which is under the control of such corporation of its service to the public as a common carrier, will not impair the ability of any such carrier to perform such service, and is otherwise compatible with the public interest.

(6) *Control effected by other than prescribed methods forbidden.*—It shall be unlawful for any person, except as provided in paragraph (4), to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after June 16, 1933, and in violation of the provisions of this paragraph. As used in this paragraph and paragraph (7), the words "control or management" shall be construed to include the power to exercise control or management.

(7) *Transactions deemed to effectuate control or management.*—For the purposes of paragraphs (6) and (11), but not in anywise limiting the application thereof, any transaction shall be deemed to accomplish or effectuate the control or management in a common interest of two carriers—

(a) If such transaction is by a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier.

(b) If such transaction is by a person affiliated with a carrier, and if the effect of such transaction is to place such carrier and persons affiliated with it, taken together, in control of another carrier.

(c) If such transaction is by two or more persons acting together, one of whom is a carrier or is affiliated with a carrier, and if the effect of such transaction is to place such persons and carriers and persons affiliated with any one of them and persons affiliated with any such affiliated carrier, taken together, in control of another carrier.

(8) *Affiliation with a carrier; conditions deemed to constitute.*—For the purposes of paragraph (7) a person shall be held to be affiliated with a carrier if, by reason of the relationship of such person to such carrier (whether by reason of the method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier.

(9) *"Control" construed.*—For the purposes of paragraphs (6), (7), (8), and (11), wherever reference is made to control it is immaterial whether such control is direct or indirect. As used in this paragraph and paragraphs (7), (8), and (11) the term "control" shall be construed to include the power to exercise control.

(10) *Investigations by Commission of violations of provisions relating to consolidation, control, etc.*—The Commission is hereby authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether any person is violating the provisions of paragraph (6). If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation.

(11) *Investigation of effect of holding stock of carrier as affecting control; restricting voting power.*—For the proper protection and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3) and the regulation of interstate commerce in accordance therewith,

the Commission is hereby authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether the holding by any person of stock or other share capital of any carrier (unless acquired with the approval of the Commission) has the effect (a) of subjecting such carrier to the control of another carrier or to common control with another carrier, and (b) of preventing or hindering the carrying out of any part of such plan or of impairing the independence, one of another, of the systems provided for in such plan. If the Commission finds after such investigation that such holding has the effects described, it shall by order provide for restricting the exercise of the voting power of such person with respect to such stock or other share capital (by requiring the deposit thereof with a trustee, or by other appropriate means) to the extent necessary to prevent such holding from continuing to have such effects.

*(12) Suspension of proceedings on opening consolidation plan for modification.*—If in the course of any proceeding under this section before the Commission, or of any proceeding before a court in enforcement of an order entered by the Commission under this section, it appears that since the beginning of such proceeding the plan for consolidation has been reopened under paragraph (3) for changes or modifications with respect to the allocation of the properties of any carrier involved in such proceeding, then such proceeding may be suspended.

*(13) District courts invested with injunctive and mandatory jurisdiction.*—The district courts of the United States shall have jurisdiction upon the application of the Commission, alleging a violation of any of the provisions of this section or disobedience of any order issued by the Commission thereunder by any person, to issue such writs of injunction or other proper process, mandatory or otherwise, as may be necessary to restrain such person from violation of such provision or to compel obedience to such order.

*(14) Supplemental orders.*—The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (4), (10), or (11), as it may deem necessary or appropriate.

*(15) Carriers affected relieved from antitrust laws, etc.*—The carriers and any corporation affected by any order made under the foregoing provisions of this section shall be, and they are hereby, relieved from the operation of the antitrust laws as designated in section 12 of Title 15, and of all other restraints or prohibitions by or imposed under authority of law, State or Federal, insofar as may be necessary to enable them to do anything authorized or required by such order.

*(16) Separability clause.*—If any provision of the foregoing paragraphs of this section, or the application thereof to any person or circumstances, is held invalid, the other provisions of such paragraphs, and the application of such provision to any other person or circumstances, shall not be affected thereby.

*(17) "Person" and "carrier" defined.*—As used in paragraphs (4) to (16), inclusive, the term "person" includes an individual, partnership, association, joint-stock company, or corporation, and the term "carrier" means a carrier by railroad subject to this chapter.

*(18) Acquisition or consolidation of telephone companies.* [Superseded.]

This paragraph has been superseded by Act June 19, 1934, c. 652, § 221, 48 Stat. 1080. See section 221 of Title 47.

*(19) Having interest in competing carrier by water prohibited.*—It shall be unlawful for any railroad company or other common carrier subject to this chapter to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water operated through the Panama Canal or elsewhere with which said railroad or other carrier aforesaid does or may compete for traffic or any vessel carrying freight or passengers upon said water route or elsewhere with which said railroad or other carrier afore-

said does or may compete for traffic; and in case of the violation of this provision each day in which such violation continues shall be deemed a separate offense.

*(20) Determination of fact of competition; hearings; orders.*—Jurisdiction is conferred on the Interstate Commerce Commission to determine questions of fact as to the competition or possibility of competition, after full hearing, on the application of any railroad company or other carrier. Such application may be filed for the purpose of determining whether any existing service is in violation of paragraphs (19), (20), or (21) of this section and pray for an order permitting the continuance of any vessel or vessels already in operation, or for the purpose of asking an order to install new service not in conflict with the provisions of this paragraph. The commission may on its own motion or the application of any shipper institute proceedings to inquire into the operation of any vessel in use by any railroad or other carrier which has not applied to the commission and had the question of competition or the possibility of competition determined as herein provided. In all such cases the order of said commission shall be final.

*(21) Continuation of water service permitted; filing of rates, schedules, and practices.*—If the Interstate Commerce Commission shall be of the opinion that any such existing specified service by water other than through the Panama Canal is being operated in the interest of the public and is of advantage to the convenience and commerce of the people, and that such extension will neither exclude, prevent, nor reduce competition on the route by water under consideration, the Interstate Commerce Commission may, by order, extend the time during which such service by water may continue to be operated beyond July 1, 1914. In every case of such extension the rates, schedules, and practices of such water carrier shall be filed with the Interstate Commerce Commission and shall be subject to this chapter in the same manner and to the same extent as is the railroad or other common carrier controlling such water carrier or interested in any manner in its operation: *Provided,* That any application for extension under the terms of this section filed with the Interstate Commerce Commission prior to July 1, 1914, but for any reason not heard and disposed of before said date, may be considered and granted thereafter. (Feb. 4, 1887, c. 104, § 5, 24 Stat. 380; Aug. 24, 1912, c. 390, § 11, 37 Stat. 566; Feb. 28, 1920, c. 91, §§ 407, 408, 41 Stat. 480, 482; June 10, 1921, c. 20, 42 Stat. 27; June 16, 1933, c. 91, Title II, §§ 201–203, 48 Stat. 217–220; June 19, 1934, c. 652, § 221, 48 Stat. 1080.)

§ 5a. Combinations and consolidations existing prior to June 16, 1933. The provisions of chapter 1 of this title, as amended, and of all other applicable Federal statutes, as in force prior to June 16, 1933, shall remain in force, as though sections 5, 15a, 15b, and 19a of this title had not been enacted, with respect to the acquisition by any carrier, prior to June 16, 1933, of the control of any other carrier or carriers. (June 16, 1933, c. 91, Title II, § 204, 48 Stat. 220.)

§ 6. Schedules and statements of rates, etc., joint rail and water transportation. (1) *Schedule of rates, fares, and charges; filing and posting.*—Every common carrier subject to the provisions of this chapter shall file with the commission created by this chapter and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares, and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges,

and all other charges which the commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this chapter.

*(2) Schedule of rates through foreign country.—* Any common carrier subject to the provisions of this chapter receiving freight in the United States to be carried through a foreign country to any place in the United States shall also in like manner print and keep open to public inspection, at every depot or office where such freight is received for shipment, schedules showing the through rates established and charged by such common carrier to all points in the United States beyond the foreign country to which it accepts freight for shipment; and any freight shipped from the United States through a foreign country into the United States the through rate on which shall not have been made public, as required by this chapter, shall, before it is admitted into the United States from said foreign country, be subject to customs duties as if said freight were of foreign production.

*(3) Change in rates, fares, etc.; notice required; simplification of schedules.—*No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: *Provided,* That the commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions: *Provided further,* That the commission is authorized to make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges, or classifications not changed if, in its judgment, not inconsistent with the public interest.

*(4) Joint tariffs.—*The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the commission, and where such evidence of concurrence or acceptance is filed it shall not be necessary for the carriers filing the same to also file copies of the tariffs in which they are named as parties.

*(5) Copies of traffic contracts to be filed.—*Every common carrier subject to this chapter shall also file with said commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any traffic affected by the provisions of this chapter to which it may be a party.

*(6) Forms of schedules prescribed by commission.—* The commission may determine and prescribe the form in which the schedules required by this section to be kept open to public inspection shall be prepared

and arranged and may change the form from time to time as shall be found expedient.

*(7) Transportation without filing and publishing rates forbidden; rebates; privileges.—*No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs.

*(8) Preference to shipments for United States.—*In time of war or threatened war preference and precedence shall, upon demand of the President of the United States, be given, over all other traffic, for the transportation of troops and material of war, and carriers shall adopt every means within their control to facilitate and expedite the military traffic. And in time of peace shipments consigned to agents of the United States for its use shall be delivered by the carriers as promptly as possible and without regard to any embargo that may have been declared, and no such embargo shall apply to shipments so consigned.

*(9) Schedule lacking notice of effective date.—*The commission may reject and refuse to file any schedule that is tendered for filing which does not provide and give lawful notice of its effective date, and any schedule so rejected by the commission shall be void and its use shall be unlawful.

*(10) Penalty for failure to comply with regulations.—*In case of failure or refusal on the part of any carrier, receiver, or trustee to comply with the terms of any regulation adopted and promulgated or any order made by the commission under the provisions of this section, such carrier, receiver, or trustee shall be liable to a penalty of $500 for each such offense, and $25 for each and every day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

*(11) Failing to give or misstating rates; penalty.—* If any common carrier subject to the provisions of this chapter after written request made upon the agent of such carrier hereinafter in this section referred to, by any person or company for a written statement of the rate or charge applicable to a described shipment between stated places under the schedules or tariffs to which such carrier is a party, shall refuse or omit to give such written statement within a reasonable time, or shall misstate in writing the applicable rate, and if the person or company making such request suffers damage in consequence of such refusal or omission or .in consequence of the misstatement of the rate, either through making the shipment over a line or route for which the proper rate is higher than the rate over another available line or route, or through entering into any sale or other contract whereunder such person or company obligates himself or itself to make such shipment of freight at his or its cost, then the said carrier shall be liable to a penalty of $250, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

*(12) Name of resident agent to be posted; request for information.—*It shall be the duty of every carrier by railroad to keep at all times conspicuously posted in every station where freight is received for transportation the name of an agent resident in the city, village, or town where such station is located, to whom application may be made for the information by this section required to be furnished on written request; and in case any carrier shall fail at any

time to have such name so posted in any station, it shall be sufficient to address such request in substantially the following form: "The Station Agent of the —————— Company at —————— Station," together with the name of the proper post office, inserting the name of the carrier company and of the station in the blanks, and to serve the same by depositing the request so addressed, with postage thereon prepaid, in any post office.

(13) *Jurisdiction of commission over transportation by rail and water.*—When property may be or is transported from point to point in the United States by rail and water through the Panama Canal or otherwise, the transportation being by a common carrier or carriers, and not entirely within the limits of a single State, the Interstate Commerce Commission shall have jurisdiction of such transportation and of the carriers, both by rail and by water, which may or do engage in the same, in the following particulars, in addition to the jurisdiction otherwise given by this chapter:

(a) To establish physical connection between the lines of the rail carrier and the dock at which interchange of passenger or property is to be made by directing the rail carrier to make suitable connection between its line and a track or tracks which have been constructed from the dock to the limits of the railroad right-of-way, or by directing either or both the rail and water carrier, individually or in connection with one another to construct and connect with the lines of the rail carrier a track or tracks to the dock. The commission shall have full authority to determine and prescribe the terms and conditions upon which these connecting tracks shall be operated, and it may, either in the construction or the operation of such tracks, determine what sum shall be paid to or by either carrier: *Provided,* That construction required by the commission under the provisions of this paragraph shall be subject to the same restrictions as to findings of public convenience and necessity and other matters as is construction required under section 1 of this chapter.

(b) To establish through routes and maximum joint rates between and over such rail and water lines, and to determine all the terms and conditions under which such lines shall be operated in the handling of the traffic embraced.

(c) To establish proportional rates or maximum, or minimum, or maximum and minimum proportional rates, by rail to and from the ports to which the traffic is brought, or from which it is taken by the water carrier, and to determine to what traffic and in connection with what vessels and upon what terms and conditions such rates shall apply. By proportional rates are meant those which differ from the corresponding local rates to and from the port and which apply only to traffic which has been brought to the port or is carried from the port by a common carrier by water.

(d) If any rail carrier subject to this chapter enters into arrangements with any water carrier operating from a port in the United States to a foreign country, through the Panama Canal or otherwise, for the handling of through business between interior points of the United States and such foreign country, the Interstate Commerce Commission may require such railway to enter into similar arrangements with any or all other lines of steamships operating from said port to the same foreign country. (Feb. 4, 1887, c. 104, § 6, 24 Stat. 380; Mar. 2, 1889, c. 382, § 1, 25 Stat. 855; June 29, 1906, c. 3591, § 2, 34 Stat. 586; June 18, 1910, c. 309, § 9, 36 Stat. 548; Aug. 24, 1912, c. 390, § 11, 37 Stat. 568; Aug. 29, 1916, c. 417, 39 Stat. 604; Feb. 28, 1920, c. 91, §§ 409–413, 41 Stat. 483.)

See section 541 of Title 18.

§ 7. **Combinations to prevent continuous carriage of freight prohibited.** It shall be unlawful for any common carrier subject to the provisions of this chapter to enter into any combination, contract, or agreement, expressed or implied, to prevent, by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to

the place of destination; and no break of bulk, stoppage, or interruption made by such common carrier shall prevent the carriage of freights from being and being treated as one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage, or interruption was made in good faith for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any of the provisions of this chapter. (Feb. 4, 1887, c. 104, § 7, 24 Stat. 382.)

§ 8. **Liability in damages to persons injured by violation of law.** In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case. (Feb. 4, 1887, c. 104, § 8, 24 Stat. 382.)

§ 9. **Remedies of persons damaged; election; witnesses.** Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. In any such action brought for the recovery of damages the court before which the same shall be pending may compel any director, officer, receiver, trustee, or agent of the corporation or company defendant in such suit to attend, appear, and testify in such case, and may compel the production of the books and papers of such corporation or company party to any such suit; the claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying, but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding. (Feb. 4, 1887, c. 104, § 9, 24 Stat. 382; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167.)

§ 10. **Violation of regulations by carrier; discrimination; penalties.** (1) *Violation by carrier or officer; penalty.*—Any common carrier subject to the provisions of this chapter, or, whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, who, alone or with any other corporation, company, person, or party, shall willfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or who shall aid or abet therein, or shall willfully omit or fail to do any act, matter, or thing in this chapter required to be done, or shall cause or willingly suffer or permit any act, matter, or thing so directed or required by this chapter to be done not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this chapter for which no penalty is otherwise provided, or who shall aid or abet therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not to exceed $5,000 for each offense: *Provided,* That if the offense for which any person shall be convicted as aforesaid shall be an unlawful discrimination in rates, fares, or charges for the transportation of passengers or property or the transmission of in-

telligence, such person shall, in addition to the fine hereinbefore provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court.

(2) *False billing or classification by carrier; penalty.*—Any common carrier subject to the provisions of this chapter, or, whenever such common carrier is a corporation, any officer or agent thereof, or any person acting for or employed by such corporation, who, by means of false billing, false classification, false weighing, or false report of weight, or by any other device or means, shall knowingly and willfully assist, or shall willingly suffer or permit, any person or persons to obtain transportation for property at less than the regular rates then established and in force on the line of transportation of such common carrier, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any court of the United States of competent jurisdiction within the district in which such offense was committed, be subject to a fine of not exceeding $5,000, or imprisonment in the penitentiary for a term of not exceeding two years, or both, in the discretion of the court, for each offense.

(3) *Obtaining lower rates by false billing, etc., or by false claim; penalty.*—Any person, corporation, or company, or any agent or officer thereof, who shall deliver property for transportation to any common carrier subject to the provisions of this chapter, or for whom, as consignor or consignee, any such carrier shall transport property, who shall knowingly and willfully, directly, or indirectly, himself or by employee, agent, officer, or otherwise, by false billing, false classification, false weighing, false representation of the contents of the package or the substance of the property, false report of weight, false statement, or by any other device or means, whether with or without the consent or connivance of the carrier, its agent, or officer, obtain or attempt to obtain transportation for such property at less than the regular rates then established and in force on the line of transportation; or who shall knowingly and willfully, directly or indirectly, himself or by employee, agent, officer, or otherwise, by false statement or representation as to cost, value, nature, or extent of injury, or by the use of any false bill, bill of lading, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to be false, fictitious, or fraudulent, or to contain any false, fictitious, or fraudulent statement or entry, obtain or attempt to obtain any allowance, refund, or payment for damage or otherwise in connection with or growing out of the transportation of or agreement to transport such property, whether with or without the consent or connivance of the carrier, whereby the compensation of such carrier for such transportation, either before or after payment, shall in fact be made less than the regular rates then established and in force on the line of transportation, shall be deemed guilty of fraud, which is declared to be a misdemeanor, and shall, upon conviction thereof in any court of the United States of competent jurisdiction within the district in which such offense was wholly or in part committed, be subject for each offense to a fine of not exceeding $5,000 or imprisonment in the penitentiary for a term of not exceeding two years, or both, in the discretion of the court: *Provided,* That the penalty of imprisonment shall not apply to artificial persons.

(4) *Inducing unjust discrimination; penalty; liability for damages.*—If any such person, or any officer or agent of any such corporation or company, shall, by payment of money or other thing of value, solicitation, or otherwise, induce or attempt to induce any common carrier subject to the provisions of this chapter, or any of its officers or agents, to discriminate unjustly in his, its, or their favor as against any other consignor or consignee in the transportation of property, or shall aid or abet any common carrier in any such unjust discrimination, such person or such officer or agent of such corporation or company shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any court of the United States of competent jurisdiction within the district in which

such offense was committed, be subject to a fine of not exceeding $5,000, or imprisonment in the penitentiary for a term of not exceeding two years, or both, in the discretion of the court, for each offense; and such person, corporation, or company shall also, together with said common carrier, be liable, jointly or severally, in an action to be brought by any consignor or consignee discriminated against in any court of the United States of competent jurisdiction for all damages caused by or resulting therefrom. (Feb. 4, 1887, c. 104, § 10, 24 Stat. 382; Mar. 2, 1889, c. 382, § 2, 25 Stat. 857; June 18, 1910, c. 309, § 10, 36 Stat. 549; Feb. 28, 1920, c. 91, § 414, 41 Stat. 483.)

§ 11. **Interstate Commerce Commission; appointment, term, and qualifications of commissioners.** A commission is created and established to be known as the Interstate Commerce Commission, which shall be composed of eleven commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate. The commissioners appointed under this chapter and their successors, shall continue in office for terms of seven years, except that any person chosen to fill a vacancy shall be appointed only for the unexpired term of the commissioner whom he shall succeed. Of the commissioners in office on January 1, 1926, the term of one shall expire December 31 in each of the years 1926, 1927, and 1932 and the terms of two shall expire December 31, in each of the years, 1928, 1929, 1930, and 1931. Any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office. Not more than six of the commissioners shall be appointed from the same political party. No person in the employ of or holding any official relation to any common carrier subject to the provisions of this chapter, or owning stock or bonds thereof, or who is in any manner pecuniarily interested therein, shall enter upon the duties of or hold such office. Said commissioners shall not engage in any other business, vocation, or employment. No vacancy in the commission shall impair the right of the remaining commissioners to exercise all the powers of the commission. (Feb. 4, 1887, c. 104, §§ 11, 24, 24 Stat. 383, 387; June 29, 1906, c. 3591, § 8, 34 Stat. 595; Aug. 9, 1917, c. 50, § 1, 40 Stat. 270; Feb. 28, 1920, c. 91, § 440, 41 Stat. 497.)

§ 12. **Authority and duties of commission; witnesses; depositions.** (1) *Authority, duties, and proceedings of commission; witnesses.*—The commission created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this chapter, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the commission to perform the duties and carry out the objects for which it was created; and the commission is authorized and required to execute and enforce the provisions of this chapter; and, upon the request of the commission, it shall be the duty of any district attorney of the United States to whom the commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this chapter and for the punishment of all violations thereof, and the costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States; and for the purposes of this chapter the commission shall have power to require, by subpoena, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation.

(2) *Attendance of witnesses and production of documents.*—Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the commission, or any party to a proceeding before the commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the

production of books, papers, and documents under the provisions of this section.

*(3) Compelling attendance and testimony of witnesses, etc.*—And any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any common carrier subject to the provisions of this chapter, or other person, issue an order requiring such common carrier or other person to appear before said commission (and produce books and papers if so ordered) and give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

*(4) Depositions.*—The testimony of any witness may be taken, at the instance of a party, in any proceeding or investigation depending before the commission, by deposition, at any time after a cause or proceeding is at issue on petition and answer. The commission may also order testimony to be taken by deposition in any proceeding or investigation pending before it, at any stage of such proceeding or investigation. Such depositions may be taken before any judge of any court of the United States, or any United States commissioner, or any clerk of a district court, or any chancellor, justice, or judge of a supreme or superior court, mayor or chief magistrate of a city, judge of a county court, or court of common pleas of any of the United States, or any notary public, not being of counsel or attorney to either of the parties, nor interested in the event of the proceeding or investigation. Reasonable notice must first be given in writing by the party or his attorney proposing to take such deposition to the opposite party or his attorney of record, as either may be nearest, which notice shall state the name of the witness and the time and place of the taking of his deposition. Any person may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the commission as hereinbefore provided.

*(5) Oath; subscription of testimony on deposition.*—Every person deposing as herein provided shall be cautioned and sworn (or affirm, if he so request) to testify the whole truth, and shall be carefully examined. His testimony shall be reduced to writing by the magistrate taking the deposition, or under his direction, and shall, after it has been reduced to writing, be subscribed by the deponent.

*(6) Deposition in foreign country; filing of depositions.*—If a witness whose testimony may be desired to be taken by deposition be in a foreign country, the deposition may be taken before an officer or person designated by the commission, or agreed upon by the parties by stipulation in writing to be filed with the commission. All depositions must be promptly filed with the commission.

*(7) Fees for depositions.*—Witnesses whose depositions are taken pursuant to this chapter, and the magistrate or other officer taking the same, shall severally be entitled to the same fees as are paid for like services in the courts of the United States. (Feb. 4, 1887, c. 104, § 12, 24 Stat. 383; Mar. 2, 1889, c. 382, § 3, 25 Stat. 858; Feb. 10, 1891, c. 128, 26 Stat. 743; May 28, 1896, c. 252, § 19, 29 Stat. 184; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167; Feb. 28, 1920, c. 91, § 415, 41 Stat. 484.)

### § 13. Complaints to and investigations by commission.

*(1) Complaint to commission of violation of law by carrier; reparation; investigation.*—Any person, firm, corporation, company, or association, or any mercantile, agricultural, or manufacturing society or other organization, or any body politic or municipal organization, or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the commission to investigate the matters complained of in such manner and by such means as it shall deem proper.

*(2) Complaint by State commission; inquiry on commission's own motion.*—Said commission shall, in like manner and with the same authority and powers, investigate any complaint forwarded by the railroad commissioner or railroad commission of any State or Territory at the request of such commissioner or commission, and the Interstate Commerce Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made, to or before said commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter. And the said commission shall have the same powers and authority to proceed with any inquiry instituted on its motion as though it had been appealed to by complaint or petition under any of the provisions of this chapter, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had excepting orders for the payment of money. No complaint shall at any time be dismissed because of the absence of direct damage to the complainant.

*(3) Investigation involving State regulations; conference of State and interstate commissions.*—Whenever in any investigation under the provisions of this chapter, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, the commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this chapter with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the commission. The commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this chapter.

*(4) Duty of commission where State regulations result in discrimination.*—Whenever in any such investigation the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates,

fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding. (Feb. 4, 1887, c. 104, § 13, 24 Stat. 383; June 18, 1910, c. 309, § 11, 36 Stat. 550; and Feb. 28, 1920, c. 91, § 416, 41 Stat. 484.)

§ 14. Reports and decisions of commission. (1) *Reports of investigations by commission.*—Whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order, or requirement in the premises; and in case damages are awarded, such report shall include the findings of fact on which the award is made.

(2) *Record of reports; copies.*—All reports of investigations made by the commission shall be entered of record, and a copy thereof shall be furnished to the party who may have complained, and to any common carrier that may have been complained of.

(3) *Publication of reports and decisions; printing and distribution of annual reports.*—The commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and such authorized publications shall be competent evidence of the reports and decisions of the commission therein contained in all courts of the United States and of the several States without any further proof or authentication thereof. The commission may also cause to be printed for early distribution its annual reports. (Feb. 4, 1887, c. 104, § 14, 24 Stat. 384; Mar. 2, 1889, c. 382, § 4, 25 Stat. 859; June 29, 1906, c. 3591, § 3, 34 Stat. 589; and Feb. 28, 1920, c. 91, § 417, 41 Stat. 484.)

§ 15. Determination of rates, routes, etc.; routing of traffic; disclosures, etc. (1) *Commission empowered to determine and prescribe rates, classifications, etc.*—Whenever, after full hearing, upon a complaint made as provided in section 13 of this chapter, or after full hearing under an order for investigation and hearing made by the commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property, as defined in the first section of this chapter, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged (or, in the case of a through route where one of the carriers is a water line, the maximum rates, fares, and charges applicable thereto), and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

(2) *Orders of commission.*—Except as otherwise provided in this chapter, all orders of the commission, other than orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force until its further order, or for a specified period of time, according as shall be prescribed in the order, unless the same shall be suspended or modified or set aside by the commission, or be suspended or set aside by a court of competent jurisdiction.

(3) *Establishment of through routes, joint classifications, joint rates, fares, etc.*—The commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without a complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property, or the maxima or minima, or maxima and minima, to be charged (or, in the case of a through route where one of the carriers is a water line, the maximum rates, fares, and charges applicable thereto), and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated; and this provision, except as herein otherwise provided, shall apply when one of the carriers is a water line. The commission shall not, however, establish any through route, classification, or practice, or any rate, fare, or charge, between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business, and railroads of a different character; nor shall the commission have the right to establish any route, classification, or practice, or any rate, fare, or charge when the transportation is wholly by water, and any transportation by water affected by this chapter shall be subject to the laws and regulations applicable to transportation by water.

(4) *Through routes to embrace entire length of railroad; temporary through routes.*—In establishing any such through route the commission shall not (except as provided in section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established: *Provided,* That in time of shortage of equipment, congestion of traffic, or other emergency declared by the commission it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest.

(5) *Transportation of livestock in carload lots; services included.*—Transportation wholly by railroad of ordinary livestock in carload lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee, or owner, except in cases where the unloading or reloading en route is at the request of the shipper, consignee, or owner, or to try an intermediate market, or to comply with quarantine regulations. The commission may prescribe or approve just and reasonable rules governing each of such excepted services. Nothing in this paragraph shall be construed to affect the duties and liabilities of the carriers existing on February 28, 1920, by virtue of law respecting the transportation of other than ordinary livestock, or the duty of performing service as to shipments other than those to or from public stockyards.

(6) *Commission to establish just divisions of joint rates, fares, or charges; adjustments.*—Whenever, after full hearing upon complaint or upon its own initiative, the commission is of opinion that the divi-

sions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares, and charges, the commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge.

(7) *Commission to determine lawfulness of new rates; suspension; refunds.*—Whenever there shall be filed with the commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate, fare, or charge increased after January 1, 1910, or of a rate, fare, or charge sought to be increased after June 18, 1910, the burden of proof to show that the increased rate, fare, or charge, or proposed increased rate, fare, or charge, is just and reasonable

shall be upon the carrier, and the commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.

(8) *Shipper's choice of route to be observed.*—In all cases where at the time of delivery of property to any railroad corporation being a common carrier for transportation subject to the provisions of this chapter to any point of destination, between which and the point of such delivery for shipment two or more through routes and through rates shall have been established as in this chapter provided to which through routes and through rates such carrier is a party, the person, firm, or corporation making such shipment, subject to such reasonable exceptions and regulations as the Interstate Commerce Commission shall from time to time prescribe, shall have the right to designate in writing by which of such through routes such property shall be transported to destination, and it shall thereupon be the duty of the initial carrier to route said property and issue a through bill of lading therefor as so directed, and to transport said property over its own line or lines and deliver the same to a connecting line or lines according to such through route, and it shall be the duty of each of said connecting carriers to receive said property and transport it over the said line or lines and deliver the same to the next succeeding carrier or consignee according to the routing instructions in said bill of lading: *Provided, however,* That the shipper shall in all instances have the right to determine, where competing lines of railroad constitute portions of a through line or route, over which of said competing lines so constituting a portion of said through line or route his freight shall be transported.

(9) *Liability of carriers where property is delivered contrary to routing instructions.*—Whenever property is diverted or delivered by one carrier to another carrier contrary to routing instructions in the bill of lading, unless such diversion or delivery is in compliance with a lawful order, rule, or regulation of the commission, such carriers shall, in a suit or action in any court of competent jurisdiction, be jointly and severally liable to the carrier thus deprived of its right to participate in the haul of the property, for the total amount of the rate or charge it would have received had it participated in the haul of the property. The carrier to which the property is thus diverted shall not be liable in such suit or action if it can show, the burden of proof being upon it, that before carrying the property it had no notice, by bill of lading, waybill or otherwise, of the routing instructions. In any judgment which may be rendered the plaintiff shall be allowed to recover against the defendant a reasonable attorney's fee to be taxed in the case.

(10) *Direction of unrouted traffic by commission.*—With respect to traffic not routed by the shipper, the commission may, whenever the public interest and a fair distribution of the traffic require, direct the route which such traffic shall take after it arrives at the terminus of one carrier or at a junction point with another carrier, and is to be there delivered to another carrier.

(11) *Disclosure or solicitation of information concerning shipments unlawful; exceptions.*—It shall be unlawful for any common carrier subject to the provisions of this chapter, or any officer, agent, or employee of such common carrier, or for any other person or corporation lawfully authorized by such common carrier to receive information therefrom, knowingly to disclose to or permit to be acquired by any person or corporation other than the shipper or consignee, without the consent of such shipper or consignee, any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to such common carrier for interstate transportation, which information may be used to the detriment or prejudice of such shipper or consignee, or which may improperly disclose his business transactions to a competitor; and it shall also be unlawful for any person or corpora-

tion to solicit or knowingly receive any such information which may be so used: *Provided,* That nothing in this chapter shall be construed to prevent the giving of such information in response to any legal process issued under the authority of any State or Federal court, or to any officer or agent of the Government of the United States, or of any State or Territory, in the exercise of his powers, or to any officer or other duly authorized person seeking such information for the prosecution of persons charged with or suspected of crime; or information given by a common carrier to another carrier or its duly authorized agent, for the purpose of adjusting mutual traffic accounts in the ordinary course of business of such carriers.

(12) *Penalty for violation of preceding provisions.*—Any person, corporation, or association violating any of the provisions of the next preceding paragraph of this section shall be deemed guilty of a misdemeanor, and for each offense, on conviction, shall pay to the United States a penalty of not more than $1,000.

(13) *Allowance for service or facilities furnished by shipper.*—If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for under this section.

(14) *Other powers of commission not excluded.*— The foregoing enumeration of powers shall not exclude any power which the commission would otherwise have in the making of an order under the provisions of this chapter. (Feb. 4, 1887, c. 104, § 15, 24 Stat. 384; June 29, 1906, c. 3591, § 4, 34 Stat. 589; June 18, 1910, c. 309, § 12, 36 Stat. 551; and Feb. 28, 1920, c. 91, §§ 418-421, 41 Stat. 484-488; Mar. 4, 1927, c. 510, 44 Stat. 1447; June 19, 1934, c. 652, § 602 (b), 48 Stat. 1102.)

The provisions of this section, insofar as they related to communication by wire or wireless, or to telegraph, telephone, or cable companies operating by wire or wireless, except the last proviso of (5) and the provisions of (7), were repealed by the Communications Act of June 19, 1934, c. 652, § 602 (b), 48 Stat. 1102, see Chapter 5 of Title 47.

§ 15a. **Fair return for carriers.** (1) When used in this section, the term " rates " means rates, fares, and charges, and all classifications, regulations, and practices relating thereto.

(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service. (Feb. 4, 1887, c. 104, § 15a; Feb. 28, 1920, c. 91, § 422, 41 Stat. 488; June 16, 1933, c. 91, Title II, § 205, 48 Stat. 220.)

§ 15b. **Collection of excess income discontinued; general railroad contingent fund liquidated; distribution of moneys; computation of tax liabilities.** (a) All moneys which were recoverable by and payable to the Interstate Commerce Commission, under paragraph (6) of section 15a of this chapter, as in force prior to June 16, 1933, shall cease to be so recoverable and payable; and all proceedings pending for the recovery of any such moneys shall be terminated. The general railroad contingent fund established under such section shall be liquidated and the Secretary of the Treasury shall distribute the moneys in such fund among the carriers which have made payments under such section, so that each such carrier

shall receive an amount bearing the same ratio to the total amount in such fund that the total of amounts paid under such section by such carrier bears to the total of amounts paid under such section by all carriers; except that if the total amount in such fund exceeds the total of amounts paid under such section by all carriers such excess shall be distributed among such carriers upon the basis of the average rate of earnings (as determined by the Secretary of the Treasury) on the investment of the moneys in such fund and differences in dates of payments by such carriers.

(b) The income, war-profits, and excess-profits tax liabilities for any taxable period ending after February 28, 1920, of the carriers and corporations whose income, war-profits, or excess-profits tax liabilities were affected by section 15a of this chapter, as in force prior to June 16, 1933, shall be computed as if such section had never been enacted, except that, in the case of carriers or corporations which have made payments under paragraph (6) of such section, an amount equal to such payments shall be excluded from gross income for the taxable periods with respect to which they were made. All distributions made to carriers in accordance with subdivision (a) of this section shall be included in the gross income of the carriers for the taxable period in which this section is enacted. The provisions of this subdivision shall not be held to affect (1) the statutes of limitations with respect to the assessment, collection, refund, or credit of income, war-profits or excess-profits taxes or (2) the liabilities for such taxes of any carriers or corporations if such liabilities were determined prior to June 16, 1933, in accordance with section 1106 (b) of the Revenue Act of 1926 or section 1660 of Title 26, or in accordance with a final judgment of a court, an order of the Board of Tax Appeals which had become final, or an offer in compromise duly accepted in accordance with law. (June 16, 1933, c. 91, Title II, § 206, 48 Stat. 220.)

§ 16. **Orders of commission and enforcement thereof; forfeitures.** (1) *Orders by commission for payment of damages.*—If, after hearing on a complaint made as provided in section 13 of this chapter, the commission shall determine that any party complainant is entitled to an award of damages under the provisions of this chapter for a violation thereof, the commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named.

(2) *Proceedings in courts to enforce orders; costs; attorney's fee.*—If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may file in the district court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the road of the carrier runs, or in any State court of general jurisdiction having jurisdiction of the parties, a petition setting forth briefly the causes for which he claims damages, and the order of the commission in the premises. Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the commission shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit.

(3) *Limitation of actions.*—(a) All actions at law by carriers subject to this chapter for recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after.

(b) All complaints against carriers subject to this chapter for the recovery of damages not based on overcharges shall be filed with the commission within

two years from the time the cause of action accrues, and not after, subject to subdivision (d) of this paragraph.

(c) For recovery of overcharges action at law shall be begun or complaint filed with the commission against carriers subject to this chapter within three years from the time the cause of action accrues, and not after, subject to subdivision (d) of this paragraph, except that if claim for the overcharge has been presented in writing to the carrier within the three-year period of limitation said period shall be extended to include six months from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.

(d) If on or before expiration of the two-year period of limitation in subdivision (b) of this paragraph or of the three-year period of limitation in subdivision (c) of this paragraph a carrier subject to this chapter begins action under subdivision (a) of this paragraph for recovery of charges in respect of the same transportation service, or, without beginning action, collects charges in respect of that service, said period of limitation shall be extended to include ninety days from the time such action is begun or such charges are collected by the carrier.

(e) The cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after.

(f) A petition for the enforcement of an order of the commission for the payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after.

(g) The term " overcharges" as used in this section shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission.

(h) The provisions of this paragraph (3) shall extend to and embrace cases in which the cause of action accrued prior to June 7, 1924, as well as cases in which the cause of action accrues thereafter, except that actions at law begun or complaints filed with the commission against carriers subject to this chapter for the recovery of overcharges where the cause of action accrued on or after March 1, 1920, shall not be deemed to be barred under subdivision (c) of this paragraph if such actions shall have been begun or complaints filed prior to June 7, 1924, or within six months thereafter.

(4) *Joinder of parties; process; judgment.*—In such suits all parties in whose favor the commission may have made an award for damages by a single order may be joined as plaintiffs, and all of the carriers parties to such order awarding such damages may be joined as defendants, and such suit may be maintained by such joint plaintiffs and against such joint defendants in any district where any one of such joint plaintiffs could maintain such suit against any one of such joint defendants; and service of process against any one of such defendants as may not be found in the district where the suit is brought may be made in any district where such defendant carrier has its principal operating office. In case of such joint suit the recovery, if any, may be by judgment in favor of any one of such plaintiffs, against the defendant found to be liable to such plaintiff.

(5) *Service of orders of commission.*—Every order of the commission shall be forthwith served upon the designated agent of the carrier in the city of Washington or in such other manner as may be provided by law.

(6) *Suspension or modification of orders.*—The commission shall be authorized to suspend or modify its orders upon such notice and in such manner as it shall deem proper.

(7) *Compliance with orders.*—It shall be the duty of every common carrier, its agents and employees, to observe and comply with such orders so long as the same shall remain in effect.

(8) *Failure of carrier or officer to obey orders; penalty.*—Any carrier, any officer, representative, or agent of a carrier, or any receiver, trustee, lessee, or agent of either of them, who knowingly fails or neglects to obey any order made under the provisions of sections 3, 13, or 15 of this chapter shall forfeit to the United States the sum of $5,000 for each offense. Every distinct violation shall be a separate offense, and in case of a continuing violation each day shall be deemed a separate offense.

(9) *Suit for recovery of forfeiture.*—The forfeiture provided for in this chapter shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States, brought in the district where the carrier has its principal operating office, or in any district through which the road of the carrier runs.

(10) *District attorneys to prosecute for forfeitures; costs and expenses.*—It shall be the duty of the various district attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures. The costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.

(11) *Employment of attorneys by commission.*—The commission may employ such attorneys as it finds necessary for proper legal aid and service of the commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the commission's own instance or upon complaint, or to appear for or represent the commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the commission.

(12) *Proceeding to enforce orders other than for payment of money.*—If any carrier fails or neglects to obey any order of the commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the carrier is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such carrier, its officers, agents, or representatives, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

(13) *Copies of schedules, tariffs, contracts, etc., kept as public records; evidence.*—The copies of schedules and classifications and tariffs of rates, fares, and charges, and of all contracts, agreements, and arrangements between common carriers filed with the commission as herein provided, and the statistics, tables, and figures contained in the annual or other reports of carriers made to the commission as required under the provisions of this chapter shall be preserved as public records in the custody of the secretary of the commission, and shall be received as prima facie evidence of what they purport to be for the purpose of investigations by the commission and in all judicial proceedings; and copies of and extracts from any of said schedules, classifications, tariffs, contracts, agreements, arrangements, or reports, made public records as aforesaid, certified by the secretary, under the commission's seal, shall be received in evidence with like effect as the originals. (Feb. 4, 1887, c. 104, § 16, 24 Stat. 384; Mar. 2, 1889, c. 382, § 5, 25 Stat. 859; June 29, 1906, c. 3591, § 5. 34 Stat. 590; June 18, 1910, c. 309, § 13. 36 Stat. 554; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167; Oct. 22, 1913, c. 32, 38 Stat. 219; Feb. 28, 1920, c. 91, §§ 423-429, 41 Stat. 491, 492; and June 7, 1924, c. 325, 43 Stat. 633.)

**§ 16a. Rehearings by commission; stay; decisions.** After a decision, order, or requirement has been made by the commission in any proceeding any party thereto may at any time make application for rehearing of the same, or any matter determined therein, and it shall be lawful for the commission in its discretion to

grant such a rehearing if sufficient reason therefor be made to appear. Applications for rehearing shall be governed by such general rules as the commission may establish. No such application shall excuse any carrier from complying with or obeying any decision, order, or requirement of the commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the commission. In case a rehearing is granted the proceedings thereupon shall conform as nearly as may be to the proceedings in an original hearing, except as the commission may otherwise direct; and if, in its judgment, after such rehearing and the consideration of all facts, including those arising since the former hearing, it shall appear that the original decision, order, or requirement is in any respect unjust or unwarranted, the commission may reverse, change, or modify the same accordingly. Any decision, order, or requirement made after such rehearing, reversing, changing, or modifying the original determination shall be subject to the same provisions as an original order. (Feb. 4, 1887, c. 104, § 16a; June 29, 1906, c. 3591, § 6, 34 Stat. 592.)

§ 17. Proceedings of commission; divisions and operation thereunder. (1) *Conduct of proceedings; seal; oaths; quorum; rules; records.*—The commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. The commission shall have an official seal, which shall be judicially noticed. Any member of the commission may administer oaths and affirmations and sign subpenas. A majority of the commission shall constitute a quorum for the transaction of business, except as may be otherwise herein provided, but no commissioner shall participate in any hearing or proceeding in which he has any pecuniary interest. The commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it, or before any division of the commission, including forms of notices and the service thereof, which shall conform, as nearly as may be, to those in use in the courts of the United States. Any party may appear before the commission or any division thereof and be heard in person or by attorney. Every vote and official act of the commission, or of any division thereof, shall be entered of record, and its proceedings shall be public upon the request of any party interested.

(2) *Divisions of commission; assignment thereto and service thereon.*—The commission is authorized by its order to divide the members thereof into as many divisions (each to consist of not less than three members) as it may deem necessary, which may be changed from time to time. Such divisions shall be denominated, respectively, division one, division two, and so forth. Any commissioner may be assigned to and may serve upon such division or divisions as the commission may direct, and the senior in service of the commissioners constituting any of said divisions shall act as chairman thereof. In case of vacancy in any division, or of absence or inability to serve thereon of any commissioner thereto assigned, the chairman of the commission or any commissioner designated by him for that purpose, may temporarily serve on said division until the commission shall otherwise order.

(3) *Reference of matters to divisions.*—The commission may by order direct that any of its work, business, or functions arising under this chapter or under any statutory provisions amendatory thereof, or supplemental thereto, or under any amendment which may be made to this chapter or to any of said statutory provisions, or under any other statute or joint resolution which has been or may be approved, or in respect of any matter which has been or may be referred to the commission by Congress or by either branch thereof, be assigned or referred to any of said divisions for action thereon, and may by order at any time amend, modify, supplement, or rescind any such direction. All such orders shall take effect forth-

with and remain in effect until otherwise ordered by the commission.

(4) *Powers of divisions; effects of orders, decisions, or reports; rehearings.*—In conformity with and subject to the order or orders of the commission in the premises, each division so constituted shall have power and authority by a majority thereof to hear and determine, order, certify, report, or otherwise act as to any of said work, business, or functions so assigned or referred to it for action by the commission, and in respect thereof the division shall have all the jurisdiction and powers now or then conferred by law upon the commission, and be subject to the same duties and obligations. Any order, decision, or report made or other action taken by any of said divisions in respect of any matters so assigned or referred to it shall have the same force and effect, and may be made, evidenced, and enforced in the same manner as if made, or taken by the commission, subject to rehearing by the commission, as provided in section 16a hereof for rehearing cases decided by the commission. The secretary and seal of the commission shall be the secretary and seal of each division thereof.

(5) *Powers of commission not divested.*—Nothing in this section contained, or done pursuant thereto, shall be deemed to divest the commission of any of its powers.

(6) *Reference of matters to commissioner or board of employees; effect of orders, decisions, or reports; rehearings.*—The commission is hereby authorized by its order to assign or refer any portion of its work, business, or functions arising under this chapter or any other Act of Congress or referred to it by Congress, or either branch thereof, to an individual commissioner, or to a board composed of an employee or employees of the commission, to be designated by such order, for action thereon, and by its order at any time to amend, modify, supplement, or rescind any such assignment or reference: *Provided, however,* That this authority shall not extend to investigations instituted upon the commission's own motion nor, without the consent of the parties thereto, to contested proceedings involving the taking of testimony at public hearings. All such orders shall take effect forthwith and remain in effect until otherwise ordered by the commission. In case of the absence or inability for any other reason to act of any such individual commissioner or employee designated to serve upon any such board, the chairman of the commission may designate another commissioner or employee, as the case may be, to serve temporarily until the commission shall otherwise order. In conformity with and subject to the order or orders of the commission in the premises, any such individual commissioner, or board acting by a majority thereof, shall have power and authority to hear and determine, order, certify, report, or otherwise act as to any of said work, business, or functions so assigned or referred to him or it for action by the commission and in respect thereof shall have all the jurisdiction and powers now or then conferred by law upon the commission and be subject to the same duties and obligations. Any order, decision, or report made or other action taken by any such individual commissioner or board in respect of any matters so assigned or referred shall have the same force and effect, and may be made, evidenced, and enforced in the same manner as if made or taken by the commission. Any party affected by any order, decision, or report of any such individual commissioner or board may file a petition for reconsideration of or for rehearing by the commission or a division thereof and every such petition shall be passed upon by the commission or a division thereof. Any action by a division upon such a petition shall itself be subject to reconsideration by the commission, as provided in section 16a of this chapter, and in paragraph (4) of this section. The commission may, as provided in paragraph (1) of this section, make and amend rules for the conduct of proceedings before such individual commissioner or board and for the rehearing of such action before a division of the commission or the

commission. The secretary and seal of the commission shall be the secretary and seal of such individual commissioner or board. (Feb. 4, 1887, c. 104, § 17, 24 Stat. 385; Mar. 2, 1889, c. 382, § 6, 25 Stat. 861; Aug. 9, 1917, c. 50, § 2, 40 Stat. 270; Feb. 28, 1920, c. 91, §§ 430–432, 41 Stat. 492, 493, Feb. 28, 1933, c. 136, 47 Stat. 1368.)

**18. Employees; appointment and compensation; witness fees; expenses.** (1) *Commissioners' salaries; secretary and employees; compensation; witness fees.*—Each commissioner shall receive an annual salary of $12,000, payable in the same manner as the judges of the courts of the United States. The commission shall appoint a secretary, who shall receive an annual salary of $7,500, payable in like manner. The commission shall have authority to employ and fix the compensation of such other employees as it may find necessary to the proper performance of its duties. Until otherwise provided by law, the commission may hire suitable offices for its use, and shall have authority to procure all necessary office supplies. Witnesses summoned before the commission shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

(2) *Expenses of commission.*—All of the expenses of the commission, including all necessary expenses for transportation incurred by the commissioners, or by their employees under their orders, in making any investigation, or upon official business in any other places than in the city of Washington, shall be allowed and paid on the presentation of itemized vouchers therefor approved by the chairman of the commission. (Feb. 4, 1887, c. 104, §§ 18, 24, 24 Stat. 386; Mar. 2, 1889, c. 382, § 7, 25 Stat. 861; June 29, 1906, c. 3591, § 8, 34 Stat. 595; Aug. 9, 1917, c. 50, § 1, 40 Stat. 270; Feb. 28, 1920, c. 91, §§ 433, 440, 41 Stat. 493, 497.)

**§ 19. Office and sessions.** The principal office of the commission shall be in the city of Washington, where its general sessions shall be held; but whenever the convenience of the public or of the parties may be promoted or delay or expense prevented thereby, the commission may hold special sessions in any part of the United States. It may, by one or more of the commissioners, prosecute any inquiry necessary to its duties, in any part of the United States, into any matter or question of fact pertaining to the business of any common carrier subject to the provisions of this chapter. (Feb. 4, 1887, c. 104, § 19, 24 Stat. 386.)

**§19a. Valuation of property of carriers.** (a) *Physical valuation of property of carriers; classification and inventory.*—The Commission shall, as hereinafter provided, investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this chapter, except any street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation; but the Commission may in its discretion investigate, ascertain, and report the value of the property owned or used by any such electric railway subject to the provisions of this chapter whenever in its judgment such action is desirable in the public interest. To enable the Commission to make such investigation and report, it is authorized to employ such experts and other assistants as may be necessary. The Commission may appoint examiners who shall have power to administer oaths, examine witnesses, and take testimony. The Commission shall, subject to the exception hereinbefore provided for in the case of electric railways, make an inventory which shall list the property of every common carrier subject to the provisions of this chapter in detail, and show the value thereof as hereinafter provided, and shall classify the physical property, as nearly as practicable, in conformity with the classification of expenditures for road and equipment, as prescribed by the Interstate Commerce Commission.

(b) *Cost of property; elements considered in determination; gifts, grants, etc.*—First. In such investigation said commission shall ascertain and report in detail as to each piece of property, other than land owned or used by said common carrier for its purposes as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any. The commission shall in like manner ascertain and report separately other values, and elements of value, if any, of the property of such common carrier, and an analysis of the methods of valuation employed, and of the reasons for any differences between any such value and each of the foregoing cost values.

Second. Such investigation and report shall state in detail and separately from improvements the original cost of all lands, rights of way, and terminals owned or used for the purpose of a common carrier, and ascertained as of the time of dedication to public use, and the present value of the same.

Third. Such investigation and report shall show separately the property held for purposes other than those of a common carrier, and the original cost and present value of the same, together with an analysis of the methods of valuation employed.

Fourth. In ascertaining the original cost to date of the property of such common carrier the commission, in addition to such other elements as it may deem necessary, shall investigate and report upon the history and organization of the present and of any previous corporation operating such property; upon any increases or decreases of stocks, bonds, or other securities, in any reorganization; upon moneys received by any such corporation by reason of any issues of stocks, bonds, or other securities; upon the syndicating, banking, and other financial arrangements under which such issues were made and the expense thereof; and upon the net and gross earnings of such corporations; and shall also ascertain and report in such detail as may be determined by the commission upon the expenditure of all moneys and the purposes for which the same were expended.

Fifth. The commission shall ascertain and report the amount and value of any aid, gift, grant of right of way, or donation, made to any such common carrier, or to any previous corporation operating such property, by the Government of the United States or by any State, county, or municipal government, or by individuals, associations, or corporations; and it shall also ascertain and report the grants of land to any such common carrier, or any previous corporation operating such property, by the Government of the United States, or by any State, county, or municipal government, and the amount of money derived from the sale of any portion of such grants and the value of the unsold portion thereof at the time acquired and at the present time, also, the amount and value of any concession and allowance made by such common carrier to the Government of the United States, or to any State, county, or municipal government in consideration of such aid, gift, grant, or donation.

(c) *Investigation; procedure and forms.*—Except as herein otherwise provided, the commission shall have power to prescribe the method of procedure to be followed in the conduct of the investigation, the form in which the results of the valuation shall be submitted, and the classification of the elements that constitute the ascertained value, and such investigation shall show the value of the property of every common carrier as a whole and separately the value of its property in each of the several States and Territories and the District of Columbia, classified and in detail as herein required.

(d) *Time for beginning investigation; reports to Congress.*—Such investigation shall be commenced within sixty days after March 1, 1913, and shall be prosecuted with diligence and thoroughness, and the result thereof reported to Congress at the beginning of each regular session until completed.

(e) *Aid of carrier required; rules and regulations; inspection of records.*—Every common carrier subject to the provisions of this chapter shall furnish to the commission or its agents from time to time and as the commission may require maps, profiles, contracts, re-

ports of engineers, and any other documents, records, and papers, or copies of any or all of the same, in aid of such investigation and determination of the value of the property of said common carrier, and shall grant to all agents of the commission free access to its right-of-way, its property, and its accounts, records, and memoranda whenever and wherever requested by any such duly authorized agent, and every common carrier is directed and required to cooperate with and aid the commission in the work of the valuation of its property in such further particulars and to such extent as the commission may require and direct, and all rules and regulations made by the commission for the purpose of administering the provisions of this section and section 20 of this chapter shall have the full force and effect of law. Unless otherwise ordered by the commission, with the reasons therefor, the records and data of the commission shall be open to the inspection and examination of the public.

(*f*) *Valuation of extensions and improvements; revisions; reports.*—Upon completion of the original valuations herein provided for, the Commission shall thereafter keep itself informed of all new construction, extensions, improvements, retirements, or other changes in the condition, quantity, use, and classification of the property of all common carriers as to which original valuations have been made, and of the cost of all additions and betterments thereto and of all changes in the investment therein, and may keep itself informed of current changes in costs and values of railroad properties, in order that it may have available at all times the information deemed by it to be necessary to enable it to revise and correct its previous inventories, classifications, and values of the properties; and when deemed necessary, may revise, correct, and supplement any of its inventories and valuations.

(*g*) *Reports and information to be furnished by carriers.*—To enable the Commission to carry out the provisions of the preceding paragraph, every common carrier subject to the provisions of this chapter shall make such reports and furnish such information as the Commission may require.

(*h*) *Notice of completion of tentative valuation; protests; finality of report.*—Whenever the commission shall have completed the tentative valuation of the property of any common carrier, as herein directed, and before such valuation shall become final, the commission shall give notice by registered letter to the said carrier, the Attorney General of the United States, the governor of any State in which the property so valued is located, and to such additional parties as the commission may prescribe, stating the valuation placed upon the several classes of property of said carrier, and shall allow thirty days in which to file a protest of the same with the commission. If no protest is filed within thirty days, said valuation shall become final as of the date thereof.

(*i*) *Protests; hearings; changes in valuations; final valuation and classification.*—If notice of protest is filed the commission shall fix a time for hearing the same, and shall proceed as promptly as may be to hear and consider any matter relative and material thereto which may be presented in support of any such protest so filed as aforesaid. If after hearing any protest of such tentative valuation under the provisions of this chapter the commission shall be of the opinion that its valuation should not become final, it shall make such changes as may be necessary, and shall issue an order making such corrected tentative valuation final as of the date thereof. All final valuations by the commission and the classification thereof shall be published and shall be prima facie evidence of the value of the property in all proceedings under this chapter as of the date of the fixing thereof, and in all judicial proceedings for the enforcement of this chapter, and in all judicial proceedings brought to enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission.

(*j*) *Effect of evidence as to values; modification of orders.*—If upon the trial of any action involving a final value fixed by the commission, evidence shall be introduced regarding such value which is found by the court to be different from that offered upon the hearing before the commission, or additional thereto and substantially affecting said value, the court, before proceeding to render judgment shall transmit a copy of such evidence to the commission, and shall stay further proceedings in said action for such time as the court shall determine from the date of such transmission. Upon the receipt of such evidence the commission shall consider the same and may fix a final value different from the one fixed in the first instance, and may alter, modify, amend or rescind any order which it has made involving said final value, and shall report its action thereon to said court within the time fixed by the court. If the commission shall alter, modify, or amend its order, such altered, modified, or amended order shall take the place of the original order complained of and judgment shall be rendered thereon as though made by the commission in the first instance. If the original order shall not be rescinded or changed by the commission, judgment shall be rendered upon such original order.

(*k*) *Receivers and trustees of carriers affected; noncompliance with law; penalty.*—The provisions of this section shall apply to receivers of carriers and operating trustees. In case of failure or refusal on the part of any carrier, receiver, or trustee to comply with all the requirements of this section and in the manner prescribed by the commission such carrier, receiver, or trustee shall forfeit to the United States the sum of $500 for each such offense and for each and every day of the continuance of such offense, such forfeitures to be recoverable in the same manner as other forfeitures provided for in section 16 of this chapter.

(*l*) *Mandamus to compel compliance with law.*—The district courts of the United States shall have jurisdiction, upon the application of the Attorney General of the United States at the request of the commission, alleging a failure to comply with or a violation of any of the provisions of this section by any common carrier, to issue a writ or writs of mandamus commanding such common carrier to comply with the provisions of this section. (Feb. 4, 1887, c. 104, § 19a; Mar. 1, 1913, c. 92, 37 Stat. 701; Feb. 28, 1920, c. 91, § 433, 41 Stat. 493; June 7, 1922, c. 210, §§ 1, 2, 42 Stat. 624; and June 16, 1933, c. 91, Title II, §§ 207, 208, 48 Stat. 221.)

See section 213 of Title 47.

## § 20. Reports, records, and accounts of carriers; mandamus; liability of initial carrier for loss, etc.

(*1*) *Annual reports of carriers; contents; uniform accounts.*—The commission is authorized to require annual reports from all common carriers subject to the provisions of this chapter, and from the owners of all railroads engaged in interstate commerce as defined in this chapter, to prescribe the manner in which such reports shall be made, and to require from such carriers specific answers to all questions upon which the commission may need information. Such annual reports shall show in detail the amount of capital stock issued, the amounts paid therefor, and the manner of payment for the same; the dividends paid, the surplus fund, if any, and the number of stockholders; the funded and floating debts and the interest paid thereon; the cost and value of the carrier's property, franchises, and equipments; the number of employees and the salaries paid each class; the accidents to passengers, employees, and other persons, and the causes thereof; the amounts expended for improvements each year, how expended, and the character of such improvements; the earnings and receipts from each branch of business and from all sources; the operating and other expenses; the balances of profit and loss; and a complete exhibit of the financial operations of the carrier each year, including an annual balance sheet. Such reports shall also contain such information in relation to rates or regulations concerning fares or freights, or agreements, arrangements, or contracts affecting the same as the commission may require; and the commission may, in its

discretion, for the purpose of enabling it the better to carry out the purposes of this chapter, prescribe a period of time within which all common carriers subject to the provisions of this chapter shall have, as near as may be, a uniform system of accounts, and the manner in which such accounts shall be kept.

(2) *Period covered by and time for making reports; monthly and special reports; penalty for omissions.*— Said detailed reports shall contain all the required statistics for the period of twelve months ending on the 30th day of June in each year, or on the 31st day of December in each year if the commission by order substitute that period for the year ending June 30th, and shall be made out under oath and filed with the commission at its office in Washington within three months after the close of the year for which the report is made, unless additional time be granted in any case by the commission; and if any carrier, person, or corporation subject to the provisions of this chapter shall fail to make and file said annual reports within the time above specified, or within the time extended by the commission, for making and filing the same, or shall fail to make specific answer to any question authorized by the provisions of this section within thirty days from the time it is lawfully required so to do, such party shall forfeit to the United States the sum of $100 for each and every day it shall continue to be in default with respect thereto. The commission shall also have authority by general or special orders to require said carriers, or any of them, to file monthly reports of earnings and expenses and to file periodical or special, or both periodical and special, reports concerning any matters about which the commission is authorized or required by this or any other law to inquire or to keep itself informed or which it is required to enforce; and such periodical or special reports shall be under oath whenever the commission so requires; and if any such carrier shall fail to make and file any such periodical or special report within the time fixed by the commission, it shall be subject to the forfeitures last above provided.

(3) *Recovery of forfeitures.*—Said forfeitures shall be recovered in the manner provided for the recovery of forfeitures under the provisions of this chapter.

(4) *Administration of oath.*—The oath required by this section may be taken before any person authorized to administer an oath by the laws of the State in which the same is taken.

(5) *Forms of accounts and records; depreciation charges; access to records, etc., by commission.*— The commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to the provisions of this chapter, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys. The commission shall, as soon as practicable, prescribe, for carriers subject to this chapter, the classes of property for which depreciation charges may properly be included under operating expenses, and the percentages of depreciation which shall be charged with respect to each of such classes of property, classifying the carriers as it may deem proper for this purpose. The commission may, when it deems necessary, modify the classes and percentages so prescribed. The carriers subject to this chapter shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the commission. No such carrier shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses. The commission shall at all times have access to all accounts, records, and memoranda, including all documents, papers, and correspondence on February 28, 1920, or thereafter existing, and kept or required to be kept by carriers subject to this chapter, and the provisions of this section respecting the preservation and destruction of books, papers, and documents shall apply thereto, and it shall be

unlawful for such carriers to keep any other accounts, records, or memoranda than those prescribed or approved by the commission, and it may employ special agents or examiners, who shall have authority under the order of the commission to inspect and examine any and all accounts, records, and memoranda, including all documents, papers, and correspondence on February 28, 1920, or thereafter existing, and kept or required to be kept by such carriers. This provision shall apply to receivers of carriers and operating trustees. The provisions of this section shall also apply to all accounts, records, and memoranda, including all documents, papers, and correspondence on February 28, 1920, or thereafter existing, kept during the period of Federal control, and placed by the President in the custody of carriers subject to this chapter.

(6) *Failure to keep accounts and records, or submit same to inspection; penalty.*—In case of failure or refusal on the part of any such carrier, receiver, or trustee to keep such accounts, records, and memoranda on the books and in the manner prescribed by the commission, or to submit such accounts, records, and memoranda as are kept to the inspection of the commission or any of its authorized agents or examiners, such carrier, receiver, or trustee shall forfeit to the United States the sum of $500 for each such offense and for each and every day of the continuance of such offense, such forfeitures to be recoverable in the same manner as other forfeitures provided for in this chapter.

(7) *False entries; destruction of or failure to make entries, etc.; penalty; proviso.*—Any person who shall willfully make any false entry in the accounts of any book of accounts or in any record or memoranda kept by a carrier, or who shall willfully destroy, mutilate, alter, or by any other means or device falsify the record of any such account, record, or memoranda, or who shall willfully neglect or fail to make full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the carrier's business, or shall keep any other accounts, records, or memoranda than those prescribed or approved by the commission, shall be deemed guilty of a misdemeanor and shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not less than $1,000 nor more than $5,000, or imprisonment for a term not less than one year nor more than three years, or both such fine and imprisonment: *Provided,* That the commission may in its discretion issue orders specifying such operating, accounting, or financial papers, records, books, blanks, tickets, stubs, or documents of carriers which may, after a reasonable time, be destroyed, and prescribing the length of time such books, papers, or documents shall be preserved.

(8) *Examiner divulging facts or information; penalty.*—Any examiner who divulges any fact or information which may come to his knowledge during the course of such examination, except insofar as he may be directed by the commission or by a court or judge thereof, shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not more than $5,000 or imprisonment for a term not exceeding two years, or both.

(9) *Jurisdiction to compel compliance by mandamus.*—The district courts of the United States shall have jurisdiction, upon the application of the Attorney General of the United States at the request of the commission, alleging a failure to comply with or a violation of any of the provisions of this chapter or of any statutes supplementary thereto or amendatory thereof by any common carrier, to issue a writ or writs of mandamus commanding such common carrier to comply with the provisions of this chapter and said statutes, or any of them.

(10) *Special agents or examiners.*—And to carry out and give effect to the provisions of this chapter and said statutes, or any of them, the commission is authorized to employ special agents or examiners who shall have power to administer oaths, examine witnesses, and receive evidence.

A-21

(11) *Liability of initial carrier for loss; limitation of liability; notice and filing of claim.*—Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: *Provided,* That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by and under the laws and regulations applicable to transportation by water, and the liability of the initial or delivering carrier shall be the same as that of such carrier by water: *Provided, however,* That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section 10 of this chapter; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the commission is hereby empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The term "ordinary livestock" shall include all cattle, swine, sheep, goats, horses, and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses: *Provided further,* That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: *Provided further,* That all actions brought under and by virtue of this paragraph against the delivering carrier shall be brought, and may be maintained, if in a district court of the United States, only in a district, and if in a State court, only in a State through or into which the defendant carrier operates a line of railroad: *Provided further,* That it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation, or otherwise a shorter period for the filing of claims than nine months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice: *And provided further,* That for the purposes of this paragraph and of paragraph (12) the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination: *And provided further,* That the liability imposed by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this chapter provided.

(12) *Recovery by initial carrier from connecting carrier.*—The common carrier, railroad, or transportation company issuing such receipt or bill of lading, or delivering such property so received and transported shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof. (Feb. 4, 1887, c. 104, § 20, 24 Stat. 386; June 29, 1906, c. 3591, § 7, 34 Stat. 593; Feb. 25, 1909, c. 193, 35 Stat. 649; June 18, 1910, c. 309, § 14, 36 Stat. 555; Mar. 4, 1915, c. 176, § 1, 38 Stat. 1196; Aug. 9, 1916, c. 301, 39 Stat. 441; Feb. 28, 1920, c. 91, §§ 434–438, 41 Stat. 493, 494; July 3, 1926, c. 761, 44 Stat. 835; Mar. 4, 1927, c. 510, § 3, 44 Stat. 1448; Apr. 23, 1930, c. 208, 46 Stat. 251.)

See section 541 of Title 18.

**§ 20a. Securities of carriers; issuance, etc.** (1) *Carrier defined.*—As used in this section the term "carrier" means a common carrier by railroad (except a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation) which is subject to this chapter, or any corporation organized for the purpose of engaging in transportation by railroad subject to this chapter.

(2) *Issuance of securities; assumption of obligations; authorization.*—It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed "securities") or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate

purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose.

(3) *Scope of commission's authority.*—The commission shall have power by its order to grant or deny the application as made, or to grant it in part and deny it in part, or to grant it with such modifications and upon such terms and conditions as the commission may deem necessary or appropriate in the premises, and may from time to time, for good cause shown, make such supplemental orders in the premises as it may deem necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any securities so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of the foregoing paragraph (2).

(4) *Form and contents of application; oath and signature.*—Every application for authority shall be made in such form and contain such matters as the commission may prescribe. Every such application, as also every certificate of notification hereinafter provided for, shall be made under oath, signed and filed on behalf of the carrier by its president, a vice president, auditor, comptroller, or other executive officer having knowledge of the matters therein set forth and duly designated for that purpose by the carrier.

(5) *Disposition of securities described in application, etc.*—Whenever any securities set forth and described in any application for authority or certificate of notification as pledged or held unencumbered in the treasury of the carrier shall, subsequent to the filing of such application or certificate, be sold, pledged, repledged, or otherwise disposed of by the carrier, such carrier shall, within ten days after such sale, pledge, repledge, or other disposition, file with the commission a certificate of notification to that effect, setting forth therein all such facts as may be required by the commission.

(6) *Notice of application to governors of States; intervention; hearings.*—Upon receipt of any such application for authority the commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which the applicant carrier operates. The railroad commissions, public service, or utilities commissions, or other appropriate State authorities of the State shall have the right to make before the commission such representations as they may deem just and proper for preserving and conserving the rights and interests of their people and the States, respectively, involved in such proceedings. The commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority.

(7) *Jurisdiction of commission as exclusive and plenary.*—The jurisdiction conferred upon the commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein.

(8) *Guaranty of securities.*—Nothing herein shall be construed to imply any guaranty or obligation as to such securities on the part of the United States.

(9) *Issue of short-term notes; certificate of notification; proviso.*—The foregoing provisions of this section shall not apply to notes to be issued by the carrier maturing not more than two years after the date thereof and aggregating (together with all other then outstanding notes of a maturity of two years or less) not more than 5 per centum of the par value of the securities of the carrier then outstanding. In the case of securities having no par value, the par value for the purposes of this paragraph shall be the fair market value as of the date of issue. Within ten days after the making of such notes the carrier issuing the same shall file with the commission a certificate of notification, in such form as may from time to

time be determined and prescribed by the commission, setting forth as nearly as may be the same matters as those required in respect of applications for authority to issue other securities: *Provided,* That in any subsequent funding of such notes the provisions of this section respecting other securities shall apply.

(10) *Reports by carriers as to securities or proceeds.*—The commission shall require periodical or special reports from each carrier issuing any securities, including such notes, which shall show, in such detail as the commission may require, the disposition made of such securities and the application of the proceeds thereof.

(11) *Securities issued contrary to law void; effect; penalty.*—Any security issued or any obligation or liability assumed by a carrier, for which under the provisions of this section the authorization of the commission is required, shall be void, if issued or assumed without such authorization therefor having first been obtained, or if issued or assumed contrary to any term or condition of such order of authorization as modified by any order supplemental thereto entered prior to such issuance or assumption; but no security issued or obligation or liability assumed in accordance with all the terms and conditions of such an order of authorization therefor as modified by any order supplemental thereto entered prior to such issuance or assumption, shall be rendered void because of failure to comply with any provision of this section relating to procedure and other matters preceding the entry of such order of authorization. If any security so made void or any security in respect to which the assumption of obligation or liability is so made void, is acquired by any person for value and in good faith and without notice that the issue or assumption is void, such person may in a suit or action in any court of competent jurisdiction hold jointly and severally liable for the full amount of the damage sustained by him in respect thereof, the carrier which issued the security so made void, or assumed the obligation or liability so made void, and its directors, officers, attorneys, and other agents, who participated in any way in the authorizing, issuing, hypothecating, or selling of the security so made void or in the authorizing of the assumption of the obligation or liability so made void. In case any security so made void was directly acquired from the carrier issuing it the holder may at his option rescind the transaction and upon the surrender of the security recover the consideration given therefor. Any director, officer, attorney, or agent of the carrier who knowingly assents to or concurs in any issue of securities or assumptions of obligation or liability forbidden by this section, or any sale or other disposition of securities contrary to the provisions of the commission's order or orders in the premises, or any application not authorized by the commission of the funds derived by the carrier through such sale or other disposition of such securities, shall be guilty of a misdemeanor and upon conviction shall be punished by a fine of not less than $1,000 nor more than $10,000, or by imprisonment for not less than one year nor more than three years, or by both such fine and imprisonment, in the discretion of the court.

(12) *Restrictions on actions of officers and directors; penalty.*—It shall be unlawful for any person to hold the position of officer or director of more than one carrier, unless such holding shall have been authorized by order of the commission, upon due showing, in form and manner prescribed by the commission, that neither public nor private interests will be adversely affected thereby. It shall be unlawful for any officer or director of any carrier to receive for his own benefit, directly or indirectly, any money or thing of value in respect of the negotiation, hypothecation, or sale of any securities issued or to be issued by such carrier, or to share in any of the proceeds thereof, or to participate in the making or paying of any dividends of an operating carrier from any funds properly included in capital account. Any violation of these provisions shall be a misdemeanor, and on conviction in any United States court having jurisdiction shall be punished by a fine of not less than $1,000

nor more than $10,000, or by imprisonment for not less than one year nor more than three years, or by both such fine and imprisonment, in the discretion of the court. (Feb. 4, 1887, c. 104, § 20a; Feb. 28, 1920, c. 91, § 439, 41 Stat. 494.)

**§ 21. Annual report of commission.** The commission shall, on or before the first day of December in each year, make a report, which shall be transmitted to Congress, and copies of which shall be distributed as are the other reports transmitted to Congress. This report shall contain such information and data collected by the commission as may be considered of value in the determination of questions connected with the regulation of commerce, together with such recommendations as to additional legislation relating thereto as the commission may deem necessary; and the names and compensation of the persons employed by said commission. (Feb. 4, 1887, c. 104, § 21, 24 Stat. 387; Mar. 2, 1889, c. 382, § 8, 25 Stat. 862.)

**§ 22. Restrictions; interchangeable mileage or scrip.** (1) *Restrictions.*—Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States, State, or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat, or the free carriage of destitute and homeless persons transported by charitable societies, and the necessary agents employed in such transportation, or the issuance of mileage, excursion, or commutation passenger tickets; nothing in this chapter shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion, or to municipal governments for the transportation of indigent persons, or to inmates of the national homes or State homes for disabled volunteer soldiers and of soldiers' and sailors' orphan homes, including those about to enter and those returning home after discharge, under arrangements with the boards of managers of said homes. Nothing in this chapter shall be construed to prevent railroads from giving free carriage to their own officers and employees, or to prevent the principal officers of any railroad company or companies from exchanging passes or tickets with other railroad companies for their officers and employees; and nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies; nothing in this chapter shall be construed to prohibit any common carrier from carrying any totally blind person accompanied by a guide at the usual and ordinary fare charged to one person, under such reasonable regulations as may have been established by the carrier: *Provided*, That nothing in this chapter shall prevent the issuance of joint interchangeable five-thousand-mile tickets, with special privileges as to the amount of free baggage that may be carried under mileage tickets of one thousand or more miles. But before any common carrier, subject to the provisions of this chapter, shall issue any such joint interchangeable mileage tickets with special privileges, as aforesaid, it shall with the Interstate Commerce Commission copies of the joint tariffs of rates, fares, or charges on which such joint interchangeable mileage tickets are to be based, together with specifications of the amount of free baggage permitted to be carried under such tickets, in the same manner as common carriers are required to do with regard to other joint rates by section 6 of this chapter; and all the provisions of said section 6 relating to joint rates, fares, and charges shall be observed by said common carriers and enforced by the Interstate Commerce Commission as fully with regard to such joint interchangeable mileage tickets as with regard to other joint rates, fares, and charges referred to in said section 6. It shall be unlawful for any common carrier that has issued or authorized to be issued any such joint interchangeable mileage tickets to demand, collect, or receive from any person or persons a greater or less compensation for transportation of persons or baggage under such joint interchangeable mileage tickets than that required by

the rate, fare, or charge specified in the copies of the joint tariff of rates, fares, or charges filed with the commission in force at the time. The provisions of section 10 of this chapter shall apply to any violation of the requirements of this proviso. Nothing in this chapter shall prevent any carrier or carriers subject to this chapter from giving reduced rates for the transportation of property to or from any section of the country with the object of providing relief in case of earthquake, flood, fire, famine, drought, epidemic, pestilence, or other calamitous visitation or disaster, if such reduced rates have first been authorized by order of the commission (with or without a hearing); but in any such order the commission shall define such section and shall specify the period during which such reduced rates are to remain in effect. Nothing in this chapter shall prevent any carrier or carriers subject to this chapter from giving reduced rates for the transportation of commodities to be specified by the Commission as hereinafter provided, to or from any section of the country, with the object of improving Nation-wide housing standards and providing employment and stimulating industry, if such reduced rates have first been authorized by order of the Commission (with or without a hearing); but in such order the Commission shall specify the commodities as to which this provision shall be declared effective and shall specify the period during which such reduced rates are to remain in effect.

(2) *Sale of interchangeable mileage or scrip.*—The commission is directed to require, after notice and hearing, each carrier by rail, subject to this chapter, to issue at such offices as may be prescribed by the commission interchangeable mileage or scrip coupon tickets at just and reasonable rates, good for passenger carriage upon the passenger trains of all carriers by rail subject to this chapter. The commission may in its discretion exempt from the provisions of this paragraph and the following paragraph either in whole or in part any carrier where the particular circumstances shown to the commission shall justify such exemption to be made. Such tickets may be required to be issued in such denominations as the commission may prescribe. Before making any order requiring the issuance of any such tickets the commission shall make and publish such reasonable rules and regulations for their issuance and use as in its judgment the public interest demands; and especially it shall prescribe whether such tickets are transferable or nontransferable, and if the latter, what identification may be required; and especially, also to what baggage privileges the lawful holders of such tickets are entitled.

(3) *Penalty for failure to comply.*—Any carrier which, through the act of any agent or employee, willfully refuses to issue or accept any such ticket demanded or presented under the lawful requirements of this chapter, or willfully refuses to conform to the rules and regulations lawfully made and published by the commission hereunder, or any person who shall willfully offer for sale or carriage any such ticket contrary to the said rules and regulations shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined not to exceed $1,000. (Feb. 4, 1887, c. 104, § 22, 24 Stat. 387; Mar. 2, 1889, c. 382, § 9, 25 Stat. 802; Feb. 8, 1895, c. 61, 28 Stat. 643; and Aug. 18, 1922, c. 280, 42 Stat. 827; Feb. 26, 1927, c. 217, 44 Stat. 1247; Mar. 4, 1927, c. 510, § 1, 44 Stat. 1446; June 27, 1934, c. 847, Title V, § 511, 48 Stat. 1264.)

**§ 25. Schedules and rates of water carriers in foreign commerce.** (1) *Schedules to be filed by carriers by water in foreign commerce.*—Every common carrier by water in foreign commerce, whose vessels are registered under the laws of the United States, shall file with the commission, regularly as changes are made, a schedule or schedules showing for each of its steam vessels intended to load general cargo at ports in the United States for foreign destinations (a) the ports of loading, (b) the dates upon which such vessels will commence to receive freight and dates of sailing, (c) the route and itinerary such

vessels will follow and the ports of call for which cargo will be carried.

*(2) Quotation of rates by carriers by water; reservation of space.*—Upon application of any shipper a carrier by railroad shall make request for, and the carrier by water shall upon receipt of such request name, a specific rate applying for such sailing, and upon such commodity as shall be embraced in the inquiry, and shall name, in connection with such rate, port charges, if any, which accrue in addition to the vessel's rates and are not otherwise published by the railway as in addition to or absorbed in the railway rate. Vessel rates, if conditioned upon quantity of shipment, must be so stated and separate rates may be provided for carload and less-than-carload shipments. The carrier by water, upon advices from a carrier by railroad, stating that the quoted rate is firmly accepted as applying upon a specifically named quantity of any commodity, shall, subject to such conditions as the commission by regulation may prescribe, make firm reservation from unsold space in such steam vessel as shall be required for its transportation and shall so advise the carrier by railroad, in which advices shall be included the latest available information as to prospective sailing date of such vessel.

*(3) Modification, publication, and distribution of schedules; rules.*—As the matters so required to be stated in such schedule or schedules are changed or modified from time to time, the carrier shall file with the commission such changes or modifications as early as practicable after such modification is ascertained. The commission is authorized to make and publish regulations not inconsistent herewith governing the manner and form in which such carriers are to comply with the foregoing provisions. The commission shall cause to be published in compact form, for the information of shippers of commodities throughout the country, the substance of such schedules, and furnish such publications to all railway carriers subject to this chapter, in such quantities that railway carriers may supply to each of their agents who receive commodities for shipment in such cities and towns as may be specified by the commission, a copy of said publication; the intent being that each shipping community sufficiently important, from the standpoint of the export trade, to be so specified by the commission shall have opportunity to know the sailings and routes, and to ascertain the transportation charges of such vessels engaged in foreign commerce. Each railway carrier to which such publication is furnished by the commission is required to distribute the same as aforesaid and to maintain such publication as it is issued from time to time, in the hands of its agents. The commission is authorized to make such rules and regulations not inconsistent herewith respecting the distribution and maintenance of such publications in the several communities so specified as will further the intent of this section.

*(4) Bills of lading; form and contents; liability of initial carrier.*—When any consignor delivers a shipment of property to any of the places so specified by the commission, to be delivered by a railway carrier to one of the vessels upon which space has been reserved at a specified rate previously ascertained, as provided herein, for the transportation by water from and for a port named in the aforesaid schedule, the railway carrier shall issue a through bill of lading to the point of destination. Such bill of lading shall name separately the charge to be paid for the railway transportation, water transportation, and port charges, if any, not included in the rail or water transportation charge; but the carrier by railroad shall not be liable to the consignor, consignee, or other person interested in the shipment after its delivery to the vessel. The commission shall, in such manner as will preserve for the carrier by water the protection of limited liability provided by law, make such rules and regulations not inconsistent herewith as will prescribe the form of such through bill of lading. In all such cases it shall be the duty of the carrier by railroad to deliver such shipment to the vessel as a part of its undertaking as a common carrier.

*(5) Bill of lading as "arrangement for continuous carriage."*—The issuance of a through bill of lading covering shipments provided for herein shall not be held to constitute "an arrangement for continuous carriage or shipment" within the meaning of this chapter. (Feb. 4, 1887, c. 104, § 25; Feb. 28, 1920, c. 91, § 441, 41 Stat. 497.)

**§ 26. Installation of safety devices directed; negligence; penalty.** The commission may, after investigation, order any carrier by railroad subject to this chapter, within a time specified in the order, to install automatic train-stop or train-control devices or other safety devices, which comply with specifications and requirements prescribed by the commission, upon the whole or any part of its railroad, such order to be issued and published at least two years before the date specified for its fulfillment: *Provided,* That a carrier shall not be held to be negligent because of its failure to install such devices upon a portion of its railroad not included in the order; and any action arising because of an accident happening upon such portion of its railroad shall be determined without consideration of the use of such devices upon another portion of its railroad. Any common carrier which refuses or neglects to comply with any order of the commission made under the authority conferred by this section shall be liable to a penalty of $100 for each day that such refusal or neglect continues, which shall accrue to the United States, and may be recovered in a civil action brought by the United States. (Feb. 4, 1887, c. 104, § 26; Feb. 28, 1920, c. 91, § 441, 41 Stat. 498.)

**§ 27. Citation.** This chapter may be cited as the "Interstate Commerce Act." (Feb. 4, 1887, c. 104, § 27; Feb. 28, 1920, c. 91, § 441, 41 Stat. 499.)

## Chapter 2.—LEGISLATION SUPPLEMENTARY TO "INTERSTATE COMMERCE ACT"

Sec.
41. Liability of corporation carriers and agents; offenses and penalties.
    (1) Liability of corporation common carriers; offenses; penalties; jurisdiction.
    (2) Liabilities for acts of agents; departure from published rates.
    (3) Receiving rebates; additional penalty and recovery thereof.
42. Parties included in proceedings to enforce law.
43. Proceedings in equity to enforce tariffs, etc.; district attorneys; damages; witnesses; precedence.
44. Expedition of suits.
45. Appeals to Supreme Court.
46. Self-criminating testimony; perjury; refusal to testify.
47. Immunity of witness from prosecution; perjury.
48. Immunity extended to natural persons only.
49. Mandamus to obtain equal facilities for shippers.
50. Agent in Washington for service; service in default of designation.
51. Proceedings relating to rail and water routes; orders.
52. Railroads to serve employees in valuation work; compensation.
53. Exception to law prohibiting free transportation.
54. Statements showing employments under appropriations. [Repealed.]
55. Policy in making rate adjustments; investigation of rates authorized.
56. Statement of expenditures of commission. [Repealed.]
57. Auditing accounts of commission.
58. Exchange of typewriters, etc.
59. Drought relief rates; carrier protected upon compliance with request of federal agent.
60. Divesting prison made goods of interstate character.

**Section 41. Liability of corporation carriers and agents; offenses and penalties.** *(1) Liability of corporation common carriers; offenses; penalties; jurisdiction.*—Anything done or omitted to be done by a corporation common carrier, subject to the chapter 1 of this title, which, if done or omitted to be done by any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, would constitute a misdemeanor under said chapter or under sections 41, 42, or 43 of this title, shall also be held to be a misdemeanor committed by such corporation, and upon conviction thereof it shall be subject to like penalties as are prescribed in said chapter or by sections 41, 42, or 43 of this title, with reference to such persons, except as such penalties are herein changed. The willful failure upon the part of any carrier subject to said

Nitrate plants.

## "NITRATE PLANTS.

Ancor, Ohio.
Land purchase.

"To complete the purchase of or to settle the obligation of the Government for real estate contracted for in connection with the erection of the nitrate plant at Ancor, Hamilton County, Ohio, $180,000."

Construction contracts on cost-plus, etc. plans forbidden.

Sec. 3. That no contract for construction covered by the appropriations contained in this Act, or any of the unexpended balances of appropriations heretofore made for the support of the Military Establishment, except repair work, the cost of which can not be clearly estimated, shall be let to any contractor under what is known as the "cost-plus," "cost-plus percentage," or "cost-plus a fixed fee for compensation" system or form of contract: *Provided, however,* That work or construction let under such system or form of contract and now under process of completion may be concluded.

*Proviso.*
Completion of pending works allowed.

Raritan Arsenal, N. J.

## RARITAN ARSENAL.

Payment for real estate requisitioned for.
Vol. 40, p. 353.

Sec. 4. That the Secretary of War be, and he is hereby, authorized to expend such portion of the unexpended balances of the appropriations made by the second urgent deficiency Act, approved October 6, 1917, for terminal storage and shipping buildings as may be necessary for the payment of awards to cover the acquisition of the following-described real estate which has been requisitioned under the provisions of section 10 of the Act approved August 10, 1917 (Fortieth Statutes at Large, page 276), to wit: Two thousand and eighty-nine acres of land, more or less, and appurtenances thereto belonging, situated near Metuchen, in townships of Woodbridge and Raritan, county of Middlesex, State of New Jersey, and now occupied as an ordnance depot and known as Raritan Arsenal: *Provided,* That where the title to the above-described real estate sought to be acquired by such requisitions, already served, proves to be defective by reason of the fact that all necessary parties in interest were not served with requisitions or for any other reason, the Secretary of War be, and he is hereby, authorized to purchase or to acquire by condemnation or otherwise such outstanding titles as are necessary to completely vest the fee simple title to such real estate in the United States of America.

Vol. 40, p. 279.
Description.

*Proviso.*
Completion of title.

Walter Reed General Hospital.

## WALTER REED GENERAL HOSPITAL.

Restriction on purchase of real estate not applicable to addition to.
*Ante,* p. 128.

That no provision contained in the Army Appropriation Act approved July 11, 1919 (Public Numbered 7, Sixty-sixth Congress), shall be deemed or construed to prohibit the expenditure of the appropriation of $350,000 made therein for the purchase of land contiguous to the Walter Reed General Hospital, twenty-six and nine-tenths acres more or less, and the acquisition of so much of said acreage for the amount appropriated as the Secretary of War, in his discretion, may deem to be in the public interest.

Approved, February 28, 1920.

---

February 28, 1920.
[H. R. 10453.]
[Public, No. 152.]

**CHAP. 91.**—An Act To provide for the termination of Federal control of railroads and systems of transportation; to provide for the settlement of disputes between carriers and their employees; to further amend an Act entitled "An Act to regulate commerce," approved February 4, 1887, as amended, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Transportation Act, 1920.
Definitions.

## TITLE I.—DEFINITIONS.

Title.

Section 1. This Act may be cited as the "Transportation Act, 1920."

Sec. 2. When used in this Act—

TRANSPORTATION ACT.

The term "Interstate Commerce Act" means the Act entitled "An Act to regulate commerce," approved Feburary 4, 1887, as amended;

Meaning of terms.
"Interstate Commerce Act."
Vol. 24, p. 379.
Post, p. 474.

The term "Commerce Court Act" means the Act entitled "An Act to create a commerce court, and to amend an Act entitled 'An Act to regulate commerce,' approved February 4, 1887, as heretofore amended, and for other purposes," approved June 18, 1910;

"Commerce Court Act."
Vol. 36, p. 539.

The term "Federal Control Act" means the Act entitled "An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes," approved March 21, 1918, as amended;

"Federal Control Act."
Vol. 40, pp. 451, 1290.

The term "Federal control" means the possession, use, control, and operation of railroads and systems of transportation, taken over or assumed by the President under section 1 of the Act entitled "An Act making appropriations for the support of the Army for the fiscal year ending June 30, 1917, and for other purposes," approved August 29, 1916, or under the Federal Control Act; and

"Federal control."
Vol. 39, p. 645.

The term "Commission" means the Interstate Commerce Commission.

"Commission."

## TITLE II.—TERMINATION OF FEDERAL CONTROL.

Termination of Federal control.

Sec. 200. (a) Federal control shall terminate at 12.01 a. m., March 1, 1920; and the President shall then relinquish possession and control of all railroads and systems of transportation then under Federal control and cease the use and operation thereof.

Effective March 1, 1920.

(b) Thereafter the President shall not have or exercise any of the powers conferred upon him by the Federal Control Act relating—

Powers relinquished.

(1) To the use or operation of railroads or systems of transportation;

Operation of transportation systems.

(2) To the control or supervision of the carriers owning or operating them, or of the business or affairs of such carriers;

Supervision of carriers.

(3) To their rates, fares, charges, classifications, regulations, or practices;

Rates, classifications, etc.

(4) To the purchase, construction, or other acquisition of boats, barges, tugs, and other transportation facilities on the inland, canal, or coastwise waterways; or (except in pursuance of contracts or agreements entered into before the termination of Federal control) of terminals, motive power, cars, or equipment, on or in connection with any railroad or system of transportation;

Water transportation facilities, terminals, etc.

(5) To the utilization or operation of canals;

Canal operation.

(6) To the purchase of securities of carriers, except in pursuance of contracts or agreements entered into before the termination of Federal control, or as a necessary or proper incident to the adjustment, settlement, liquidation and winding up of matters arising out of Federal control; or

Purchase of carriers' securities.

(7) To the use for any of the purposes above stated (except in pursuance of contracts or agreements entered into before the termination of Federal control, and except as a necessary or proper incident to the winding up or settling of matters arising out of Federal control, and except as provided in section 202) of the revolving fund created by such Act, or of any of the additions thereto made under such Act, or by the Act entitled "An Act to supply a deficiency in the appropriation for carrying out the Act entitled 'An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,' approved March 21, 1918," approved June 30, 1919.

Use of revolving fund.

Exceptions.

Vol. 40, p. 455.
Ante, p. 34.

(c) Nothing in this Act shall be construed as affecting or limiting the power of the President in time of war (under section 1 of the Act entitled "An Act making appropriations for the support of the

War emergency powers not affected.
Vol. 39, p. 645.

44281°—21——31

TRANSPORTATION ACT. Army for the fiscal year ending June 30, 1917, and for other purposes," approved August 29, 1916) to take possession and assume control of any system of transportation and utilize the same.

Inland waterways.

## GOVERNMENT-OWNED BOATS ON INLAND WATERWAYS.

Government boats, etc., on, transferred to Secretary of War.
*Post*, p. 906.

Sec. 201. (a) On the termination of Federal control, as provided in section 200, all boats, barges, tugs, and other transportation facilities, on the inland, canal, and coastwise waterways (hereinafter in this section called "transportation facilities") acquired by the

Vol. 40, p. 455.

United States in pursuance of the fourth paragraph of section 6 of the Federal Control Act (except the transportation facilities con-

*Post*, p. 1149.

stituting parts of railroads or transportation systems over which

Operation continued, etc.

Federal control was assumed) are transferred to the Secretary of War, who shall operate or cause to be operated such transportation facilities so that the lines of inland water transportation established by or through the President during Federal control shall be continued, and assume and carry out all contracts and agreements in relation thereto entered into by or through the President in pursuance of such paragraph prior to the time above fixed for such transfer.

Prior contracts, claims, etc., payable from Federal control moneys.

All payments under the terms of such contracts, and for claims arising out of the operation of such transportation facilities by or through the President prior to the termination of Federal control, shall be made out of moneys available under the provisions of this Act for adjusting, settling, liquidating, and winding up matters

Transfers of moneys.

arising out of or incident to Federal control. Moneys required for such payments shall, from time to time, be transferred to the Secretary of War as required for payment under the terms of such contracts.

Subsequent operation, etc., expenses.

(b) All other payments after such transfer in connection with the construction, utilization, and operation of any such transportation facilities, whether completed or under construction, shall be made by the Secretary of War out of funds now or hereafter made available for that purpose.

Terminal facilities for traffic interchange.
*Post*, p. 1392.

(c) The Secretary of War is hereby authorized, out of any moneys hereafter made available therefor, to construct or contract for the construction of terminal facilities for the interchange of traffic between the transportation facilities operated by him under this

Under State ownership.

section and other carriers whether by rail or water, and to make loans for such purposes under such terms and conditions as he may determine to any State whose constitution prohibits the ownership of such terminal facilities by other than the State or a political sub-

Mississippi River. Operation of facilities above Saint Louis, Mo.

division thereof.
(d) Any transportation facilities owned by the United States and included within any contract made by the United States for operation on the Mississippi River above Saint Louis, the possession of which reverts to the United States at or before the expiration of such contract, shall be operated by the Secretary of War so as to provide facilities for water carriage on the Mississippi River above Saint Louis.

Operation subject to interstate commerce laws, and Shipping Act.

(e) The operation of the transportation facilities referred to in this section shall be subject to the provisions of the Interstate Commerce Act as amended by this Act or by subsequent legislation, and to the

Vol. 39, p. 728; Vol. 40, p. 900.

provisions of the "Shipping Act, 1916," as now or hereafter amended, in the same manner and to the same extent as if such transportation

Shipping laws applicable to merchant vessels.

facilities were privately owned and operated; and all such vessels while operated and employed solely as merchant vessels shall be subject to all other laws, regulations, and liabilities governing merchant vessels, whether the United States is interested therein as owner, in whole or in part, or holds any mortgage, lien, or interest

Employees authorized.

therein. For the performance of the duties imposed by this section the Secretary of War is authorized to appoint or employ such num-

ber of experts, clerks, and other employees as may be necessary for <span>TRANSPORTATION ACT.</span> service in the District of Columbia or elsewhere, and as may be provided for by Congress.

### SETTLEMENT OF MATTERS ARISING OUT OF FEDERAL CONTROL.

<span>Settlement of Federal control matters.</span>

SEC. 202. The President shall, as soon as practicable after the termination of Federal control, adjust, settle, liquidate, and wind up all matters, including compensation, and all questions and disputes of whatsoever nature, arising out of or incident to Federal control. For these purposes and for the purpose of making the payments specified in subdivision (a) of section 201, all unexpended balances in the revolving fund created by the Federal Control Act or of the moneys appropriated by the Act entitled "An Act to supply a deficiency in the appropriation for carrying out the Act entitled 'An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,' approved March 21, 1918," approved June 30, 1919, are hereby reappropriated and made available until expended; and all moneys derived from the operation of the carriers or otherwise arising out of Federal control, and all moneys that have been or may be received in payment of the indebtedness of any carrier to the United States arising out of Federal control, shall be and remain available until expended for the aforesaid purposes; and there is hereby appropriated for the aforesaid purposes, out of any money in the Treasury not otherwise appropriated, $200,000,000 in addition to the above, to be available until expended.

<span>Early liquidation, etc., directed.</span>

<span>Moneys available.</span>

<span>Vol. 40, p. 455. Ante, p. 34.</span>

<span>Use of operation receipts, etc.</span>

<span>Additional appropriation.</span>
<span>Post, p. 589.</span>

### COMPENSATION OF CARRIERS WITH WHICH NO CONTRACT MADE.

<span>Compensation of carriers with which no contract made.</span>

SEC. 203. (a) Upon the request of any carrier entitled to just compensation under the Federal Control Act, but with which no contract fixing or waiving compensation has been made and which has made no waiver of compensation, the President: (1) shall pay to it so much of the amount he may determine to be just compensation as may be necessary to enable such carrier to have the sums required for interest, taxes, and other corporate charges and expenses referred to in paragraph (b) of section 7 of the standard contract between the United States and the carriers, accruing during the period for which such carrier is entitled to just compensation under the Federal Control Act, and also the sums required for dividends declared and paid during the same period, including, also, in addition, a sum equal to that proportion of such last dividend which the period between its payment and the termination of the period for which the carrier is entitled to just compensation under the Federal Control Act bears to the last dividend period; and (2) may, in his discretion, pay to such carrier the whole or any part of the remainder of such estimated amount of just compensation.

<span>Part of estimated amount for corporate charges and expenses, to be paid.</span>

<span>For dividends.</span>

<span>Further discretionary payment.</span>

(b) The acceptance of any benefits by a carrier under this section— (1) shall not deprive it of the right to claim additional compensation, which, unless agreed upon, shall be ascertained in the manner provided in section 3 of the Federal Control Act; but (2) shall constitute an acceptance by the carrier of all the provisions of the Federal Control Act as modified by this Act, and obligate the carrier to pay to the United States, with interest at the rate of 6 per centum per annum from a date or dates fixed in proceedings under section 3 of the Federal Control Act, the amount by which the sums received on account of such compensation, under this section or otherwise, exceed the sum found due in such proceedings.

<span>Conditions if accepted.</span>
<span>Additional compensation may be claimed.</span>

<span>Carrier to repay excess if any found due.</span>

REIMBURSEMENT OF DEFICITS DURING FEDERAL CONTROL.

Meaning of terms.
"Carrier."
Competing road which sustained deficit during Federal control.

SEC. 204. (a) When used in this section—

The term "carrier" means a carrier by railroad which, during any part of the period of Federal control, engaged as a common carrier in general transportation, and competed for traffic, or connected, with a railroad under Federal control, and which sustained a deficit in its railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation; but does not include any street or interurban electric railway which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic or sale of power, heat, and light, or both; and

The term "test period" means the three years ending June 30, 1917.

(b) For the purposes of this section—

Railway operating income or any deficit therein for the period of Federal control shall be computed in a manner similar to that provided in section 209 with respect to such income or deficit for the guaranty period; and

Railway operating income or any deficit therein for the test period shall be computed in the manner provided in section 1 of the Federal Control Act.

(c) As soon as practicable after March 1, 1920, the Commission shall ascertain for every carrier, for every month of the period of Federal control during which its railroad or system of transportation was not under Federal operation, its deficit in railway operating income, if any, and its railway operating income, if any, (hereinafter called "Federal control return"), and the average of its deficit in railway operating income, if any, and of its railway operating income, if any, for the three corresponding months of the test period taken together, (hereinafter called "test period return"): Provided, That "test period return," in the case of a carrier which operated its railroad or system of transportation for at least one year during, but not for the whole of, the test period, means its railway operating income, or the deficit therein, for the corresponding month during the test period, or the average thereof for the corresponding months during the test period taken together, during which the carrier operated its railroad or system of transportation.

(d) For every month of the period of Federal control during which the railroad or system of transportation of the carrier was not under Federal operation, the Commission shall then ascertain (1) the difference between its Federal control return, if a deficit, and its test period return, if a smaller deficit, or (2) the difference between its test period return, if an income, and its Federal control return, if a smaller income, or (3) the sum of its Federal control return, if a deficit, plus its test period return, if an income. The sum of such amounts shall be credited to the carrier.

(e) For every such month the Commission shall then ascertain (1) the difference between the carrier's Federal control return, if an income, and its test period return, if a smaller income, or (2) the difference between its test period return, if a deficit, and its Federal control return, if a smaller deficit, or (3) the sum of its Federal control return, if an income, plus its test period return, if a deficit. The sum of such amounts shall be credited to the United States.

(f) If the sum of the amounts so credited to the carrier under subdivision (d) exceeds the sum of the amounts so credited to the United States under subdivision (e), the difference shall be payable to the carrier. In the case of a carrier which operated its railroad or system of transportation for less than a year during, or for none of, the test period, the foregoing computations shall not be used, but there shall be payable to such carrier its deficit in railway operating

income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation.

(g) The Commission shall promptly certify to the Secretary of the Treasury the several amounts payable to carriers under paragraph (f). The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States for the amount shown in such certificate as payable thereto. An amount sufficient to pay such warrants is hereby appropriated out of any money in the Treasury not otherwise appropriated.

TRANSPORTATION ACT.
Certificate to Secretary of the Treasury, etc.
Warrant for payment.
Appropriation.

## INSPECTION OF CARRIERS' RECORDS.

Records, etc., of carriers.

SEC. 205. The President shall have the right, at all reasonable times until the affairs of Federal control are concluded, to inspect the property and records of all carriers whose railroads or systems of transportation were at any time under Federal control, whenever such inspection is necessary or appropriate (1) to protect the interests of the United States, or (2) to supervise matters being handled for the United States by agents of the carriers, or (3) to secure information concerning matters arising during Federal control, and such carriers shall provide all reasonable facilities therefor, including the issuance of free transportation to all agents of the President while traveling on official business for these purposes.

Inspection authorized of, under Federal control.

Purpose.

Facilities to agents.

Such carriers shall, at their expense, upon the request of the President, or those duly authorized by him, furnish all necessary and proper information and reports compiled from the records made or kept during the period of Federal control affecting their respective lines, and shall keep and continue such records and furnish like information and reports compiled therefrom.

Information to be furnished by carriers.

Any carrier which refuses or obstructs such inspection, or which willfully fails to provide reasonable facilities therefor, or to furnish such information or reports shall be liable to a penalty of $500 for each day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action to be brought by the United States.

Penalty for refusal, etc.

## CAUSES OF ACTION ARISING OUT OF FEDERAL CONTROL.

Causes of action arising out of Federal control.

SEC. 206. (a) Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier (under the provisions of the Federal Control Act, or of the Act of August 29, 1916) of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the President for such purpose, which agent shall be designated by the President within thirty days after the passage of this Act. Such actions, suits, or proceedings may, within the periods of limitation now prescribed by State or Federal statutes but not later than two years from the date of the passage of this Act, be brought in any court which but for Federal control would have had jurisdiction of the cause of action had it arisen against such carrier.

Suits may be brought against designated agent, after control terminated.
Vol. 40, p. 451; Vol. 39, p. 645.

Post, pp. 1859, 1864.

Time and jurisdiction.

(b) Process may be served upon any agent or officer of the carrier operating such railroad or system of transportation, if such agent or officer is authorized by law to be served with process in proceedings brought against such carrier and if a contract has been made with such carrier by or through the President for the conduct of litigation arising out of operation during Federal control. If no such contract has been made process may be served upon such agents or officers

Service of process. If contract made with carrier.

If no contract.

TRANSPORTATION ACT.
Statement by designated agent to district courts.
as may be designated by or through the President. The agent designated by the President under subdivision (a) shall cause to be filed, upon the termination of Federal control, in the office of the Clerk of each District Court of the United States, a statement naming all carriers with whom he has contracted for the conduct of litigation arising out of operation during Federal control, and a like statement designating the agents or officers upon whom process may be served in actions, suits, and proceedings arising in respect to railroads or systems of transportation with the owner of which no such contract has been made; and such statements shall be supplemented from time to time, if additional contracts are made or other agents or officers appointed.

Reparation for damages by violations of interstate commerce laws during Federal control.
(c) Complaints praying for reparation on account of damage claimed to have been caused by reason of the collection or enforcement by or through the President during the period of Federal control of rates, fares, charges, classifications, regulations, or practices (including those applicable to interstate, foreign, or intrastate traffic) which were unjust, unreasonable, unjustly discriminatory, or unduly or unreasonably prejudicial, or otherwise in violation of the Interstate Commerce Act, may be filed with the Commission, within Claims to be filed against designated agent. one year after the termination of Federal control, against the agent designated by the President under subdivision (a), naming in the petition the railroad or system of transportation against which such complaint would have been brought if such railroad or system had not been under Federal control at the time the matter complained Jurisdiction of Commission. of took place. The Commission is hereby given jurisdiction to hear and decide such complaints in the manner provided in the Interstate Commerce Act, and all notices and orders in such proceedings shall be served upon the agent designated by the President under subdivision (a).

Pending claims continued.
(d) Actions, suits, proceedings, and reparation claims, of the character above described pending at the termination of Federal control shall not abate by reason of such termination, but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a).

Payment of awards, etc.
(e) Final judgments, decrees, and awards in actions, suits, proceedings, or reparation claims, of the character above described, rendered against the agent designated by the President under sub-Post, p. 468. division (a), shall be promptly paid out of the revolving fund created by section 210.

Control period not computed in time limitations.
(f) The period of Federal control shall not be computed as a part of the periods of limitation in actions against carriers or in claims for reparation to the Commission for causes of action arising prior to Federal control.

Property of carrier under Federal control exempt from execution, etc.
(g) No execution or process, other than on a judgment recovered by the United States against a carrier, shall be levied upon the property of any carrier where the cause of action on account of which the judgment was obtained grew out of the possession, use, control, or operation of any railroad or system of transportation by the President under Federal control.

Refunding of carriers' indebtedness to United States.
REFUNDING OF CARRIERS' INDEBTEDNESS TO UNITED STATES.

Speedy ascertainment of indebtedness between carriers and United States.
SEC. 207. (a) As soon as practicable after the termination of Federal control the President shall ascertain (1) the amount of the indebtedness of each carrier to the United States, which may exist at the termination of Federal control, incurred for additions and betterments made during Federal control and properly chargeable to capital account; (2) the amount of indebtedness of such carrier to the United States otherwise incurred; and (3) the amount of the indebtedness of the United States to such carrier arising out of

Federal control. The amount under clause (3) may be set off against either or both of the amounts under clauses (1) and (2), so far as deemed wise by the President, but only to the extent permitted under any contract now or hereafter made between such carrier and the United States in respect to the matters of Federal control, or, where no such contract exists, to the extent permitted under paragraph (b) of section 7 of the standard contract between the United States and the carriers relative to deductions from compensation: *Provided,* That such right of set-off shall not be so exercised as to prevent such carrier from having the sums required for interest, taxes, and other corporate charges and expenses referred to in paragraph (b) of section 7 of such standard contract, accruing during Federal control, and also the sums required for dividends declared and paid during Federal control, including, also in addition, a sum equal to that proportion of such last dividend which the period between its payment and the termination of Federal control bears to the last regular dividend period: *And provided further,* That such right of set-off shall not be exercised unless there shall have first been paid such sums in addition as may be necessary to provide the carrier with working capital in amount not less than one twenty-fourth of its operating expenses for the calendar year 1919.

(b) Any remaining indebtedness of the carrier to the United States in respect to such additions and betterments shall, at the request of the carrier, be funded for a period of ten years from the termination of Federal control, or a shorter period at the option of the carrier, with interest at the rate of 6 per centum per annum, payable semiannually, subject to the right of such carrier to pay, on any interest-payment day, the whole or any part of such indebtedness. Any carrier obtaining the funding of such indebtedness as aforesaid shall give, in the discretion of the President, such security, in such form and upon such terms, as he may prescribe.

(c) If the President and the various carriers, or any of them, shall enter into an agreement for funding, through the medium of car trust certificates, or otherwise, the indebtedness of any such carrier to the United States incurred for equipment ordered for the benefit of such carrier, such indebtedness so funded shall not be refundable under the foregoing provisions.

(d) Any other indebtedness of any such carrier to the United States which may exist after the settlement of accounts between the United States and the carrier and is then due shall be evidenced by notes payable in one year from the termination of Federal control, or a shorter period at the option of the carrier, with interest at the rate of 6 per centum per annum, and secured by such collateral security as the President may deem it advisable to require.

(e) With respect to any bonds, notes, or other securities, acquired under the provisions of this section or of the Federal Control Act or of the Act entitled "An Act to provide for the reimbursement of the United States for motive power, cars and other equipment ordered for railroads and systems of transportation under Federal control, and for other purposes," approved November 19, 1919, the President shall have the right to make such arrangements for extension of the time of payment or for the exchange of any of them for other securities, or partly for cash and partly for securities, as may be provided for in any agreement entered into by him or as may in his judgment seem desirable.

(f) Carriers may, by agreement with the President, issue notes or other evidences of indebtedness, secured by equipment trust agreements, for equipment purchased during Federal control by or through the President under section 6 of the Federal Control Act, and allocated to such carriers respectively; and the filing of such equipment trust agreements with the Commission shall constitute notice thereof to all the world.

*Marginal notes:*
TRANSPORTATION ACT. Set-off allowed.

Limitations.

*Provisos.* Set-offs not to prevent allowances for corporate charges, dividends, etc.

Working capital allowance.

Funding of indebtedness for betterments, etc.

Security to be given.

Car trust certificates for equipment indebtedness.

Time notes for other indebtedness.

Collateral security.

Extensions, etc., permitted of securities acquired. *Ante,* p. 359.

Issue of notes secured by equipment trust agreements.

Vol. 40, p. 455.

TRANSPORTATION ACT.
Absolute authority
for issues by carriers.

(g) A carrier may issue evidences of indebtedness pursuant to this section without the authorization or approval of any authority, State or Federal, and without compliance with any requirement, State or Federal, as to notification.

Existing rates continued.

**EXISTING RATES TO CONTINUE IN EFFECT.**

All rates, classifications, etc., subject to interstate commerce laws, in force until changed by law, etc.

SEC. 208. (a) All rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law;

No reduction prior to September 1, 1920, unless approved by Commission.

but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the Commission.

Present joint rates, etc., continued.

(b) All divisions of joint rates, fares, or charges, which on February 29, 1920, are in effect between the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by mutual agreement between the interested carriers or by State or Federal authorities, respectively.

Land grant road transportation.
Vol. 14, p. 338.
Vol. 12, p. 772; Vol. 14, p. 292.

(c) Any land grant railroad organized under the Act of July 28, 1866 (chapter 300), shall receive the same compensation for transportation of property and troops of the United States as is paid to land grant railroads organized under the Land Grant Act of March 3, 1863, and the Act of July 27, 1866 (chapter 278).

Guaranty to carriers.

**GUARANTY TO CARRIERS AFTER TERMINATION OF FEDERAL CONTROL.**

Meaning of term.
"Carrier."

SEC. 209. (a) When used in this section—

The term "carrier" means (1) a carrier by railroad or partly by railroad and partly by water, whose railroad or system of transportation is under Federal control at the time Federal control terminates, or which has heretofore engaged as a common carrier in general transportation and competed for traffic, or connected, with a railroad at any time under Federal control; and (2) a sleeping car company whose system of transportation is under Federal control at the time Federal control terminates; but does not include a street or interurban electric railway not under Federal control at the time Federal control terminates, which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic or sale of power, heat, and light, or both;

Sleeping car company.

Railways excluded.

"Guaranty period."

The term "guaranty period" means the six months beginning March 1, 1920.

"Test period."

The term "test period" means the three years ending June 30, 1917; and

"Railway operating income."
Application to sleeping cars.

The term "railway operating income" and other references to accounts of carriers by railroad shall, in the case of a sleeping car company, be construed as indicating the appropriate corresponding accounts in the accounting system prescribed by the Commission.

Written acceptance by carriers required.

(b) This section shall not be applicable to any carrier which does not on or before March 15, 1920, file with the Commission a written statement that it accepts all the provisions of this section.

Amount of guaranty.
To carriers under contract.

(c) The United States hereby guarantees—

(1) With respect to any carrier with which a contract (exclusive of so-called cooperative contracts or waivers) has been made fixing the amount of just compensation under the Federal Control Act, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than one-half the amount named in such contract as annual compensation, or, where the contract fixed a

Half the amount of annual compensation.

lump sum as compensation for the whole period of Federal operation, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than an amount which shall bear the same proportion to the lump sum so fixed as six months bears to the number of months during which such carrier was under Federal operation, including in both cases the increases in such compensation provided for in section 4 of the Federal Control Act;

TRANSPORTATION ACT.
Lump-sum contracts.

Increases allowed.
Vol. 40, p. 455.

(2) With respect to any carrier entitled to just compensation under the Federal Control Act, with which such a contract has not been made, that the railway operating income of such' carrier for the guaranty period as a whole shall not be less than one-half of the annual amount estimated by the President as just compensation for such carrier under the Federal Control Act, including the increases in such compensation provided for in section 4 of the Federal Control Act. If any such carrier does not accept the President's estimate respecting its just compensation, and if in proceedings under section 3 of the Federal Control Act it is determined that a larger or smaller annual amount is due as just compensation, the guaranty under this paragraph shall be increased or decreased accordingly;

If no contract with carrier.
Half of annual amount estimated as just compensation, etc.

Determination if estimate not accepted.

(3) With respect to any carrier, whether or not entitled to just compensation under the Federal Control Act, with which such a contract has not been made, and for which no estimate of just compensation is made by the President, and which for the test period as a whole sustained a deficit in railway operating income, the guaranty shall be a sum equal to (a) the amount by which any deficit in its railway operating income for the guaranty period as a whole exceeds one-half of its average annual deficit in railway operating income for the test period, plus (b) an amount equal to one-half the annual sum fixed by the President under section 4 of the Federal Control Act;

Amount allowed if no estimate of just compensation has been made.

(4) With respect to any carrier not entitled to just compensation under the Federal Control Act, which for the test period as a whole had an average annual railway operating income, that the railway operating income of such carrier for the guaranty period as a whole shall not be less than one-half the average annual railway operating income of such carrier during the test period.

Allowance to carriers not entitled to compensation under Federal Control Act.

(d) If for the guaranty period as a whole the railway operating income of any carrier entitled to a guaranty under paragraph (1), (2), or (4) of subdivision (c) is in excess of the minimum railway operating income guaranteed in such paragraph, such carrier shall forthwith pay the amount of such excess into the Treasury of the United States. If for the guaranty period as a whole the railway operating income of any carrier entitled to a guaranty under paragraph (3) of subdivision (c) is in excess of one-half of the annual sum fixed by the President with respect to such carrier under section 4 of the Federal Control Act, such carrier shall forthwith pay the amount of such excess into the Treasury of the United States. The amounts so paid into the Treasury of the United States shall be added to the funds made available under section 202 for the purposes indicated in such section. Notwithstanding the provisions of this subdivision, any carrier may retain out of any such excess any amount necessary to enable it to pay its fixed charges accruing during the guaranty period.

Carrier to pay excess of income over guaranty.

If no estimate made.

Use of payments.
Ante, p. 459.

Retention of amount for fixed charges.

(e) For the purposes of this section railway operating income, or any deficit therein, for the test period shall be computed in the manner provided for in section 1 of the Federal Control Act.

Computation for test period.
Vol. 40, p. 452.

(f) In computing railway operating income, or any deficit therein, for the guaranty period for the purposes of this section—

Computation for guaranty period.

(1) Debits and credits arising from the accounts, called in the monthly reports to the Commission equipment rents and joint facility rents, shall be included, but debits and credits arising from the operation of such street electric passenger railways, including rail-

Debits and credits included.

TRANSPORTATION ACT.

Adjustments for lines formerly part of carriers' system.

Consolidated, etc., during guaranty period.

Maintenance expenses.
Allowance for, to be determined by Commission.

Taxes excluded.
Vol. 40, pp. 300-308, 1058-1096.

Correction of disproportionate or unreasonable charges.

Amount due carrier to be certified to Secretary of the Treasury.

Payment directed.

Appropriation.

Advances during guaranty period to meet fixed charges.

Contract for repayment of excess, if any.

Appropriation.

ways commonly called interurbans, as are not under Federal control at the time of termination thereof, shall be excluded;

(2) Proper adjustments shall be made (a) in case any lines which were, during any portion of the period of Federal control, a part of the railroad or system of transportation of the carrier, and whose railway operating income was included in such income of the carrier for the test period, do not continue to be a part of such railroad or system of transportation during the entire guaranty period, and (b) in case of any lines acquired by, leased to, or consolidated with, the railroad or system of transportation of the carrier at any time since the end of the test period and prior to the expiration of the guaranty period, for which separate operating returns to the Commission are not made in respect to the entire portion of the guaranty period;

(3) There shall not be included in operating expenses, for maintenance of way and structures, or for maintenance of equipment, more than an amount fixed by the Commission. In fixing such amount the Commission shall so far as practicable apply the rule set forth in the proviso in paragraph (a) of section 5 of the "standard contract" between the United States and the carriers (whether or not such contract has been entered into with the carrier whose railway operating income is being computed);

(4) There shall not be included any taxes paid under Title I or II of the Revenue Act of 1917, or such portion of the taxes paid under Title II or III of the Revenue Act of 1918 as by the terms of such Act are to be treated as levied by an Act in amendment of Title I or II of the Revenue Act of 1917; and

(5) The Commission shall require the elimination and restatement of the operating expenses and revenues (other than for maintenance of way and structures, or maintenance of equipment) for the guaranty period, to the extent necessary to correct and exclude any disproportionate or unreasonable charge to such expenses or revenues for such period, or any charge to such expenses or revenues for such period which under a proper system of accounting is attributable to another period.

(g) The Commission shall, as soon as practicable after the expiration of the guaranty period, ascertain and certify to the Secretary of the Treasury the several amounts necessary to make good the foregoing guaranty to each carrier. The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States, for the amount shown in such certificate as necessary to make good such guaranty. An amount sufficient to pay such warrants is hereby appropriated out of any money in the Treasury not otherwise appropriated.

(h) Upon application of any carrier to the Commission, asking that during the guaranty period there may be advanced to it from time to time such sums, not in excess of the estimated amount necessary to make good the guaranty, as are necessary to enable it to meet its fixed charges and operating expenses, the Commission may certify to the Secretary of the Treasury the amount of, and times at which, such advances, if any, shall be made. The Secretary of the Treasury, on receipt of such certificate, is authorized and directed to make the advances in the amounts and at the times specified in the certificate, upon the execution by the carrier of a contract, secured in such manner as the Secretary may determine, that upon final determination of the amount of the guaranty provided for by this section such carrier will repay to the United States any amounts which it has received from such advances in excess of the guaranty, with interest at the rate of 6 per centum per annum from the time such excess was paid. There is hereby appropriated, out of any money in the Treasury not otherwise appropriated, a sum sufficient to enable

the Secretary of the Treasury to make the advances referred to in this subdivision.

TRANSPORTATION ACT.

(i) If the American Railway Express Company shall, on or before March 15, 1920, file with the Commission a written statement that it accepts all the provisions of this subdivision, the contract of June 26, 1918, between such company and the Director General of Railroads, as amended and continued by agreement dated November 21, 1918, shall remain in full force and effect during the guaranty period in so far as the same constitutes a guaranty on the part of the United States to such company against a deficit in operating income.

American Railway Express Company. Guaranty against deficit if conditions accepted.

In computing operating income, and any deficit therein, for the guaranty period for the purposes of this subdivision, the Commission shall require the elimination and restatement of the operating expenses and revenues for the guaranty period, to the extent necessary to correct and exclude any disproportionate or unreasonable charge to such expenses or revenues for such period, or any charge to such expenses or revenues for such period which under a proper system of accounting is attributable to another period, and to exclude from operating expenses so much of the charge for payment for express privileges to carriers on whose lines the express traffic is carried as is in excess of 50.25 per centum of gross express revenue.

Computation to be made of expenses and revenues.

Exclusion from operating expenses.

For the guaranty period the American Railway Express Company shall pay to every carrier which accepts the provisions of this section, as provided in subdivision (b) hereof, 50.25 per centum of the gross revenue earned on the transportation of all its express traffic on the carrier's lines, and every such carrier shall accept from the American Railway Express Company such percentage of the gross revenue as its compensation. In arriving at the gross revenue on through or joint express traffic, the method of dividing the revenue between the carriers shall be that agreed upon between the carriers and such express company and approved by the Commission.

Basis for payment of guaranty.

If for the guaranty period as a whole the American Railway Express Company does not have a deficit in operating income, it shall forthwith pay the amount of its operating income for such period into the Treasury of the United States. The amount so paid shall be added to the funds made available under section 202 for the purposes indicated in such section.

If no deficit, income to be paid into the Treasury.

Ante, p. 459.

The Commission shall, as soon as practicable after the expiration of the guaranty period, certify to the Secretary of the Treasury the amount necessary to make good the foregoing guaranty to the American Railway Express Company. The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of such company upon the Treasury of the United States for the amount shown in such certificate as necessary to make good such guaranty. An amount sufficient to pay such warrants is hereby appropriated out of any money in the Treasury not otherwise appropriated.

Certificate of amount due.

Payment directed.

Appropriation for.

Upon application of the American Railway Express Company to the Commission, asking that during the guaranty period there may be advanced to it from time to time such sums, not in excess of the estimated amount necessary to make good the guaranty, as are necessary to enable it to meet its operating expenses, the Commission may certify to the Secretary of the Treasury the amount of, and times at which, such advances, if any, shall be made. The Secretary of the Treasury, on receipt of such certificate, is authorized and directed to make the advances in the amounts and at the times specified in the certificate, upon the execution by such company of a contract, secured in such manner as the Secretary may determine, that upon final determination of the amount of the guaranty provided for by this subdivision such company will repay to the United States any amounts which it has received from such advances in

Advances to meet operating expenses.

Contract for repaying any excess.

TRANSPORTATION ACT.
Appropriation.
excess of the guaranty, with interest at the rate of 6 per centum per annum from the time such excess was paid. There is hereby appropriated out of any money in the Treasury not otherwise appropriated a sum sufficient to enable the Secretary of the Treasury to make the advances referred to in this subdivision.

New loans to railroads.

## NEW LOANS TO RAILROADS.

Applications by carriers for, on termination of Federal control. Details required.
*Post*, p. 946.

SEC. 210. (a) For the purpose of enabling carriers by railroad subject to the Interstate Commerce Act properly to serve the public during the transition period immediately following the termination of Federal control, any such carrier may, at any time after the passage of this Act and before the expiration of two years after the termination of Federal control, make application to the Commission for a loan from the United States, setting forth the amount of the loan and the term for which it is desired, the purpose of the loan and the uses to which it will be applied, the present and prospective ability of the applicant to repay the loan and meet the requirements of its obligations in that regard, the character and value of the security offered, and the extent to which the public convenience and

Statements to accompany applications.
necessity will be served. The application shall be accompanied by statements showing such facts and details as the Commission may require with respect to the physical situation, ownership, capitalization, indebtedness, contract obligations, operation, and earning power of the applicant, together with such other facts relating to the propriety and expediency of granting the loan applied for and the ability of the applicant to make good the obligation, as the Commission may deem pertinent to the inquiry.

Investigation, and certificate of findings to Secretary of the Treasury.
(b) If the Commission, after such hearing and investigation, with or without notice, as it may direct, finds that the making, in whole or in part, of the proposed loan by the United States is necessary to enable the applicant properly to meet the transportation needs of the public, and that the prospective earning power of the applicant and the character and value of the security offered are such as to furnish reasonable assurance of the applicant's ability to repay the loan within the time fixed therefor, and to meet its other obligations in connection with such loan, the Commission may certify to the

Findings and recommendations.
Secretary of the Treasury its findings of fact and its recommendations as to: the amount of the loan which is to be made; the time, not exceeding five years from the making thereof, within which it is to be repaid; the character of the security which is to be offered therefor; and the terms and conditions of the loan.

Allowance from revolving fund.
(c) Upon receipt of such certificate from the Commission, the Secretary of the Treasury, at any time before the expiration of twenty-six months after the termination of Federal control, is authorized to make a loan, not exceeding the maximum amount recommended in such certificate, out of any moneys in the revolving fund

Interest.
provided for in this section. All such loans shall bear interest at the rate of 6 per centum per annum, payable semiannually to the Secretary of the Treasury and to be placed to the credit of the

Repayment.
revolving fund provided for in this section. The time, not exceeding five years from the making thereof, within which such loan is to

Security to be prescribed.
be repaid, the security which is to be taken therefor, which shall be adequate to secure the loan, the terms and conditions of the loan, and the form of the obligation to be entered into, shall be prescribed by the Secretary of the Treasury.

Assistance of Federal Reserve Board.
(d) The Commission or the Secretary of the Treasury may call upon the Federal Reserve Board for advice and assistance with respect to any such application or loan.

Appropriation.
(e) There is hereby appropriated out of any moneys in the Treasury not otherwise appropriated the sum of $300,000,000, which shall

be used as a revolving fund for the purpose of making the loans provided for in this section, and for paying the judgments, decrees, and awards referred to in subdivision (e) of section 206.

TRANSPORTATION ACT.
Use of revolving fund.
*Ante,* p. 462.

(f) A carrier may issue evidences of indebtedness to the United States pursuant to this section without the authorization or approval of any authority, State or Federal, and without compliance with any requirement, State or Federal, as to notification.

Issue of indebtedness to United States.

### EXECUTION OF POWERS OF PRESIDENT.

Execution of powers of the President.

SEC. 211. All powers and duties conferred or imposed upon the President by the preceding sections of this Act, except the designation of the agent under section 206, may be executed by him through such agency or agencies as he may determine.

Agent may be designated for.
Exception.
*Ante,* p. 461.
*Post,* pp. 1145, 1858, 1863.

## TITLE III.—DISPUTES BETWEEN CARRIERS AND THEIR EMPLOYEES AND SUBORDINATE OFFICIALS.

Railroad disputes.

SEC. 300. When used in this title—

Meaning of terms.

(1) The term "carrier" includes any express company, sleeping car company, and any carrier by railroad, subject to the Interstate Commerce Act, except a street, interurban, or suburban electric railway not operating as a part of a general steam railroad system of transportation;

"Carrier."

(2) The term "Adjustment Board" means any Railroad Board of Labor Adjustment established under section 302;

"Adjustment Board."

(3) The term "Labor Board" means the Railroad Labor Board;

"Labor Board."

(4) The term "commerce" means commerce among the several States or between any State, Territory, or the District of Columbia and any foreign nation, or between any Territory or the District of Columbia and any State, or between any Territory and any other Territory, or between any Territory and the District of Columbia, or within any Territory or the District of Columbia, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign nation; and

"Commerce."

(5) The term "subordinate official" includes officials of carriers of such class or rank as the Commission shall designate by regulation formulated and issued after such notice and hearing as the Commission may prescribe, to the carriers, and employees and subordinate officials of carriers, and organizations thereof, directly to be affected by such regulations.

"Subordinate official."

SEC. 301. It shall be the duty of all carriers and their officers, employees, and agents to exert every reasonable effort and adopt every available means to avoid any interruption to the operation of any carrier growing out of any dispute between the carrier and the employees or subordinate officials thereof. All such disputes shall be considered and, if possible, decided in conference between representatives designated and authorized so to confer by the carriers, or the employees or subordinate officials thereof, directly interested in the dispute. If any dispute is not decided in such conference, it shall be referred by the parties thereto to the board which under the provisions of this title is authorized to hear and decide such dispute.

Duty enjoined to avoid disputes interrupting operations of roads.
Mutual conferences between carriers and employees to decide.
Board to decide if no agreement made.

SEC. 302. Railroad Boards of Labor Adjustment may be established by agreement between any carrier, group of carriers, or the carriers as a whole, and any employees or subordinate officials of carriers, or organization or group of organizations thereof.

Boards of Labor Adjustment.
Establishment and composition of.

SEC. 303. Each such Adjustment Board shall, (1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon the written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, (3) upon the Adjustment Board's own motion, or (4)

Disputes as to grievances, rules or working conditions.
Hearings, etc, by boards.

TRANSPORTATION ACT.

Decisions.

upon the request of the Labor Board whenever such board is of the opinion that the dispute is likely substantially to interrupt commerce, receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving only grievances, rules, or working conditions, not decided as provided in section 301, between the carrier and its employees or subordinate officials, who are, or any organization thereof which is, in accordance with the provisions of section 302, represented upon any such Adjustment Board.

Railroad Labor Board created.
Composition and appointment.

SEC. 304. There is hereby established a board to be known as the "Railroad Labor Board" and to be composed of nine members as follows:

Labor group.

(1) Three members constituting the labor group, representing the employees and subordinate officials of the carriers, to be appointed by the President, by and with the advice and consent of the Senate, from not less than six nominees whose nominations shall be made and offered by such employees in such manner as the Commission shall by regulation prescribe;

Management group.

(2) Three members, constituting the management group, representing the carriers, to be appointed by the President, by and with the advice and consent of the Senate, from not less than six nominees whose nominations shall be made and offered by the carriers in such manner as the Commission shall by regulation prescribe; and

Public group.

(3) Three members, constituting the public group, representing the public, to be appointed directly by the President, by and with the advice and consent of the Senate.

Vacancies.

Any vacancy on the Labor Board shall be filled in the same manner as the original appointment.

Appointments if nominees not offered by carriers or employees.

SEC. 305. If either the employees or the carriers fail to make nominations and offer nominees in accordance with the regulations of the Commission, as provided in paragraphs (1) and (2) of section 304, within thirty days after the passage of this Act in case of any original appointment to the office of member of the Labor Board, or in case of a vacancy in any such office within fifteen days after such vacancy occurs, the President shall thereupon directly make the appointment, by and with the advice and consent of the Senate. In making any such appointment the President shall, as far as he deems it practicable, select an individual associated in interest with the carriers or employees thereof, whichever he is to represent.

Ineligibility of members.

SEC. 306. (a) Any member of the Labor Board who during his term of office is an active member or in the employ of or holds any office in any organization of employees or subordinate officials, or any carrier, or owns any stock or bond thereof, or is pecuniarily interested therein, shall at once become ineligible for further membership upon the Labor Board; but no such member is required to relinquish honorary membership in, or his rights in any insurance or pension or other benefit fund maintained by, any organization of employees or subordinate officials or by a carrier.

Tenure of appointments.

(b) Of the original members of the Labor Board, one from each group shall be appointed for a term of three years, one for two years, and one for one year. Their successors shall hold office for terms of five years, except that any member appointed to fill a vacancy shall be appointed only for the unexpired term of the member whom he succeeds. Each member shall receive from the United States an annual salary of $10,000. A member may be removed by the President for neglect of duty or malfeasance in office, but for no other cause.

Pay.
Removal restricted.

Decisions on matters from Adjustment Boards.

SEC. 307. (a) The Labor Board shall hear, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules, or working conditions, in respect to which any Adjustment Board certifies to the Labor Board that in its opinion the Adjustment Board has failed or will fail to reach a decision within a reasonable time, or in respect to which the Labor Board determines that any

Adjustment Board has so failed or is not using due diligence in its consideration thereof. In case the appropriate Adjustment Board is not organized under the provisions of section 302, the Labor Board, (1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules, or working conditions which is not decided as provided in section 301 and which such Adjustment Board would be required to receive for hearing and decision under the provisions of section 303.

TRANSPORTATION ACT.
Of cases of grievances, etc., which may interrupt commerce, not settled by mutual conferences, etc.

(b) The Labor Board, (1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, all disputes with respect to the wages or salaries of employees or subordinate officials of carriers, not decided as provided in section 301. The Labor Board may upon its own motion within ten days after the decision, in accordance with the provisions of section 301, of any dispute with respect to wages or salaries of employees or subordinate officials of carriers, suspend the operation of such decision if the Labor Board is of the opinion that the decision involves such an increase in wages or salaries as will be likely to necessitate a substantial readjustment of the rates of any carrier. The Labor Board shall hear any decision so suspended and as soon as practicable and with due diligence decide to affirm or modify such suspended decision.

Disputes as to wages. Decisions if not settled by mutual conferences.

Suspensions of decisions as to wages made by mutual conferences.

Final decision.

(c) A decision by the Labor Board under the provisions of paragraphs (a) or (b) of this section shall require the concurrence therein of at least 5 of the 9 members of the Labor Board: *Provided*, That in case of any decision under paragraph (b), at least one of the representatives of the public shall concur in such decision. All decisions of the Labor Board shall be entered upon the records of the board and copies thereof, together with such statement of facts bearing thereon as the board may deem proper, shall be immediately communicated to the parties to the dispute, the President, each Adjustment Board, and the Commission, and shall be given further publicity in such manner as the Labor Board may determine.

Concurrence in decisions.
*Proviso.*
As to wages.
Record and publicity of decisions.

(d) All the decisions of the Labor Board in respect to wages or salaries and of the Labor Board or an Adjustment Board in respect to working conditions of employees or subordinate officials of carriers shall establish rates of wages and salaries and standards of working conditions which in the opinion of the board are just and reasonable. In determining the justness and reasonableness of such wages and salaries or working conditions the board shall, so far as applicable, take into consideration among other relevant circumstances:

All decisions to be just and reasonable.

Elements for determination of.

(1) The scales of wages paid for similar kinds of work in other industries;

(2) The relation between wages and the cost of living;

(3) The hazards of the employment;

(4) The training and skill required;

(5) The degree of responsibility;

(6) The character and regularity of the employment; and

(7) Inequalities of increases in wages or of treatment, the result of previous wage orders or adjustments.

TRANSPORTATION ACT.

Chairman to be elected.

Central offices at Chicago, Ill.

Investigations and studies of relations between carriers and employees, directed.

Compilation, etc., of data to be published.

Executory regulations.

Decisions, etc., to be published annually.

Presence at hearings.

Power of members to secure evidence.

Depositions.

Witness fees, etc.

Assistance of courts.

Testimony compulsory.

Criminal immunity of natural persons.

Perjury excepted.

Members to have access to books, records, etc.

Penalty for refusal.

SEC. 308. The Labor Board—

(1) Shall elect a chairman by majority vote of its members;

(2) Shall maintain central offices in Chicago, Illinois, but the Labor Board may, whenever it deems it necessary, meet at such other place as it may determine;

(3) Shall investigate and study the relations between carriers and their employees, particularly questions relating to wages, hours of labor, and other conditions of employment and the respective privileges, rights, and duties of carriers and employees, and shall gather, compile, classify, digest, and publish, from time to time, data and information relating to such questions to the end that the Labor Board may be properly equipped to perform its duties under this title and that the members of the Adjustment Boards and the public may be properly informed;

(4) May make regulations necessary for the efficient execution of the functions vested in it by this title; and

(5) Shall at least annually collect and publish the decisions and regulations of the Labor Board and the Adjustment Boards and all court and administrative decisions and regulations of the Commission in respect to this title, together with a cumulative index-digest thereof.

SEC. 309. Any party to any dispute to be considered by an Adjustment Board or by the Labor Board shall be entitled to a hearing either in person or by counsel.

SEC. 310. (a) For the efficient administration of the functions vested in the Labor Board by this title, any member thereof may require, by subpœna issued and signed by himself, the attendance of any witness and the production of any book, paper, document, or other evidence from any place in the United States at any designated place of hearing, and the taking of a deposition before any designated person having power to administer oaths.   In the case of a deposition the testimony shall be reduced to writing by the person taking the deposition or under his direction, and shall then be subscribed to by the deponent.   Any member of the Labor Board may administer oaths and examine any witness.   Any witness summoned before the board and any witness whose deposition is taken shall be paid the same fees and mileage as are paid witnesses in the courts of the United States.

(b) In case of failure to comply with any subpœna or in case of the contumacy of any witness appearing before the Labor Board, the board may invoke the aid of any United States district court.   Such court may thereupon order the witness to comply with the requirements of such subpœna, or to give evidence touching the matter in question, as the case may be.   Any failure to obey such order may be punished by such court as a contempt thereof.

(c) No person shall be excused from so attending and testifying or deposing, nor from so producing any book, paper, document, or other evidence on the ground that the testimony or evidence, documentary or otherwise, required of him may tend to incriminate him or subject him to a penalty or forfeiture; but no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing, as to which in obedience to a subpœna and under oath, he may so testify or produce evidence, documentary or otherwise.   But no person shall be exempt from prosecution and punishment for perjury committed in so testifying.

SEC. 311. (a) When necessary to the efficient administration of the functions vested in the Labor Board by this title, any member, officer, employee, or agent thereof, duly authorized in writing by the board, shall at all reasonable times for the purpose of examination have access to and the right to copy any book, account, record, paper, or correspondence relating to any matter which the board is authorized to consider or investigate.   Any person who upon demand refuses any duly authorized member, officer, employee, or agent of

the Labor Board such right of access or copying, or hinders, obstructs, or resists him in the exercise of such right, shall upon conviction thereof be liable to a penalty of $500 for each such offense. Each day during any part of which such offense continues shall constitute a separate offense. Such penalty shall be recoverable in a civil suit brought in the name of the United States, and shall be covered into the Treasury of the United States as miscellaneous receipts.

*TRANSPORTATION ACT.*

*Suit for recovery.*

(b) Every officer or employee of the United States, whenever requested by any member of the Labor Board or an Adjustment Board duly authorized by the board for the purpose, shall supply to such board any data or information pertaining to the administration of the functions vested in it by this title, which may be contained in the records of his office.

*Data from Government officials, etc.*

(c) The President is authorized to transfer to the Labor Board any books, papers, or documents pertaining to the administration of the functions vested in the board by this title, which are in the possession of any agency, or railway board of adjustment in connection therewith, established for executing the powers granted the President under the Federal Control Act and which are no longer necessary to the administration of the affairs of such agency.

*Transfer of records from former agencies, etc., under Federal control.*

SEC. 312. Prior to September 1, 1920, each carrier shall pay to each employee or subordinate official thereof wages or salary at a rate not less than that fixed by the decision of any agency, or railway board of adjustment in connection therewith, established for executing the powers granted the President under the Federal Control Act, in effect in respect to such employee or subordinate official immediately preceding 12.01 a. m. March 1, 1920. Any carrier acting in violation of any provision of this section shall upon conviction thereof be liable to a penalty of $100 for each such offense. Each such action with respect to any such employee or subordinate official and each day or portion thereof during which the offense continues shall constitute a separate offense. Such penalty shall be recoverable in a civil suit brought in the name of the United States, and shall be covered into the Treasury of the United States as miscellaneous receipts.

*Carriers not to reduce fixed pay rates prior to September 1, 1920.*

*Penalty for violation.*

*Suit for recovery.*

SEC. 313. The Labor Board, in case it has reason to believe that any decision of the Labor Board or of an Adjustment Board is violated by any carrier, or employee or subordinate official, or organization thereof, may upon its own motion after due notice and hearing to all persons directly interested in such violation, determine whether in its opinion such violation has occurred and make public its decision in such manner as it may determine.

*Board to make public violations of decisions.*

SEC. 314. The Labor Board may (1) appoint a secretary, who shall receive from the United States an annual salary of $5,000; and (2) subject to the provisions of the civil-service laws, appoint and remove such officers, employees, and agents; and make such expenditures for rent, printing, telegrams, telephone, law books, books of reference, periodicals, furniture, stationery, office equipment, and other supplies and expenses, including salaries, traveling expenses of its members, secretary, officers, employees, and agents, and witness fees, as are necessary for the efficient execution of the functions vested in the board by this title and as may be provided for by Congress from time to time. All of the expenditures of the Labor Board shall be allowed and paid upon the presentation of itemized vouchers therefor approved by the chairman of the Labor Board.

*Secretary, and employees authorized.*

*Contingent expenses.*

SEC. 315. There is hereby appropriated for the fiscal year ending June 30, 1920, out of any money in the Treasury not otherwise appropriated, the sum of $50,000, or so much thereof as may be necessary, to be expended by the Labor Board, for defraying the expenses of the maintenance and establishment of the board, including the payment of salaries as provided in this title.

*Appropriation for expenses.*

44281°—21——32

<div style="margin-left:2em;">

**TRANSPORTATION ACT.**
*Board of Mediation and Conciliation.*
*Duties restricted.*
*Vol. 38, p. 103.*
</div>

SEC. 316. The powers and duties of the Board of Mediation and Conciliation created by the Act approved July 15, 1913, shall not extend to any dispute which may be received for hearing and decision by any Adjustment Board or the Labor Board.

*Interstate Commerce Act amendments.*

## TITLE IV.—AMENDMENTS TO INTERSTATE COMMERCE ACT.

*Applications of interstate commerce.*
*Vol. 36, p. 544, amended.*

SEC. 400  The first four paragraphs of section 1 of the Interstate Commerce Act, as such paragraphs appear in section 7 of the Commerce Court Act, are hereby amended to read as follows:

*Carriers affected.*

"(1) That the provisions of this Act shall apply to common carriers engaged in—

*Transporting by rail or by partly rail and water.*

"(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; or

*Oil pipe lines.*

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; or

*Transmission of messages.*
*Interstate and foreign commerce embraced.*

"(c) The transmission of intelligence by wire or wireless:— from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country,

*Only within the United States.*

but only in so far as such transportation or transmission takes place within the United States.

*Territory included.*

"(2) The provisions of this Act shall also apply to such transportation of passengers and property and transmission of intelligence,

*Exceptions.*

but only in so far as such transportation or transmission takes place within the United States, but shall not apply—

*Transportation wholly intrastate.*

"(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid;

*Messages wholly within one State.*

"(b) To the transmission of intelligence by wire or wireless wholly within one State and not transmitted to or from a foreign country from or to any place in the United States as aforesaid; or

*Transportation solely by water.*

"(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this act except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district.

*Terms defined.*
*"Common carrier."*

"(3) The term 'common carrier' as used in this Act shall include all pipe-line companies; telegraph, telephone, and cable companies operating by wire or wireless; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire. Wherever the word 'carrier' is used in this Act it shall be held to

*"Railroad."*

mean 'common carrier.'  The term 'railroad' as used in this Act shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or

*Facilities included.*

operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated

herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term 'transportation' as used in this Act shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. The term 'transmission' as used in this Act shall include the transmission of intelligence through the application of electrical energy or other use of electricity, whether by means of wire, cable, radio apparatus, or other wire or wireless conductors or appliances, and all instrumentalities and facilities for and services in connection with the receipt, forwarding, and delivery of messages, communications, or other intelligence so transmitted, hereinafter also collectively called messages. *TRANSPORTATION ACT.*

*"Transportation."*

*"Transmission."*

"(4) It shall be the duty of every common carrier subject to this Act engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates, fares, and charges applicable thereto, and to provide reasonable facilities for operating through routes and to make reasonable rules and regulations with respect to the operation of through routes, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof as between the carriers subject to this Act participating therein which shall not unduly prefer or prejudice any of such participating carriers. *Carriers to furnish transportation, establish through routes, rates, etc.*

*Just division of joint rates, etc.*

"(5) All charges made for any service rendered or to be rendered in the transportation of passengers or property or in the transmission of intelligence by wire or wireless as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: *Provided,* That messages by wire or wireless subject to the provisions of this Act may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages: *And provided further,* That nothing in this Act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers for the exchange of services. *All charges to be just and reasonable.*

*Provisos.*
*Classification of messages.*

*Messages for carriers.*

"(6) It is hereby made the duty of all common carriers subject to the provisions of this Act to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this Act which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this Act upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful." *Classification of property for transportation to be just and reasonable.*

*Regulations.*

*Baggage facilities, etc.*

*Unjust practices, etc., unlawful.*

SEC. 401. The fifth, sixth, and seventh paragraphs of section 1 of the Interstate Commerce Act, as such paragraphs appear in section 7 of the Commerce Court Act, are hereby amended by inserting "(7)" *Paragraphs numbered.*
*Vol. 36, p. 547.*

TRANSPORTATION ACT. at the beginning of such fifth paragraph, "(8)" at the beginning of such sixth paragraph, and "(9)" at the beginning of such seventh paragraph.

Car service regulations.
Vol.40,p.101,amended.
SEC. 402. The paragraphs added to section 1 of the Interstate Commerce Act by the Act entitled "An Act to amend an Act entitled 'An Act to regulate commerce,' as amended, in respect of car service, and for other purposes," approved May 29, 1917, are hereby amended to read as follows:

Equipment included in the term.
"(10) The term 'car service' in this Act shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this Act.

Safe and adequate service required.
"(11) It shall be the duty of every carrier by railroad subject to this Act to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.

Coal cars.
Regulation for just distribution of service.
"(12) It shall also be the duty of every carrier by railroad to make just and reasonable distribution of cars for transportation of coal among the coal mines served by it, whether located upon its line or lines or customarily dependent upon it for car supply. During any period when the supply of cars available for such service does not equal the requirements of such mines it shall be the duty of the carrier to maintain and apply just and reasonable ratings of such mines and to count each and every car furnished to or used by any

Penalty for refusal, etc.
such mine for transportation of coal against the mine. Failure or refusal so to do shall be unlawful, and in respect of each car not so counted shall be deemed a separate offense, and the carrier, receiver, or operating trustee so failing or refusing shall forfeit to the United States the sum of $100 for each offense, which may be recovered in a civil action brought by the United States.

Regulations, etc., to be filed with Commission.
"(13) The Commission is hereby authorized by general or special orders to require all carriers by railroad subject to this Act, or any of them, to file with it from time to time their rules and regulations with respect to car service, and the Commission may, in its discretion,

Inclusion in schedules.
direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this Act relating thereto.

Rules, etc., may be established by Commission.
"(14) The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this Act, including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it, and the penalties or other sanctions for nonobservance of such rules, regulations or practices.

Authority of Commission in emergencies.
"(15) Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing

Suspension of rules, etc.
of a report, according as the Commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be

Direct service regardless of ownership.
determined by the Commission; (b) to make such just and reasonable directions with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the

interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; (c) to require such joint or common use of terminals, including main-line track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; and (d) to give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, at such time and for such periods as it may determine, and to modify, change, suspend, or annul them. In time of war or threatened war the President may certify to the Commission that it is essential to the national defense and security that certain traffic shall have preference or priority in transportation, and the Commission shall, under the power herein conferred, direct that such preference or priority be afforded.

*Transportation act.*
*Compensation.*
*Joint use of terminals, etc.*
*Priority traffic permits, etc.*
*Preferences in time of war for national defense, etc.*

"(16) Whenever the Commission is of opinion that any carrier by railroad subject to this Act is for any reason unable to transport the traffic offered it so as properly to serve the public, it may, upon the same procedure as provided in paragraph (15), make such just and reasonable directions with respect to the handling, routing, and movement of the traffic of such carrier and its distribution over other lines of roads, as in the opinion of the Commission will best promote the service in the interest of the public and the commerce of the people, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable.

*Transportation by other roads if carrier unable to handle traffic.*
*Terms.*

"(17) The directions of the Commission as to car service and to the matters referred to in paragraphs (15) and (16) may be made through and by such agents or agencies as the Commission shall designate and appoint for that purpose. It shall be the duty of all carriers by railroad subject to this Act, and of their officers, agents, and employees, to obey strictly and conform promptly to such orders or directions of the Commission, and in case of failure or refusal on the part of any carrier, receiver, or operating trustee to comply with any such order or direction such carrier, receiver, or trustee shall be liable to a penalty of not less than $100 nor more than $500 for each such offense and $50 for each and every day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action brought by the United States: *Provided, however,* That nothing in this Act shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this Act.

*Executions of directions.*
*Compliance with orders required.*
*Penalty for refusal, etc.*
*Proviso.*
*State authority over intrastate business, not impaired.*

"(18) After ninety days after this paragraph takes effect no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the

*Future extensions of lines, etc., restricted.*
*Certificate of necessity, etc., from Commission required.*
*Abandonment, etc., restricted.*

TRANSPORTATION ACT. present or future public convenience and necessity permit of such abandonment.

Applications for certificates.

"(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this Act shall apply to all such proceedings. Upon receipt of any application for such certificate the Commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which such additional or extended line of railroad is proposed to be constructed or operated, or all or any portion of a line of railroad, or the operation thereof, is proposed to be abandoned, with the right to be heard as hereinafter provided with respect to the hearing of complaints or the issuance of securities; and said notice shall also be published for three consecutive weeks in some newspaper of general circulation in each county in or through which said line of railroad is constructed or operates.

Notice to State authorities, etc.

Advertisement.

Discretionary power of Commission to issue certificates.

"(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both.

Authority under certificate.

Injunctions for violations.

Punishment for.

Order of further service, etc., by carrier.

"(21) The Commission may, after hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier by railroad subject to this Act, party to such proceeding, to provide itself with safe and adequate facilities for performing as a common carrier its car service as that term is used in this Act, and to extend its line or lines: *Provided*, That no such authorization or order shall be made unless the Commission finds, as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier subject to this Act which refuses or neglects to comply with any order of the Commission made in pursuance of this paragraph shall be liable to a penalty of $100 for each day during which such refusal or neglect continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

Proviso.
Condition of necessity.

Penalty for refusal, etc.

Tracks, etc., not included in authority.

"(22) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

SEC. 403. The fifteenth and sixteenth paragraphs of section 1 of the Interstate Commerce Act, added to such section by the Act entitled "An Act to amend the Act to regulate commerce, as amended, and for other purposes," approved August 10, 1917, are hereby amended by inserting "(23)" at the beginning of such fifteenth paragraph and "(24)" at the beginning of such sixteenth paragraph.

TRANSPORTATION ACT.
Paragraphs numbered.
Vol. 40, p. 272

SEC. 404. Section 2 of the Interstate Commerce Act is hereby amended to read as follows:

"SEC. 2. That if any common carrier subject to the provisions of this Act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property or the transmission of intelligence, subject to the provisions of this Act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation or transmission of a like kind of traffic or message under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

Rates, etc.
Special rates, rebates, etc., unlawful.
Vol.24,p.379,amended.
Messages added.

SEC. 405. The first paragraph of section 3 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning thereof.

Paragraph numbered.
Vol. 24, p. 380.

Section 3 of the Interstate Commerce Act is hereby amended by adding after the first paragraph a new paragraph to read as follows:

New matter.

"(2) From and after July 1, 1920, no carrier by railroad subject to the provisions of this Act shall deliver or relinquish possession at destination of any freight transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the Commission may from time to time prescribe to assure prompt payment of all such rates and charges and to prevent unjust discrimination: *Provided*, That the provisions of this paragraph shall not be construed to prohibit any carrier from extending credit in connection with rates and charges on freight transported for the United States, for any department, bureau, or agency thereof, or for any State or Territory or political subdivision thereof, or for the District of Columbia."

Freight charges to be paid before delivery.
Vol.24,p.380,amended.
Exception.
Proviso.
Credit allowed Government, States, etc.

The second paragraph of section 3 of the Interstate Commerce Act is hereby amended to read as follows:

Interchange of traffic.

"(3) All carriers, engaged in the transportation of passengers or property, subject to the provisions of this Act, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper.

Equal facilities for, to be afforded.
Vol. 24, p. 380, amended.
Discriminations forbidden.

"(4) If the Commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensa-

Use of terminal facilities by other carriers.
Compensation.

TRANSPORTATION ACT.

Suit if terms unsatis-factory.

tion in condemnation proceedings. Such compensation shall be paid or adequately secured before the enjoyment of the use may be commenced. If under this paragraph the use of such terminal facilities of any carrier is required to be given to another carrier or other carriers, and the carrier whose terminal facilities are required to be so used is not satisfied with the terms fixed for such use, or if the amount of compensation so fixed is not duly and promptly paid, the carrier whose terminal facilities have thus been required to be given to another carrier or other carriers shall be entitled to recover, by suit or action against such other carrier or carriers, proper damages for any injuries sustained by it as the result of compliance with such requirement, or just compensation for such use, or both, as the case may be."

Long and short hauls.

Sec. 406. Section 4 of the Interstate Commerce Act is hereby amended to read as follows:

Greater charge for shorter than longer distance over same route, unlawful.

"Sec. 4. (1) That it shall be unlawful for any common carrier subject to the provisions of this Act to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this Act, but this shall not be construed as authorizing any common carrier within the terms of this Act to charge or receive as great compensation for a shorter as for a longer distance: *Provided*, That upon application to the Commission such common carrier may in special cases, after investigation, be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section; but in exercising the authority conferred upon it in this proviso the Commission shall not permit the establishment of any charge to or from the more distant point that is not reasonably compensatory for the service performed; and if a circuitous rail line or route is, because of such circuity, granted authority to meet the charges of a more direct line or route to or from competitive points and to maintain higher charges to or from intermediate points on its line, the authority shall not include intermediate points as to which the haul of the petitioning line or route is not longer than that of the direct line or route between the competitive points; and no such authorization shall be granted on account of merely potential water competition not actually in existence: *And provided further*, That rates, fares, or charges existing at the time of the passage of this amendatory Act by virtue of orders of the Commission or as to which application has theretofore been filed with the Commission and not yet acted upon, shall not be required to be changed by reason of the provisions of this section until the further order of or a determination by the Commission.

Vol.36,p.547,amended.

Provisos.
Allowance in special cases.

Compensatory for service.

Limitation on competing points.

Water competition.

Existing rates, etc., continued.

Restriction on increasing rates reduced to meet water competition.

"(2) Wherever a carrier by railroad shall in competition with a water route or routes reduce the rates on the carriage of any species of freight to or from competitive points it shall not be permitted to increase such rates unless after hearing by the Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition."

Pooling of freights.

Sec. 407. The first paragraph of section 5 of the Interstate Commerce Act is hereby amended to read as follows:

Agreements, etc., for, unlawful.
Vol.24,p.380,amended.
Ante, p. 477.

"Sec. 5. (1) That, except upon specific approval by order of the Commission as in this section provided, and except as provided in paragraph (16) of section 1 of this Act, it shall be unlawful for any common carrier subject to this Act to enter into any contract,

agreement, or combination with any other common carrier or carriers for the pooling of freights of different and competing railroads, or to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof; and in any case of an agreement for the pooling of freights as aforesaid each day of its continuance shall be deemed a separate offense: *Provided*, That whenever the Commission is of opinion, after hearing upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this Act, or upon its own initiative, that the division of their traffic or earnings, to the extent indicated by the Commission, will be in the interest of better service to the public, or economy in operation, and will not unduly restrain competition, the Commission shall have authority by order to approve and authorize, if assented to by all the carriers involved, such division of traffic or earnings, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises.

"(2) Whenever the Commission is of opinion, after hearing, upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this Act, that the acquisition, to the extent indicated by the Commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation, will be in the public interest, the Commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the Commission to be just and reasonable in the premises.

"(3) The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1) or (2), as it may deem necessary or appropriate.

"(4) The Commission shall as soon as practicable prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems. In the division of such railways into such systems under such plan, competition shall be preserved as fully as possible and wherever practicable the existing routes and channels of trade and commerce shall be maintained. Subject to the foregoing requirements, the several systems shall be so arranged that the cost of transportation as between competitive systems and as related to the values of the properties through which the service is rendered shall be the same, so far as practicable, so that these systems can employ uniform rates in the movement of competitive traffic and under efficient management earn substantially the same rate of return upon the value of their respective railway properties.

"(5) When the Commission has agreed upon a tentative plan, it shall give the same due publicity and upon reasonable notice, including notice to the Governor of each State, shall hear all persons who may file or present objections thereto. The Commission is authorized to prescribe a procedure for such hearings and to fix a time for bringing them to a close. After the hearings are at an end, the Commission shall adopt a plan for such consolidation and publish the same; but it may at any time thereafter, upon its own motion or upon application, reopen the subject for such changes or modifications as in its judgment will promote the public interest. The consolidations herein provided for shall be in harmony with such plan.

"(6) It shall be lawful for two or more carriers by railroad, subject to this Act, to consolidate their properties or any part thereof, into one corporation for the ownership, management, and operation of the

*Marginal notes:*

TRANSPORTATION ACT.

*Proviso.*
Commission may allow division of traffic in interest of better service, etc.

Assent by all carriers required.

Acquisition of control of other carriers authorized.
Application to be made.

Approval by Commission.

Supplemental orders, etc.

Consolidation of railroad systems to be proposed.
Maintenance of competition.

Uniform rates, etc., to be arranged.

Public notice of proposed plan.

Hearings, etc.

Adoption of consolidation plan.

Consolidation by railroads into one corporation, allowed.

TRANSPORTATION ACT.
Conditions.
properties theretofore in separate ownership, management, and operation, under the following conditions:

Approval of Commission, etc.
"(a) The proposed consolidation must be in harmony with and in furtherance of the complete plan of consolidation mentioned in paragraph (5) and must be approved by the Commission;

Bonds and stock limitations.
"(b) The bonds at par of the corporation which is to become the owner of the consolidated properties, together with the outstanding capital stock at par of such corporation, shall not exceed the value of the consolidated properties as determined by the Commission.  The value of the properties sought to be consolidated shall be ascertained by the Commission under section 19a of this Act, and it shall be the duty of the Commission to proceed immediately to the ascertainment of such value for the properties involved in a proposed consolidation upon the filing of the application for such consolidation.

Valuation of properties.
Vol. 37, p. 701.

Application for consolidation.
"(c) Whenever two or more carriers propose a consolidation under this section, they shall present their application therefor to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties sought to be consolidated is situated and the carriers involved in the proposed consolidation, of the time and place for a public hearing.  If after such hearing the Commission finds that the public interest will be promoted by the consolidation and that the conditions of this section have been or will be fulfilled, it may enter an order approving and authorizing such consolidation, with such modifications and upon such terms and conditions as it may prescribe, and thereupon such consolidation may be effected, in accordance with such order, if all the carriers involved assent thereto, the law of any State or the decision or order of any State authority to the contrary notwithstanding.

Hearings, etc.

Order authorizing consolidation.

State laws, etc., not to prevent.

American Railway Express Company.
Consolidation of companies into, authorized.
"(7) The power and authority of the Commission to approve and authorize the consolidation of two or more carriers shall extend and apply to the consolidation of four express companies into the American Railway Express Company, a Delaware corporation, if application for such approval and authority is made to the Commission within thirty days after the passage of this amendatory Act; and pending the decision of the Commission such consolidation shall not be dissolved.

Approved consolidations relieved from antitrust laws.
Vol. 26, p. 209; Vol. 28, p. 570.
Vol. 38, p. 730.
"(8) The carriers affected by any order made under the foregoing provisions of this section and any corporation organized to effect a consolidation approved and authorized in such order shall be, and they are hereby, relieved from the operation of the 'antitrust laws,' as designated in section 1 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914, and of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section."

Paragraph numbered.
Vol. 37, p. 566.
SEC. 408. The paragraph of section 5 of the Interstate Commerce Act, added to such section by section 11 of the Act entitled "An Act to provide for the opening, maintenance, protection, and operation of the Panama Canal and the sanitation and government of the Canal Zone," approved August 24, 1912, is hereby amended by inserting "(9)" at the beginning thereof.

Other paragraphs numbered, etc.
Vol. 37, p. 567.
The two paragraphs of section 11 of such Act of August 24, 1912, which follow the paragraph added by such section to section 5 of the Interstate Commerce Act, are hereby made a part of section 5 of the Interstate Commerce Act.  The first paragraph so made a part of section 5 of the Interstate Commerce Act is hereby amended by inserting "(10)" at the beginning thereof, and the second such paragraph is hereby amended by inserting "(11)" at the beginning thereof.

Sec. 409. Section 6 of the Interstate Commerce Act is hereby amended by inserting " (1) " after the section number at the beginning of the first paragraph, " (2) " at the beginning of the second paragraph, " (3) " at the beginning of the third paragraph, " (4) " at the beginning of the fourth paragraph, " (5) " at the beginning of the fifth paragraph, " (6) " at the beginning of the sixth paragraph, " (7) " at the beginning of the seventh paragraph, " (8) " at the beginning of the eighth paragraph, " (9) " at the beginning of the ninth paragraph, " (10) " at the beginning of the tenth paragraph, " (11) " at the beginning of the eleventh paragraph, " (12) " at the beginning of the twelfth paragraph, and " (13) " at the beginning of the thirteenth paragraph.

TRANSPORTATION ACT.
Schedules of rates.
Paragraphs numbered.
Vol. 34, pp. 586, 587.
Vol. 39, p. 604.
Vol. 36, pp. 548, 549.
Vol. 37, p. 568.

Sec. 410. The third paragraph of section 6 of the Interstate Commerce Act is hereby amended by striking out the period at the end thereof and inserting in lieu thereof a colon and the following: *"Provided further*, That the Commission is hereby authorized to make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges or classifications not changed if, in its judgment, not inconsistent with the public interest."

Changes, etc.
Vol.34,p.587,amended.
Rules for simplifying schedules to be made.

Sec. 411. The seventh paragraph of section 6 of the Interstate Commerce Act is hereby amended by striking out the proviso at the end.

Limitation of "carrier" stricken out.
Vol.34,p.587,amended.

Sec. 412. The two paragraphs under (a) of the thirteenth paragraph of section 6 of the Interstate Commerce Act are hereby amended so as to be combined into one paragraph to read as follows:

Rail and water transportation.
Vol.37,p.568,amended.

" (a) To establish physical connection between the lines of the rail carrier and the dock at which interchange of passengers or property is to be made by directing the rail carrier to make suitable connection between its line and a track or tracks which have been constructed from the dock to the limits of the railroad right of way, or by directing either or both the rail and water carrier, individually or in connection with one another, to construct and connect with the lines of the rail carrier a track or tracks to the dock. The Commission shall have full authority to determine and prescribe the terms and conditions upon which these connecting tracks shall be operated, and it may, either in the construction or the operation of such tracks, determine what sum shall be paid to or by either carrier: *Provided*, That construction required by the Commission under the provisions of this paragraph shall be subject to the same restrictions as to findings of public convenience and necessity and other matters as is construction required under section 1 of this Act."

Physical connection of rail lines and dock to be established.
Determination of terms and conditions.
Proviso.
Facilities required.
Ante, p. 474.

Sec. 413. Paragraph (c) of the thirteenth paragraph of section 6 of the Interstate Commerce Act is hereby amended to read as follows:

Proportional rates.

" (c) To establish proportional rates, or maximum, or minimum, or maximum and minimum proportional rates, by rail to and from the ports to which the traffic is brought, or from which it is taken by the water carrier, and to determine to what traffic and in connection with what vessels and upon what terms and conditions such rates shall apply. By proportional rates are meant those which differ from the corresponding local rates to and from the port and which apply only to traffic which has been brought to the port or is carried from the port by a common carrier by water."

Terms and conditions to be determined.
Vol.37,p.568,amended.
Minimum added.
Proportional rates defined.

Sec. 414. Section 10 of the Interstate Commerce Act is hereby amended by inserting " (1) " after the section number at the beginning of the first paragraph, " (2) " at the beginning of the second paragraph, " (3) " at the beginning of the third paragraph, and " (4) " at the beginning of the fourth paragraph, and by inserting after the

Penalties.
Paragraphs numbered.
Vol. 36, pp. 549, 550.

TRANSPORTATION ACT.
Transmission of in-
telligence added. words "transportation of passengers or property," in the proviso in the first paragraph thereof, the words "or the transmission of intelligence."

Powers of Commis-
sion.
Paragraphs num-
bered.
Vol. 26, pp. 743, 744. SEC. 415. Section 12 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning of the first paragraph, "(2)" at the beginning of the second paragraph, "(3)" at the beginning of the third paragraph, "(4)" at the beginning of the fourth paragraph, "(5)" at the beginning of the fifth paragraph, "(6)" at the beginning of the sixth paragraph, and "(7)" at the beginning of the seventh paragraph.

Investigating com-
plaints.
Paragraphs num-
bered.
Vol. 36, pp. 550, 551.
New matter. SEC. 416. Section 13 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning of the first paragraph and "(2)" at the beginning of the second paragraph, and by adding at the end thereof two new paragraphs to read as follows:

State authorities to
be notified when rates
made by them are in
issue. "(3) Whenever in any investigation under the provisions of this Act, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commis-

Consideration of ju-
risdiction. sion, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The Commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this Act with respect to the relationship between rate

Joint hearings, etc. structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the Commission is

Enforcement. empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the

Discriminations in
favor of intrastate com-
merce, unlawful. enforcement of any provision of this Act.

"(4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination

Removal by pre-
scribing the rates, etc.,
to be charged. against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will

Observance not af-
fected by State laws,
etc. remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or

Investigations.
Paragraphs num-
bered. order of any State authority to the contrary notwithstanding."

SEC. 417. Section 14 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the begin-

Vol. 34, p. 589.
Violations. ning of the first paragraph, "(2)" at the beginning of the second paragraph, and "(3)" at the beginning of the third paragraph.

SEC. 418. The first four paragraphs of section 15 of the Interstate

Determination by
Commission if charges,
classifications, etc., are
unjust, discriminatory,
etc. Commerce Act are hereby amended to read as follows:

"SEC. 15. (1) That whenever, after full hearing, upon a complaint made as provided in section 13 of this Act, or after full hearing under an order for investigation and hearing made by the Commission on

its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this Act for the transportation of persons or property or for the transmission of messages as defined in the first section of this Act, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this Act, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this Act, the Commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged (or, in the case of a through route where one of the carriers is a water line, the maximum rates, fares, and charges applicable thereto), and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation or transmission other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.

"(2) Except as otherwise provided in this Act, all orders of the Commission, other than orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force until its further order, or for a specified period of time, according as shall be prescribed in the order, unless the same shall be suspended or modified or set aside by the Commission, or be suspended or set aside by a court of competent jurisdiction.

"(3) The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without a complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property, or the maxima or minima, or maxima and minima, to be charged (or, in the case of a through route where one of the carriers is a water line, the maximum rates, fares, and charges applicable thereto), and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated; and this provision, except as herein otherwise provided, shall apply when one of the carriers is a water line. The Commission shall not, however, establish any through route, classification, or practice, or any rate, fare, or charge, between street electric passenger railways not engaged in the general business of transporting freight in addition to their passenger and express business, and railroads of a different character; nor shall the Commission have the right to establish any route, classification, or practice, or any rate, fare, or charge when the transportation is wholly by water, and any transportation by water affected by this Act shall be subject to the laws and regulations applicable to transportation by water.

"(4) In establishing any such through route the Commission shall not (except as provided in section 3, and except where one of the carriers is a water line), require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in

*Marginal notes:*

TRANSPORTATION ACT. Vol. 36, p. 550.

Vol. 34, p. 589, amended.

Just and reasonable rates to be observed.

Maximum and minimum added.

Carrier ordered to conform to rates prescribed.

Taking effect of orders.

Continuance.

Through routes, joint rates, etc., to be established by Commission.

Maxima and minima added.

Water lines included.

Electric roads excepted.

Wholly by water excluded.

Through routes to embrace entire length of road.

TRANSPORTATION ACT.
Exception. conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established: *Proviso*,
Proviso.
Temporary through
routes for emergencies,
authorized. *Provided*, That in time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest.

Livestock transportation.    "(5) Transportation wholly by railroad of ordinary livestock in
Special regulations
governing, in carload
lots. car-load lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee or owner, except in cases where the unloading or reloading en route is at the request of the shipper, consignee or owner, or to try an intermediate market, or to comply with quarantine regulations. The Commission may prescribe or approve just and reasonable rules governing each of such
Limitation. excepted services. Nothing in this paragraph shall be construed to affect the duties and liabilities of the carriers now existing by virtue of law respecting the transportation of other than ordinary livestock, or the duty of performing service as to shipments other than those to or from public stockyards.

Division of joint
rates, etc., to be prescribed in place of unjust, preferential, etc.    "(6) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers,
Considerations for
determining divisions. and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge.

New rates, classifications, etc.
Commission to determine lawfulness of.    "(7) Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the

Commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than one hundred and twenty days beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If any such hearing can not be concluded within the period of suspension, as above stated, the Commission may extend the time of suspenson for a further period not exceeding thirty days, and if the proceeding has not been concluded and an order made at the expiration of such thirty days, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period, but, in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate, fare, or charge increased after January 1, 1910, or of a rate, fare, or charge sought to be increased after the passage of this Act, the burden of proof to show that the increased rate, fare, or charge, or proposed increased rate, fare, or charge, is just and reasonable shall be upon the carrier, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

> **TRANSPORTATION ACT.**
>
> *Suspension pending decision.*
>
> *Limit.*
>
> *Final determination.*
>
> *Suspension extended.*
>
> *Temporary permission.*
>
> *Refund if increased rates finally disallowed.*
>
> *Hearings on rates increased since January 1, 1910.*

SEC. 419. The fifth paragraph of section 15 of the Interstate Commerce Act is hereby amended by inserting "(8)" at the beginning of such paragraph.

> *Paragraphs numbered.*
> *Vol. 36, p. 553.*

SEC. 420. Section 15 of the Interstate Commerce Act is hereby amended by inserting after the fifth paragraph two new paragraphs, to read as follows:

> *New matter.*

"(9) Whenever property is diverted or delivered by one carrier to another carrier contrary to routing instructions in the bill of lading, unless such diversion or delivery is in compliance with a lawful order, rule, or regulation of the Commission, such carriers shall, in a suit or action in any court of competent jurisdiction, be jointly and severally liable to the carrier thus deprived of its right to participate in the haul of the property, for the total amount of the rate or charge it would have received had it participated in the haul of the property. The carrier to which the property is thus diverted shall not be liable in such suit or action if it can show, the burden of proof being upon it, that before carrying the property it had no notice, by bill of lading, waybill or otherwise, of the routing instructions. In any judgment which may be rendered the plaintiff shall be allowed to recover against the defendant a reasonable attorney's fee to be taxed in the case.

> *Diversions of property, contrary to routing instructions.*
> *Liability of carriers for.*
>
> *Nonliability if no notice on waybill, etc.*

TRANSPORTATION ACT.
Commission may direct traffic not routed.
"(10) With respect to traffic not routed by the shipper, the Commission may, whenever the public interest and a fair distribution of the traffic require, direct the route which such traffic shall take after it arrives at the terminus of one carrier or at a junction point with another carrier, and is to be there delivered to another carrier."

Paragraphs numbered.
Vol. 36, p. 553.
SEC. 421. Section 15 of the Interstate Commerce Act is hereby further amended by inserting "(11)" at the beginning of the sixth paragraph, "(12)" at the beginning of the seventh paragraph, "(13)" at the beginning of the eighth paragraph, and "(14)" at the beginning of the ninth paragraph.

New section.
Railroad incomes.
SEC. 422. The Interstate Commerce Act is further amended by inserting after section 15 a new section to be known as section 15a and to read as follows:

Meaning of "rates."

Limitation of "carrier."

Specific exclusions.
"SEC. 15a. (1) When used in this section the term "rates" means rates, fares, and charges, and all classifications, regulations, and practices, relating thereto; the term "carrier" means a carrier by railroad or partly by railroad and partly by water, within the continental United States, subject to this Act, excluding (a)sleeping-car companies and express companies, (b) street or suburban electric railways unless operated as a part of a general steam railroad system of transportation, (c) interurban electric railways unless operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight, and (d) any belt-line railroad, terminal switching railroad, or other terminal facility, owned exclusively and maintained, operated, and controlled by any State or political subdivision thereof; and the term "net railway operating income" means railway operating income, including in the computation thereof debits and credits arising from equipment rents and joint facility rents.

"Net railway operating income," defined.

Rates.
Adjustment of, by Commission that carriers may earn fair return on property used.
"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole (or as a whole in each of such rate groups or territories as the Commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of

Proviso.
Modifications permitted.
transportation: *Provided*, That the Commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different sections of the country.

Determination of percentage constituting fair return on property value.
"(3) The Commission shall from time to time determine and make public what percentage of such aggregate property value constitutes a fair return thereon, and such percentage shall be uniform for all rate groups or territories which may be designated by the Commission.

Transportation needs to be considered.
In making such determination it shall give due consideration, among other things, to the transportation needs of the country and the necessity (under honest, efficient and economical management of existing transportation facilities) of enlarging such facilities in order to provide

Proviso.
Rate adopted for two years.
the people of the United States with adequate transportation: *Provided*, That during the two years beginning March 1, 1920, the Commission shall take as such fair return a sum equal to 5½ per centum of such aggregate value, but may, in its discretion, add thereto a sum not exceeding one-half of one per centum of such aggregate value to

Addition for betterments.
make provision in whole or in part for improvements, betterments or equipment, which, according to the accounting system prescribed by the Commission, are chargeable to capital account.

Determination of property value.
Use of valuation investigation.
Vol. 37, p. 701.
"(4) For the purposes of this section, such aggregate value of the property of the carriers shall be determined by the Commission from time to time and as often as may be necessary.   The Commission may utilize the results of its investigation under section 19a of this Act, in

so far as deemed by it available, and shall give due consideration to <span style="float:right">TRANSPORTATION ACT.</span> all the elements of value recognized by the law of the land for rate-making purposes, and shall give to the property investment account <span style="float:right">Property investment account, etc.</span> of the carriers only that consideration which under such law it is entitled to in establishing values for rate-making purposes. When-<span style="float:right">Ascertained valuation accepted.</span> ever pursuant to section 19a of this Act the value of the railway prop-<span style="float:right">Vol. 37, p. 702.</span> erty of any carrier held for and used in the service of transportation has been finally ascertained, the value so ascertained shall be deemed by the Commission to be the value thereof for the purpose of determining such aggregate value.

" (5) Inasmuch as it is impossible (without regulation and control <span style="float:right">Competitive traffic. Income from, in excess of fair return, to be paid to the United States.</span> in the interest of the commerce of the United States considered as a whole) to establish uniform rates upon competitive traffic which will adequately sustain all the carriers which are engaged in such traffic and which are indispensable to the communities to which they render the service of transportation, without enabling some of such carriers to receive a net railway operating income substantially and unreasonably in excess of a fair return upon the value of their railway property held for and used in the service of transportation, it is hereby declared that any carrier which receives such an income so in excess of a fair return, shall hold such part of the excess, as hereinafter prescribed, as trustee for, and shall pay it to, the United States.

" (6) If, under the provisions of this section, any carrier receives for <span style="float:right">Net operating income.</span> any year a net railway operating income in excess of 6 per centum of <span style="float:right">Division of excess for the year.</span> the value of the railway property held for and used by it in the service of transportation, one-half of such excess shall be placed in a reserve <span style="float:right">To reserve fund of carrier.</span> fund established and maintained by such carrier, and the remaining one-half thereof shall, within the first four months following the close of the period for which such computation is made, be recoverable by <span style="float:right">To general railroad contingent fund.</span> and paid to the Commission for the purpose of establishing and maintaining a general railroad contingent fund as hereinafter described. For the purposes of this paragraph the value of the railway property <span style="float:right">Carriers operating as one system.</span> and the net railway operating income of a group of carriers, which the Commission finds are under common control and management and are operated as a single system, shall be computed for the system as a whole irrespective of the separate ownership and accounting returns of the various parts of such system. In the case of any carrier which <span style="float:right">Carriers accepting six months' guaranty.</span> has accepted the provisions of section 209 of this amendatory Act the <span style="float:right">*Ante*, p. 464.</span> provisions of this paragraph shall not be applicable to the income for any period prior to January 1, 1920. The value of such railway <span style="float:right">Property valuation.</span> property shall be determined by the Commission in the manner provided in paragraph (4).

" (7) For the purpose of paying dividends or interest on its stocks, <span style="float:right">Reserve fund of carriers.</span> bonds or other securities, or rent for leased roads, a carrier may <span style="float:right">Withdrawal for dividends, etc.</span> draw from the reserve fund established and maintained by it under the provisions of this section to the extent that its net railway operating income for any year is less than a sum equal to 6 per centum of the value of the railway property held for and used by it in the service of transportation, determined as provided in paragraph (6); <span style="float:right">Restriction.</span> but such fund shall not be drawn upon for any other purpose.

" (8) Such reserve fund need not be accumulated and maintained <span style="float:right">Use of excess income above requirement for reserve fund, permitted.</span> by any carrier beyond a sum equal to 5 per centum of the value of its railway property determined as herein provided, and when such fund is so accumulated and maintained the portion of its excess income which the carrier is permitted to retain under paragraph (6) may be used by it for any lawful purpose.

" (9) The Commission shall prescribe rules and regulations for the <span style="float:right">Excess income payable to Commission. Determination of, etc.</span> determination and recovery of the excess income payable to it under this section, and may require such security and prescribe such reasonable terms and conditions in connection therewith as it may

44281°—21——33

TRANSPORTATION ACT.
Adjustments for part
of a year.

find necessary. The Commission shall make proper adjustments to provide for the computation of excess income for a portion of a year, and for a year in which a change in the percentage constituting a fair return or in the value of a carrier's railway property becomes effective.

General railroad contingent fund.
Use by Commission specified.

"(10) The general railroad contingent fund so to be recoverable by and paid to the Commission and all accretions thereof shall be a revolving fund and shall be administered by the Commission. It shall be used by the Commission in furtherance of the public interest in railway transportation either by making loans to carriers to meet expenditures for capital account or to refund maturing securities originally issued for capital account, or by purchasing transportation equipment and facilities and leasing the same to carriers, as hereinafter provided. Any moneys in the fund not so employed shall be invested in obligations of the United States or deposited in authorized depositaries of the United States subject to the rules promulgated from time to time by the Secretary of the Treasury relating to Government deposits.

Investment of unemployed moneys.

Loans from contingent fund.
Applications for, by carriers.
Detailed statements of purpose, etc.

"(11) A carrier may at any time make application to the Commission for a loan from the general railroad contingent fund, setting forth the amount of the loan and the term for which it is desired, the purpose of the loan and the uses to which it will be applied, the present and prospective ability of the applicant to repay the loan and meet the requirements of its obligations in that regard, the character and value of the security offered, and the extent to which the public convenience and necessity will be served. The application shall be accompanied by statements showing such facts and details as the Commission may require with respect to the physical situation, ownership, capitalization, indebtedness, contract obligations, operation, and earning power of the applicant, together with such other facts relating to the propriety and expediency of granting the loan applied for and the ability of the applicant to make good the obligation, as the Commission may deem pertinent to the inquiry.

Commission authorized to grant loans after investigation, etc.

"(12) If the Commission, after such hearing and investigation, with or without notice, as it may direct, finds that the making, in whole or in part, of the proposed loan from the general railroad contingent fund is necessary to enable the applicant properly to meet the transportation needs of the public, and that the prospective earning power of the applicant and the character and value of the security offered are such as to furnish reasonable assurance of the applicant's ability to repay the loan within the time fixed therefor, and to meet its other obligations in connection with such loan, the Commission may make a loan to the applicant from such railroad contingent fund, in such amount, for such length of time, and under such terms and conditions as it may deem proper. The Commission shall also prescribe the security to be furnished, which shall be adequate to secure the loan. All such loans shall bear interest at the rate of 6 per centum per annum, payable semiannually to the Commission. Such loans when repaid, and all interest paid thereon, shall be placed in the general railroad contingent fund.

Security, interest, etc.

Lease of transportation equipment to carriers.
Application to be made to Commission.

"(13) A carrier may at any time make application to the Commission for the lease to it of transportation equipment or facilities, purchased from the general railroad contingent fund, setting forth the kind and amount of such equipment or facilities and the term for which it is desired to be leased, the uses to which it is proposed to put such equipment or facilities, the present and prospective ability of the applicant to pay the rental charges thereon and to meet the requirements of its obligations under the lease, and the extent to which the public convenience and necessity will be served. The application shall be accompanied by statements showing such facts and details as the Commission may require with respect to the

Details, etc., of applications.

physical situation, ownership, capitalization, indebtedness, contract obligations, operation, and earning power of the applicant, together with such other facts relating to the propriety and expediency of leasing such equipment or facilities to the applicant as the Commission may deem pertinent to the inquiry.

"(14) If the Commission, after such hearing and investigation, with or without notice, as it may direct, finds that the leasing to the applicant of such equipment or facilities, in whole or in part, is necessary to enable the applicant properly to meet the transportation needs of the public, and that the prospective earning power of the applicant is such as to furnish reasonable assurance of the applicant's ability to pay promptly the rental charges and meet its other obligations under such lease, the Commission may lease such equipment or facilities purchased by it from the general railroad contingent fund, to the applicant for such length of time, and under such terms and conditions as it may deem proper. The rental charges provided in every such lease shall be at least sufficient to pay a return of 6 per centum per annum, plus allowance for depreciation determined as provided in paragraph (5) of section 20 of this Act, upon the value of the equipment or facilities leased thereunder. All rental charges and other payments received by the Commission in connection with such equipment and facilities, including amounts received under any sale thereof, shall be placed in the general railroad contingent fund.

"(15) The Commission may from time to time purchase, contract for the construction, repair and replacement of, and sell, equipment and facilities, and enter into and carry out contracts and other obligations in connection therewith, to the extent that moneys included in the general railroad contingent fund are available therefor, and in so far as necessary to enable it to secure and supply equipment and facilities to carriers whose applications therefor are approved under the provisions of this section, and to maintain and dispose of such equipment and facilities.

"(16) The Commission may from time to time prescribe such rules and regulations as it deems necessary to carry out the provisions of this section respecting the making of loans and the lease of equipment and facilities.

"(17) The provisions of this section shall not be construed as depriving shippers of their right to reparation in case of overcharges, unlawfully excessive or discriminatory rates, or rates excessive in their relation to other rates, but no shipper shall be entitled to recover upon the sole ground that any particular rate may reflect a proportion of excess income to be paid by the carrier to the Commission in the public interest under the provisions of this section.

"(18) Any carrier, or any corporation organized to construct and operate a railroad, proposing to undertake the construction and operation of a new line of railroad may apply to the Commission for permission to retain for a period not to exceed ten years all or any part of its earnings derived from such new construction in excess of the amount heretofore in this section provided, for such disposition as it may lawfully make of the same, and the Commission may, in its discretion, grant such permission, conditioned, however, upon the completion of the work of construction within a period to be designated by the Commission in its order granting such permission."

SEC. 423. The first paragraph of section 16 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning of such paragraph.

SEC. 424. The second paragraph of section 16 of the Interstate Commerce Act is hereby amended by inserting "(2)" at the beginning of such paragraph, and by striking out the last sentence thereof and inserting in lieu thereof the following as a new paragraph:

TRANSPORTATION ACT.

Commission authorized to furnish equipment, etc.

Rental charges.

Payments placed in general contingent fund.

Equipment facilities, etc.
Purchase, etc., from railroad contingent fund authorized.

Rules, etc., to be prescribed.

Reparation for overcharges, etc., not affected.

New railroads.
May be permitted to retain excess income for ten years.

Conditions.

Enforcement of law.
Paragraph numbered.
Vol. 36, p. 554.

Court procedure.
Vol. 36, p. 554, amended.
New matter.

TRANSPORTATION ACT.
Time for filing actions by carriers.
By shippers.
"(3) All actions at law by carriers subject to this Act for recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after. All complaints for the recovery of damages shall be filed with the Commission within two years from the time the cause of action accrues, and not after, unless the carrier, after the expiration of such two years or within ninety days before such expiration, begins an action for recovery of charges in respect of the same service, in which case such period of two years shall be extended to and including ninety days from the time such action by the carrier is begun. In either case the cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of

*Petitions for enforcement.*

delivery thereof by the carrier, and not after. A petition for the enforcement of an order for the payment of money shall be filed in the district court or State court within one year from the date of the order, and not after."

*Paragraphs numbered.*
*Vol. 36, p. 554.*

SEC. 425. The third, fourth, fifth, and sixth paragraphs of section 16 of the Interstate Commerce Act are hereby amended by inserting "(4)" at the beginning of the third paragraph, "(5)" at the beginning of the fourth paragraph, "(6)" at the beginning of the fifth paragraph, and "(7)" at the beginning of the sixth paragraph.

SEC. 426. The seventh paragraph of section 16 of the Interstate Commerce Act is hereby amended to read as follows:

*Penalty for not obeying orders.*
*Vol. 36, p. 554, amended.*

"(8) Any carrier, any officer, representative, or agent of a carrier, or any receiver, trustee, lessee, or agent of either of them, who knowingly fails or neglects to obey any order made under the provisions of sections 3, 13, or 15 of this Act shall forfeit to the United States the sum of $5,000 for each offense. Every distinct violation shall be a separate offense, and in case of a continuing violation each day shall be deemed a separate offense."

*Paragraphs numbered.*
*Vol. 36, p. 555.*

SEC. 427. The eighth and ninth paragraphs of section 16 of the Interstate Commerce Act are hereby amended by inserting "(9)" at the beginning of the eighth paragraph and "(10)" at the beginning of the ninth paragraph.

SEC. 428. The tenth paragraph of section 16 of the Interstate Commerce Act is hereby amended to read as follows:

*Employment of attorneys authorized.*
*Vol. 36, p. 555, amended.*

"(11) The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission."

*Payment.*

*Paragraphs numbered.*
*Vol. 36, p. 555.*

SEC. 429. The eleventh and twelfth paragraphs of section 16 of the Interstate Commerce Act are hereby amended by inserting "(12)" at the beginning of the eleventh paragraph and "(13)" at the beginning of the twelfth paragraph.

*Conduct of proceedings.*
*Paragraph numbered.*
*Vol. 40, p. 270.*

SEC. 430. Section 17 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning of the first paragraph.

*Divisions of Commission authorized.*
*Minimum number.*
*Vol. 40, p. 271, amended.*

SEC. 431. The second paragraph of section 17 of the Interstate Commerce Act is hereby amended to read as follows:

"(2) The Commission is hereby authorized by its order to divide the members thereof into as many divisions (each to consist of not less than three members) as it may deem necessary, which may be changed from time to time. Such divisions shall be denominated, respectively, division one, division two, and so forth. Any Com-

*Assignment, etc.*

missioner may be assigned to and may serve upon such division or divisions as the Commission may direct, and the senior in service of the Commissioners constituting any of said divisions shall act as

chairman thereof. In case of vacancy in any division, or of absence or inability to serve thereon of any Commissioner thereto assigned, the chairman of the Commission or any Commissioner designated by him for that purpose, may temporarily serve on said division until the Commission shall otherwise order."

TRANSPORTATION ACT.
Temporary filling of vacancies.

SEC. 432. The third and fourth paragraphs of section 17 of the Interstate Commerce Act are hereby amended by inserting "(3)" at the beginning of the third paragraph, and "(4)" at the beginning of the fourth paragraph.

Paragraphs numbered.
Vol. 40, p. 271.

The fifth and sixth paragraphs of such section are hereby repealed.

Paragraphs repealed.

The seventh paragraph of such section is hereby amended by inserting "(5)" at the beginning of such paragraph.

Paragraph numbered.

SEC. 433. Section 18 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning of the first paragraph, and "(2)" at the beginning of the second paragraph.

Salaries.
Paragraphs numbered.
Vol. 25, p. 861.

Section 19a of the Interstate Commerce Act is hereby amended by inserting "(a)" after the section number at the beginning of the first paragraph, "(b)" at the beginning of the second paragraph, "(c)" at the beginning of the seventh paragraph, "(d)" at the beginning of the eighth paragraph, "(e)" at the beginning of the ninth paragraph, "(f)" at the beginning of the tenth paragraph, "(g)" at the beginning of the eleventh paragraph, "(h)" at the beginning of the twelfth paragraph, "(i)" at the beginning of the thirteenth paragraph, "(j)" at the beginning of the fourteenth paragraph, "(k)" at the beginning of the fifteenth paragraph, and "(l)" at the beginning of the sixteenth paragraph.

Physical valuation of railroads.
Paragraphs lettered.
Vol. 37, pp. 701, 702.

SEC. 434. Section 20 of the Interstate Commerce Act is hereby amended by inserting "(1)" after the section number at the beginning of the first paragraph, "(2)" at the beginning of the second paragraph, "(3)" at the beginning of the third paragraph, and "(4)" at the beginning of the fourth paragraph.

Annual reports.
Paragraphs numbered.
Vol. 34, p. 593.

SEC. 435. The fifth paragraph of section 20 of the Interstate Commerce Act is hereby amended to read as follows:

Accounts.

"(5) The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to the provisions of this Act, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys. The Commission shall, as soon as practicable, prescribe, for carriers subject to this Act, the classes of property for which depreciation charges may properly be included under operating expenses, and the percentages of depreciation which shall be charged with respect to each of such classes of property, classifying the carriers as it may deem proper for this purpose. The Commission may, when it deems necessary, modify the classes and percentages so prescribed. The carriers subject to this Act shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission. No such carrier shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses. The commission shall at all times have access to all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by carriers subject to this Act, and the provisions of this section respecting the preservation and destruction of books, papers, and documents shall apply thereto, and it shall be unlawful for such carriers to keep any other accounts, records, or memoranda than those prescribed or approved by the Commission,

Forms, etc., may be prescribed.

Depreciation charges.

Classification of, to be prescribed.

Restriction.

Access to records, etc.

TRANSPORTATION ACT.
Examinations, etc.
and it may employ special agents or examiners, who shall have authority under the order of the Commission to inspect and examine any and all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers.  This provision shall apply to receivers of carriers and operating trustees.  The provisions of this section shall also apply to all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, kept during the period of Federal control, and placed by the President in the custody of carriers subject to this Act."

*Federal control records included.*

*Paragraph numbered.*
*Vol. 34, p. 594.*

SEC. 436. The sixth paragraph of section 20 of the Interstate Commerce Act is hereby amended by inserting " (6) " at the beginning of such paragraph.

*Paragraph numbered.*
*Vol. 35, p. 649, amended.*

The seventh paragraph of section 20 of the Interstate Commerce Act is hereby amended by striking out "Par. 7," at the beginning of such paragraph and inserting " (7) " in lieu thereof.

*Paragraphs numbered.*
*Vol. 34, pp. 594, 595.*

The eighth to twelfth paragraphs, inclusive, of section 20 of the Interstate Commerce Act are hereby amended by inserting " (8) " at the beginning of the eighth paragraph, " (9) " at the beginning of the ninth paragraph, " (10) " at the beginning of the tenth paragraph, " (11) " at the beginning of the eleventh paragraph, and " (12) " at the beginning of the twelfth paragraph.

*Responsibility for losses.*

SEC. 437. The eleventh paragraph of section 20 of the Interstate Commerce Act is hereby amended by inserting immediately before the first proviso thereof the following:

*Determination if by carrier by water.*
*Vol. 38, p. 1197, amended.*

"*Provided*, That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by and under the laws and regulations applicable to transportation by water, and the liability of the initial carrier shall be the same as that of such carrier by water."

*Time for filing claims.*

SEC. 438. The third proviso of the eleventh paragraph of section 20 of the Interstate Commerce Act (not counting the proviso added by section 437 of this Act) is hereby amended to read as follows:

*Contracts providing shorter time than legal period, unlawful.*
*Vol. 38, p. 1197, amended.*

"*Provided further*, That it shall be unlawful for any such common carrier to provide by rule, contract, regulation, or otherwise a shorter period for giving notice of claims than ninety days, for the filing of claims than four months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice."

*Issue of securities.*
*New section.*

SEC. 439. The Interstate Commerce Act is further amended by inserting therein a new section between section 20 and section 21, to be designated section 20a, and to read as follows:

*Meaning of "carrier" as used herein.*

"SEC. 20a. (1) That as used in this section the term 'carrier' means a common carrier by railroad (except a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation) which is subject to this Act, or any corporation organized for the purpose of engaging in transportation by railroad subject to this Act.

*Issue of securities by carriers unlawful unless authorized by Commission.*

"(2) From and after one hundred and twenty days after this section takes effect it shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the

*Investigation of purposes and uses.*

carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the

proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the Commission by order authorizes such issue or assumption. The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose.

*Object and necessity for issue, etc., to be shown.*

"(3) The Commission shall have power by its order to grant or deny the application as made, or to grant it in part and deny it in part, or to grant it with such modifications and upon such terms and conditions as the Commission may deem necessary or appropriate in the premises, and may from time to time, for good cause shown, make such supplemental orders in the premises as it may deem necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any securities so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of the foregoing paragraph (2).

*Authority given to Commission.*

"(4) Every application for authority shall be made in such form and contain such matters as the Commission may prescribe. Every such application, as also every certificate of notification hereinafter provided for, shall be made under oath, signed and filed on behalf of the carrier by its president, a vice president, auditor, comptroller, or other executive officer having knowledge of the matters therein set forth and duly designated for that purpose by the carrier.

*Applications to be submitted to Commission. Verification, etc.*

"(5) Whenever any securities set forth and described in any application for authority or certificate of notification as pledged or held unencumbered in the treasury of the carrier shall, subsequent to the filing of such application or certificate, be sold, pledged, repledged, or otherwise disposed of by the carrier, such carrier shall, within ten days after such sale, pledge, repledge, or other disposition, file with the Commission a certificate of notification to that effect, setting forth therein all such facts as may be required by the Commission.

*Notification of disposal of pledged, etc., securities.*

"(6) Upon receipt of any such application for authority the Commission shall cause notice thereof to be given to and a copy filed with the governor of each State in which the applicant carrier operates. The railroad commissions, public service or utilities commissions, or other appropriate State authorities of the State shall have the right to make before the Commission such representations as they may deem just and proper for preserving and conserving the rights and interests of their people and the States, respectively, involved in such proceedings. The Commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority.

*Action on applications. Notification, etc.*

*Representation by State authorities.*

*Hearings.*

"(7) The jurisdiction conferred upon the Commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein.

*Jurisdiction of Commission exclusive.*

"(8) Nothing herein shall be construed to imply any guaranty or obligation as to such securities on the part of the United States.

*No Federal guaranty of issues.*

"(9) The foregoing provisions of this section shall not apply to notes to be issued by the carrier maturing not more than two years after the date thereof and aggregating (together with all other then outstanding notes of a maturity of two years or less) not more than 5 per centum of the par value of the securities of the carrier then out-

*Provisions not applicable to short-time notes.*

TRANSPORTATION ACT. standing.  In the case of securities having no par value, the par value
for the purposes of this paragraph shall be the fair market value as

Notification of issue
of notes.
of the date of issue.  Within ten days after the making of such notes
the carrier issuing the same shall file with the Commission a certificate
of notification, in such form as may from time to time be determined
and prescribed by the Commission, setting forth as nearly as may be
the same matters as those required in respect of applications for

Proviso.
Funding require-
ments.
authority to issue other securities: *Provided,* That in any subsequent
funding of such notes the provisions of this section respecting other
securities shall apply.

Carriers to make re-
ports of issues, disposi-
tion, etc.
"(10) The Commission shall require periodical or special reports
from each carrier hereafter issuing any securities, including such notes,
which shall show, in such detail as the Commission may require, the
disposition made of such securities and the application of the pro-
ceeds thereof.

Securities issued
without authorization,
etc., of Commission,
void.
"(11) Any security issued or any obligation or liability assumed
by a carrier, for which under the provisions of this section the authori-
zation of the Commission is required, shall be void, if issued or as-
sumed without such authorization therefor having first been obtained,
or if issued or assumed contrary to any term or condition of such order
of authorization as modified by any order supplemental thereto

Procedure preceding
entry of order.
entered prior to such issuance or assumption; but no security issued
or obligation or liability assumed in accordance with all the terms and
conditions of such an order of authorization therefor as modified by
any order supplemental thereto entered prior to such issuance or as-
sumption, shall be rendered void because of failure to comply with
any provision of this section relating to procedure and other matters

Liability of carrier,
officers, etc., for void
securities.
preceding the entry of such order of authorization.  If any security so
made void or any security in respect to which the assumption of
obligation or liability is so made void, is acquired by any person for
value and in good faith and without notice that the issue or assump-
tion is void, such person may in a suit or action in any court of com-
petent jurisdiction hold jointly and severally liable for the full amount
of the damage sustained by him in respect thereof, the carrier which
issued the security so made void, or assumed the obligation or liability
so made void, and its directors, officers, attorneys, and other agents,
who participated in any way in the authorizing, issuing, hypothecating,
or selling of the security so made void or in the authorizing of the

Recovery of consid-
eration, if acquired
from carrier.
assumption of the obligation or liability so made void.  In case any
security so made void was directly acquired from the carrier issuing
it the holder may at his option rescind the transaction and upon the
surrender of the security recover the consideration given therefor.

Punishment of direc-
tor, etc., of carrier con-
curring in forbidden
issue, etc.
Any director, officer, attorney or agent of the carrier who knowingly
assents to or concurs in any issue of securities or assumptions of
obligation or liability forbidden by this section, or any sale or other
disposition of securities contrary to the provisions of the Commission's
order or orders in the premises, or any application not authorized by
the Commission of the funds derived by the carrier through such sale
or other disposition of such securities, shall be guilty of a misdemeanor
and upon conviction shall be punished by a fine of not less than
$1,000 nor more than $10,000, or by imprisonment for not less than
one year nor more than three years, or by both such fine and imprison-
ment, in the discretion of the court.

Unauthorized hold-
ing office in more than
one carrier unlawful.
"(12) After December 31, 1921, it shall be unlawful for any person
to hold the position of officer or director of more than one carrier,
unless such holding shall have been authorized by order of the Com-
mission, upon due showing, in form and manner prescribed by the
Commission, that neither public nor private interests will be adversely

Officer forbidden to
benefit personally in
sale of securities, etc.
affected thereby.  After this section takes effect it shall be unlawful
for any officer or director of any carrier to receive for his own benefit,
directly or indirectly, any money or thing of value in respect of the

negotiation, hypothecation, or sale of any securities issued or to be issued by such carrier, or to share in any of the proceeds thereof, or to participate in the making or paying of any dividends of an operating carrier from any funds properly included in capital account. Any violation of these provisions shall be a misdemeanor, and on conviction in any United States court having jurisdiction shall be punished by a fine of not less than $1,000 nor more than $10,000, or by imprisonment for not less than one year nor more than three years, or by both such fine and imprisonment, in the discretion of the court."

SEC. 440. Section 24 of the Interstate Commerce Act is hereby amended to read as follows:

"SEC. 24. That the Commission is hereby enlarged so as to consist of eleven members, with terms of seven years, and each shall receive $12,000 compensation annually. The qualifications of the members and the manner of payment of their salaries shall be as already provided by law. Such enlargement of the Commission shall be accomplished through appointment by the President, by and with the advice and consent of the Senate, of two additional Interstate Commerce Commissioners, one for a term expiring December 31, 1923, and one for a term expiring December 31, 1924. The terms of the present commissioners, or of any successor appointed to fill a vacancy caused by the death or resignation of any of the present commissioners, shall expire as heretofore provided by law. Their successors and the successors of the additional commissioners herein provided for shall be appointed for the full term of seven years, except that any person appointed to fill a vacancy shall be appointed only for the unexpired term of the commissioner whom he shall succeed. Not more than six commissioners shall be appointed from the same political party. Hereafter the salary of the secretary of the Commission shall be $7,500 a year."

SEC. 441. The Interstate Commerce Act is hereby further amended by adding at the end thereof three new sections, to read as follows:

"SEC. 25 (1) That every common carrier by water in foreign commerce, whose vessels are registered under the laws of the United States, shall file with the Commission, within thirty days after this section becomes effective and regularly thereafter as changes are made, a schedule or schedules showing for each of its steam vessels intended to load general cargo at ports in the United States for foreign destinations (a) the ports of loading, (b) the dates upon which such vessels will commence to receive freight and dates of sailing, (c) the route and itinerary such vessels will follow and the ports of call for which cargo will be carried.

" (2) Upon application of any shipper a carrier by railroad shall make request for, and the carrier by water shall upon receipt of such request name, a specific rate applying for such sailing, and upon such commodity as shall be embraced in the inquiry, and shall name in connection with such rate, port charges, if any, which accrue in addition to the vessel's rates and are not otherwise published by the railway as in addition to or absorbed in the railway rate. Vessel rates, if conditioned upon quantity of shipment, must be so stated and separate rates may be provided for carload and less than carload shipments. The carrier by water, upon advices from a carrier by railroad, stating that the quoted rate is firmly accepted as applying upon a specifically named quantity of any commodity, shall, subject to such conditions as the Commission by regulation may prescribe, make firm reservation from unsold space in such steam vessel as shall be required for its transportation and shall so advise the carrier by railroad, in which advices shall be included the latest available information as to prospective sailing date of such vessel.

**Marginal notes:**

TRANSPORTATION ACT.

Punishment for violations.

Vol. 40, p. 270, amended.

Membership of Commission enlarged.
Salaries increased.

Appointment of new members.

Expiration of terms.

Successors to serve seven years.

Political selection.

Pay of secretary increased.

Vol. 40, p. 271, amended.
New sections.
Foreign shipments.
American vessels to file schedules of dates, routes, etc., of voyages.

Carriers by water to furnish rates for proposed shipments.

Reservation of space if quoted rate accepted by rail carrier.

TRANSPORTATION ACT.
Changes in schedules to be filed.
"(3) As the matters so required to be stated in such schedule or schedules are changed or modified from time to time, the carrier shall file with the Commission such changes or modifications as early as practicable after such modification is ascertained.  The Commission is authorized to make and publish regulations not inconsistent herewith governing the manner and form in which such carriers are to comply with the foregoing provisions.  The Commission shall cause to be published in compact form, for the information of shippers of commodities throughout the country, the substance of such schedules, and furnish such publications to all railway carriers subject to this Act, in such quantities that railway carriers may supply to each of their agents who receive commodities for shipment in such cities and towns as may be specified by the Commission, a copy of said publication; the intent being that each shipping community sufficiently important, from the standpoint of the export trade, to be so specified by the Commission shall have opportunity to know the sailings and routes, and to ascertain the transportation charges of such vessels engaged in foreign commerce.  Each railway carrier to which such publication is furnished by the Commission is hereby required to distribute the same as aforesaid and to maintain such publication as it is issued from time to time, in the hands of its agents.  The Commission is authorized to make such rules and regulations not inconsistent herewith respecting the distribution and maintenance of such publications in the several communities so specified as will further the intent of this section.

Information to shippers to be published.

Copies to railway carriers.

Distribution, etc.

Regulations to be made.

Railway carrier to issue through bills of lading on receiving consignments.
"(4) When any consignor delivers a shipment of property to any of the places so specified by the Commission, to be delivered by a railway carrier to one of the vessels upon which space has been reserved at a specified rate previously ascertained, as provided herein, for the transportation by water from and for a port named in the aforesaid schedule, the railway carrier shall issue a through bill of lading to the point of destination.  Such bill of lading shall name separately the charge to be paid for the railway transportation, water transportation, and port charges, if any, not included in the rail or water transportation charge; but the carrier by railroad shall not be liable to the consignor, consignee, or other person interested in the shipment after its delivery to the vessel.  The Commission shall, in such manner as will preserve for the carrier by water the protection of limited liability provided by law, make such rules and regulations not inconsistent herewith as will prescribe the form of such through bill of lading.  In all such cases it shall be the duty of the carrier by railroad to deliver such shipment to the vessel as a part of its undertaking as a common carrier.

Charges, etc.

Limited liability of water carrier.

Delivery to vessel.

Through bill not arrangement for continuous carriage.
"(5) The issuance of a through bill of lading covering shipments provided for herein shall not be held to constitute 'an arrangement for continuous carriage or shipment' within the meaning of this Act.

Safety devices.
Carriers to install, on order by Commission.
"Sec. 26. That the Commission may, after investigation, order any carrier by railroad subject to this Act, within a time specified in the order, to install automatic train-stop or train-control devices or other safety devices, which comply with specifications and requirements prescribed by the Commission, upon the whole or any part of its railroad, such order to be issued and published at least two years before the date specified for its fulfillment: *Provided*, That a carrier shall not be held to be negligent because of its failure to install such devices upon a portion of its railroad not included in the order; and any action arising because of an accident happening upon such portion of its railroad shall be determined without consideration of the use of such devices upon another portion of its railroad.  Any common carrier which refuses or neglects to comply with any order of the

Proviso.
Limit of liability of carriers.

Penalty for refusal to comply with order, etc.

Commission made under the authority conferred by this section shall be liable to a penalty of $100 for each day that such refusal or neglect continues, which shall accrue to the United States, and may be recovered in a civil action brought by the United States.

"Sec. 27. That this Act may be cited as the 'Interstate Commerce Act.'"

TITLE V.—MISCELLANEOUS PROVISIONS.

Sec. 500. It is hereby declared to be the policy of Congress to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation.

It shall be the duty of the Secretary of War, with the object of promoting, encouraging, and developing inland waterway transportation facilities in connection with the commerce of the United States, to investigate the appropriate types of boats suitable for different classes of such waterways; to investigate the subject of water terminals, both for inland waterway traffic and for through traffic by water and rail, including the necessary docks, warehouses, apparatus, equipment, and appliances in connection therewith, and also railroad spurs and switches connecting with such terminals, with a view to devising the types most appropriate for different locations, and for the more expeditious and economical transfer or interchange of passengers or property between carriers by water and carriers by rail; to advise with communities, cities, and towns regarding the appropriate location of such terminals, and to cooperate with them in the preparation of plans for suitable terminal facilities; to investigate the existing status of water transportation upon the different inland waterways of the country, with a view to determining whether such waterways are being utilized to the extent of their capacity, and to what extent they are meeting the demands of traffic, and whether the water carriers utilizing such waterways are interchanging traffic with the railroads; and to investigate any other matter that may tend to promote and encourage inland water transportation. It shall also be the province and duty of the Secretary of War to compile, publish, and distribute, from time to time, such useful statistics, data, and information concerning transportation on inland waterways as he may deem to be of value to the commercial interests of the country.

The words "inland waterway" as used in this section shall be construed to include the Great Lakes.

Sec. 501. The effective date on and after which the provisions of section 10 of the Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes," approved October 15, 1914, shall become and be effective is hereby deferred and extended to January 1, 1921: *Provided,* That such extension shall not apply in the case of any corporation organized after January 12, 1918.

Sec. 502. That if any clause, sentence, paragraph, or part of this Act shall for any reason be adjudged by any court of competent jurisdiction to be invalid such judgment shall not affect, impair, or invalidate the remainder of the Act, but shall be confined in its operation to the clause, sentence, paragraph, or part thereof directly involved in the controversy in which such judgment has been rendered.

Approved, February 28, 1920.

*Marginal notes:*

TRANSPORTATION ACT.

Title declared.

Miscellaneous.

Policy declared to promote water transportation, etc.

Inland waterway transportation. Investigation by Secretary of War of specified matters to encourage, etc.

Compilation, distribution, etc., of valuable information.

Great Lakes included.

Antitrust Act, 1914. Prohibition against officers having interest in purchases. Date extended. Vol. 38, p. 734. *Proviso.* Application to new corporations.

Invalidity of any clause, etc., not to affect remainder of Act.

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, I filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case.


Dated: September 9, 2022                                    */s/ Scott H. Strauss*