**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 21-3068, 21-3205 & 21-3243

_____

PJM POWER PROVIDERS GROUP,

Petitioner in No. 21-3068

v.

FEDERAL ENERGY REGULATORY COMMISSION

_____

ELECTRICAL POWER SUPPLY ASSOCIATION,

Petitioner in No. 21-3205

v.

FEDERAL ENERGY REGULATORY COMMISSION

_____

PENNSYLVANIA PUBLIC UTILITY COMMISSION;
PUBLIC UTILITIES COMMISSION OF OHIO,

Petitioner in No. 21-3243

v.

FEDERAL ENERGY REGULATORY COMMISSION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission
(FERC No. ER21-2582-000)

Argued on January 10, 2023

Before: JORDAN, PHIPPS and ROTH, <u>Circuit Judges</u>

(Opinion filed December 1, 2023)

Elbert Lin
Charles D. Wallace, III
Hunton Andrews Kurth
951 East Byrd Street
Riverfront Plaza East Tower
Richmond, VA 23219

John L. Shepherd, Jr.        **(ARGUED)**
Hunton Andrews Kurth
2200 Pennsylvania Avenue, NW
Washington, DC 20037

Counsel for Petitioner PJM Power Providers
Group

Paul W. Hughes
McDermott Will & Emery
500 N Capitol Street, NW
Washington, DC 20001

       Counsel for Petitioner Electric Power Supply
       Association

Kriss E. Brown       **(ARGUED)**
Christian A. McDewell
Pennsylvania Public Utility Commission
Commonwealth Keystone Building
400 N Street
PO Box 3265
Harrisburg, PA 17120

       Counsel for Petitioner Pennsylvania Public
       Utility Commission

Thomas G. Lindgren
Werner L. Margard, III
Office of Attorney General of Ohio
30 East Broad Street
26th Floor
Columbus, OH 43215

       Counsel for Petitioner Public Utilities
       Commission of Ohio

Jeffrey W. Mayes
Monitoring Analytics
2621 Van Buren Avenue
Suite 160
Eagleville, PA 19403

   Counsel for Intervenor Petitioner Monitoring
   Analytics LLC

Denise C. Goulet   **(ARGUED)**
McCarter & English
1301 K Street, NW
Suite 1000 West
Washington, DC 20005

   Counsel for Intervenor Petitioner Office of the
   Consumers Counsel State of Ohio OCC

Jared E. Fish   **(ARGUED)**
Federal Energy Regulatory Commission
881 1st Street, N.E.
Washington, DC 20426

   Counsel for Respondent

Danielle C. Fidler
Earthjustice Legal Defense Fund
1001 G Street, NW
Suite 1000
Washington, DC 20001

   Counsel for Intervenor Respondents Union of
   Concerned Scientists and Sierra Club

Peter Hopkins
Amber L. Martin Stone
Jeffrey A. Schwartz
Scott H. Strauss            **(ARGUED)**
Cynthia Bogorad
Lauren L. Springett
Spiegel & McDiarmid
1875 Eye Street, NW
Suite 700
Washington, DC 20006

        Counsel for Intervenor Respondents Delaware
        Division of Public Advocate; Maryland Office
        of Peoples Counsel; New Jersey Division of
        Rate Counsel and Office of Peoples Counsel for
        the District of Columbia


Matthew Price              **(ARGUED)**
Jenner & Block
1099 New York Avenue, NW
Suite 900
Washington, DC 20001

        Counsel for Intervenor Respondents
        Constellation Energy Corp and Constellation
        Energy Generation LLC

Miles H. Mitchell
Maryland Public Service Commission
6 St. Paul Street
6 St. Paul Centre, 16th Floor
Baltimore, MD 21202

> Counsel for Intervenor Respondent Maryland
> Public Service Commission

David C. Apy
Office of Attorney General of New Jersey
Division of Law
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625

> Counsel for Intervenor Respondent New Jersey
> Board of Public Utilities

Robert A. Weishaar, Jr.
McNees Wallace & Nurick
1200 G Street, NW
Suite 800
Washington, DC 20005

> Counsel for Intervenor Respondent PJM
> Industrial Customer Coalition

Ryan J. Collins
Paul M. Flynn
Wright & Talisman
1200 G Street, NW
Suite 600
Washington, DC 20005

        Counsel for Intervenor respondent PJM
        Interconnection LLC

Caroline Reiser
Natural Resources Defense Council
1152 15th Street, NW
Site 300
Washington, DC 20005

        Counsel for Intervenor Respondent Natural
        Resource Defense Council

Casey Roberts
Sierra Club
1536 Wynkoop Street
Suite 200
Denver, CO 80202

Megan C. Wachspress
Sierra Club Environmental law Program
2101 Webster Street
13th Floor
Oakland, CA 94612

        Counsel for Intervenor Respondent Sierra Club

7

Sarah A. Hunger
Office of Attorney General of Illinois
100 West Randolph Street
12th Floor
Chicago, IL 60601

> Counsel for Intervenor Respondents Illinois
> Commerce Commission and People of the State
> of Illinois

Cynthia Bogorad
Lauren L. Springett
Spiegel & McDiarmid
1875 Eye Street NW
Suite 700
Washington, DC 20006

> Counsel for Intervenor Respondent Buckeye
> Power, Inc.

Adrienne E. Clair
Thompson Coburn
1909 K Street, NW
Suite 600
Washington, DC 2006

> Counsel for Intervenor Respondent Old
> Dominion Electric Cooperative; National Rural
> Electric Cooperative Association

Daniel E. Frank
Allison Speaker
Eversheds Sutherland
700 Sixth Street, NW
Suite 700
Washington, DC 20001

       Counsel for Intervenor Respondent East
       Kentucky Power Cooperative Inc.

Andrew D. Cordo
Shannon E. German
Wilson Sonsini Goodrich & Rosati
222 Delaware Avenue
Suite 800
Wilmington, DE 19801

       Counsel for Intervenor Respondent Advanced
       Energy Economy

Gerit Hull
American Municipal Power
1111 Schrock Road
Suite 100
Columbus, OH 43229

       Counsel for Intervenor Respondent American
       Municipal Power Inc.

John E. McCaffrey, III
American Public Power Association
2451 Crystal Drive
Suite 1000
Arlington, VA 22202

> Counsel for Intervenor Respondent American
> Public Power Association

Anthony J. Corino
PSEG Corporation
80 Park Plaza
Newark, NJ 07102

> Counsel for Intervenor Respondents PSEG;
> PSEG Power LLC and PSEG ER&T

Donald R. Goodson
Institute for Policy Integrity
139 MacDougal Street
Third Floor
New York, NY 10012

> Counsel for Amicus Appellee Institute for
> Policy Integrity at New York University School
> of Law

Christopher R. Nestor
Overstreet & Nestor
461 Cochran Road
P.O. Box 237
Pittsburgh, PA 15228

        Counsel for Amicus Petitioner Pennsylvania
        Senate Republican Caucus

Michael E. Rowan
Office of Attorney General of Maryland
Higher Education Div.
200 St Paul Place
20th Floor
Baltimore, MD 21202

        Counsel for Amicus Respondents District of
        Columbia, State of Delaware and State of
        Maryland

Ari Peskoe
Harvard Electricity Law Initiative
6 Everett Street
Suite 4119
Cambridge, MA 02138

        Counsel for Amicus Respondent Electricity
        Regulation Scholars

_____

O P I N I O N

_____

**ROTH**, <u>Circuit Judge</u>:

This consolidated action represents the latest salvo in a years-long battle over whether, and to what extent, state-subsidized energy resources should be subject to price mitigation in interstate capacity auctions. The focal point of the dispute is a tariff filed by PJM Interconnection, L.L.C. (PJM), which took effect by operation of law in 2021.[1]

Three separate petitions now ask us to exercise, for the first time, our authority to review this "action by inaction" pursuant to Section 205(g) of the Federal Power Act (FPA),[2] a 2018 provision expressly articulating the right to review under these circumstances. PJM Power Providers Group (P3) and Electric Power Supply Association (EPSA) (collectively, Generators), two nonprofit associations representing energy generators, filed separate petitions. Pennsylvania Public Utility Commission and Public Utilities Commission of Ohio (State Entities) jointly filed the third.[3]

_____

[1] 16 U.S.C. § 824d(g).

[2] _Id._ §§ 791 et seq.

[3] More than two dozen intervenors and amici also filed briefs. Intervenor Petitioners include: Monitoring Analytics LLC and the Ohio Office of the Consumers Counsel. Amicus for Petitioners is the Pennsylvania Senate Republican Caucus. Intervenor Respondents include: Union of Concerned Scientists, Delaware Division of the Public Advocate,

The Petitioners, Federal Energy Regulatory Commission (FERC), and numerous intervenors and amici dispute the proper scope of our review pursuant to § 205(g). We hold that our review of FERC "action," whether actual or constructive, proceeds under the same deferential standards set forth in the FPA and Administrative Procedure Act.[4] Consistent with Congress's directive in § 205(g), we further hold that our review properly encompasses the Commissioners' mandatory statements setting forth their reasons for approving or denying the filing.

Reviewing the petitions accordingly, we will deny all three because FERC's acceptance of PJM's tariff was not

---

Maryland Office of Peoples Counsel, Maryland Public Service Commission, New Jersey Board of Public Utilities, New Jersey Division of Rate Counsel, Natural Resources Defense Council, Natural Rural Electric Cooperative, Office of Peoples Counsel for the District of Columbia, PJM Industrial Customer Coalition, PJM Interconnection LLC, Sierra Club, Illinois Commerce Commission, People of the State of Illinois, Buckeye Power Inc., Old Dominion Electric Cooperative, East Kentucky Power Cooperative Inc., Advanced Energy Economy, American Municipal Power Inc., American Public Power Association, PSEG, PSEG Power LLC, PSEG ER&T, Constellation Energy Corp, Constellation Energy Generation LLC, and Exelon Generation Co LLC. Amici on behalf of FERC include: the Institute for Policy Integrity at New York University School of Law, the District of Columbia, the State of Delaware, the State of Maryland, and Electricity Regulation Scholars.

[4] 5 U.S.C. §§ 551 et seq.

arbitrary or capricious and was supported by substantial evidence in the record.

## I.     Background

To frame the issues presented by the parties, we begin by reviewing the key statutory provisions governing this action, with a particular focus on § 205(g), the 2018 amendment to the FPA concerning judicial review of FERC action by operation of law.  We then turn to the factual and procedural context for their claims.

### A.     The Federal Power Act and Judicial Review

FERC is the independent agency to which Congress, in the FPA, granted exclusive jurisdiction to ensure "rates charged by public utilities for the transmission and sale of energy in interstate commerce, and the 'rules and regulations affecting or pertaining to such rates', [sic] are 'just and reasonable.'"[5]  While the FPA empowers FERC to regulate "all facilities for such transmission or sale of electric energy," it reserves jurisdiction over "facilities used for the generation of electric energy" to state and local authorities.[6]

---

[5] *New Jersey Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 79 (3d Cir. 2014) (quoting 16 U.S.C. § 824d) (hereinafter *NJBPU*).

[6] *NJBPU*, 744 F.3d at 80 (quotations omitted) (quoting § 824(b)(1)); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264 (2016) (noting that the FPA "authorizes [FERC] to regulate 'the sale of electric energy at wholesale in interstate commerce,'" but "leaves to the States alone, the regulation of 'any other sale' … of electricity").

Sections 205 and 206 of the FPA set forth the means by which FERC may "fulfill its statutory charge of ensuring the justness and reasonableness of rates."[7]     Together, they comprise part of "a single statutory scheme under which all rates are *established initially* by the [public utilities] . . . and all rates are subject to being modified by the Commission upon a finding that they are unlawful."[8]     Section 205 provides that "public utilities may change their rates unilaterally, upon 60 days' notice to FERC, which then reviews the changed rates to ensure that they are 'just and reasonable.'"[9]     "It is *not* necessary, in a filing pursuant to § 205, that FERC find that the previous rate was *unjust* or *unreasonable*."[10]     Rather, here FERC "plays 'an essentially passive and reactive role.'"[11]     Section 206, in contrast, provides that FERC may proactively initiate rate changes, either on its own motion or in response to a complaint, if the moving party demonstrates that the existing rate is unjust and unreasonable and the proposed alternative is just and reasonable.[12]     Notably, § 206 does not "give[] FERC the power to deny a utility the right to file changes" unilaterally under § 205.[13]

---

[7] *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1167 (D.C. Cir. 2016).

[8] *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 10 (D.C. Cir. 2002) (alteration in original) (quoting *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 341 (1956)).

[9] *NJBPU*, 744 F.3d at 94; *see* 16 U.S.C. § 824d(d).

[10] *NJBPU*, 744 F.3d at 94 (citing *Atl. City Elec. Co.*, 295 F.3d at 9–10); *see* 16 U.S.C. § 824d(a)-(d).

[11] *NJBPU*, 744 F.3d at 94 (quoting *Atl. City Elec. Co.*, 295 F.3d at 9–10).

[12] 16 U.S.C. § 824e(a).

[13] *Atl. City Elec. Co.*, 295 F.3d at 10.

Our jurisdiction to review FERC orders arises under the FPA and Administrative Procedure Act.[14]   Specifically, the FPA provides that a party aggrieved by a FERC order must first seek rehearing by the Commission, which may grant or deny rehearing, abrogate or modify its order without rehearing, or constructively deny rehearing by failing to act within thirty days.[15]   Within sixty days of the Commission's order on the application for rehearing, an aggrieved party may seek review of "order[s] issued by the Commission" in the courts of appeals.[16]   The FPA provides that we "shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part."[17] Finally, the FPA makes clear that, absent orders to the contrary, neither the filing of an application for rehearing before the Commission nor the start of proceedings before the court of appeals shall "operate as a stay of the Commission's order."[18]

The question of what constitutes a reviewable Commission order is central to this dispute.  FERC's enabling statute establishes that "[a]ctions of the Commission shall be determined by a majority vote of the members present."[19] While FERC comprises five commissioners, a quorum requires

---

[14] *See* 16 U.S.C. § 825*l*(b); 5 U.S.C. § 702 (waiving sovereign immunity for claims for relief "other than money damages"); 28 U.S.C. § 1331.

[15] 16 U.S.C. § 825*l*(a).

[16] *Id.* § 825*l*(b)

[17] *Id*. ("The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.").

[18] *Id.* § 825*l*(c).

[19] 42 U.S.C. § 7171(e).

just three, making it possible for four commissioners to deadlock two-to-two.[20]   In *Public Citizen, Inc. v. FERC*, the Court of Appeals for the D.C. Circuit considered whether judicial review was available for a § 205 rate filing that took effect after the four sitting Commissioners deadlocked and failed to act within sixty days.[21]   The court determined that it lacked jurisdiction.[22]   With regard to the FPA, the court held that the secretarial notice issued by the Commission to "describ[e] the effects of the deadlock are not reviewable orders"[23] because "FERC did not engage in collective, institutional action when it deadlocked."[24]   The court held that it also lacked jurisdiction under the APA because that statute only makes inaction reviewable "where the agency fails to take a 'discrete' action it is legally required to take,"[25] and the FPA does not "compel" FERC to act on a § 205 filing.[26]   Accordingly, the court held that it lacked jurisdiction to review FERC inaction resulting in an order by operation of law.   The court concluded that "[a]ny unfairness associated with this outcome inheres in the very text of the FPA.   Accordingly, it lies with Congress, not this Court, to provide the remedy."[27]

---

[20] *Id.* § 7171(b)(1), (e).

[21] 839 F.3d at 1170.

[22] *Id.*

[23] *Id.* at 1172.

[24] *Id*. at 1170.

[25] *Id*. at 1172 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004)).

[26] *Id*. at 1174 (explaining that the FPA does "not compel FERC to either set the disputed rates for hearing or affirmatively disapprove any unjust or unreasonable rates through the Section 205 process").

[27] *Id.*

Congress did so in 2018.  Rather than compelling FERC to act on a § 205 filing, Congress added a provision to clarify how agency inaction should be construed to permit judicial review.  The new provision, § 205(g),[28] stated that if FERC "permits the 60-day period . . .  to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change . . . or if the Commission lacks a quorum" then:

> (A) the failure to issue an order accepting or denying the change by the Commission ***shall be considered to be an order issued by the Commission accepting the change*** for purposes of section 825*l*(a) of this title [FPA § 313(a)]; and
>
> (B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.[29]

Section 205(g) further established that if "a person seeks a rehearing . . . and the Commission fails to act on the merits of the rehearing request" within 30 days because the deadlock continues, "such person may appeal under section 825*l*(b) [FPA § 313(b)]."[30]

---

[28] 16 U.S.C. § 824d(g).
[29] *Id.* (emphasis added).
[30] *Id.* § 824d(g)(2).

## B.     Factual and Procedural Context

"Since the FPA's passage, electricity has increasingly become a competitive interstate business, and FERC's role has evolved accordingly."[31]  Today, "[i]ndependent power plants now abound, and almost all electricity flows not through 'the local power networks of the past,' but instead through an interconnected 'grid' of near-nationwide scope."[32]  To ensure the reliable transmission of electricity from independent generators to "load serving entities" (LSEs)—the organizations that deliver electricity to retail consumers—FERC has empowered nonprofit entities, including Regional Transmission Organizations (RTOs), to manage segments of the grid.[33]  RTOs constitute "public utilities" under the FPA, subject to FERC's regulation.[34]

Intervenor PJM is one such RTO, managing a system that serves approximately fifty million consumers in thirteen mid-Atlantic and Midwestern states and the District of Columbia.[35]    Like other RTOs, PJM fulfills important functions that include ensuring the grid maintains sufficient electrical supply to meet demand during peak periods.[36]  To accomplish this, PJM manages a capacity market that

---

[31] *Elec. Power Supply Ass'n*, 577 U.S. at 267.

[32] *Id.* (quoting *New York v. FERC*, 535 U.S. 1, 7 (2002)).

[33] *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016).

[34] *NJBPU*, 744 F.3d at 82.

[35] PJM Br. 3; *see Hughes*, 578 U.S. at 155.

[36] *NJBPU*, 744 F.3d at 82.

essentially "pay[s] participants for a promise to produce electricity when called by PJM to do so."[37]

In 2006, the Commission found the existing capacity market was unjust and unreasonable because it maintained insufficient capacity to keep the system reliable.[38]  To remedy this, FERC issued an order accepting a negotiated settlement among power providers, utility companies, and state and local authorities, which provided for the adoption of the Reliability Pricing Model.[39]  This model works essentially as follows:

> PJM predicts electricity demand three years ahead of time, and assigns a share of that demand to each participating LSE. Owners of capacity to produce electricity in three years' time bid to sell that capacity to PJM at proposed rates. PJM accepts bids, beginning with the lowest proposed rate, until it has purchased enough capacity to satisfy projected demand. . . . [A]ll accepted capacity sellers receive the highest accepted rate, which is called the "clearing price."  LSEs

---

[37] PJM Br. 4 (citing *NJBPU*, 744 F.3d at 82 (explaining that the capacity market ensures that "there are enough . . . generators connected to the transmission grid for the system to function at peak load.")).

[38] *See PJM Interconnection, L.L.C.*, 135 FERC ¶ 61,022 (2011) (hereinafter 2011 Order) at ¶ 4.

[39] *NJBPU*, 744 F.3d at 79; s*ee PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331 (hereinafter 2006 Settlement Order).

> then must purchase from PJM, at
> the clearing price, enough
> electricity to satisfy their PJM-
> assigned share of overall projected
> demand.[40]

Besides allowing LSEs to satisfy their obligations to provide a share of projected demand, this forward-looking capacity auction serves another purpose, at least in theory: sending market signals to suppliers to incentivize resource development.[41] "A high clearing price in the capacity auction encourages new generators to enter the market, increasing supply and thereby lowering the [future] clearing price . . . [while] a low clearing price discourages new entry and encourages retirement of existing high-cost generators."[42]

Because some participants both buy *and* sell capacity in the auction, the auctions are theoretically vulnerable to manipulation by exercise of monopsony power.[43] That is, net-buyers—those who buy more capacity than they sell—could artificially depress prices by selling capacity below its true cost, skewing the market signals produced by the auction.[44]

---

[40] *Hughes*, 578 U.S. at 155–56; *see PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 251 (3d Cir. 2014); *NJBPU*, 744 F.3d at 83–84.   Technically, PJM operates multiple capacity auctions.  The one at issue in this appeal, and described here, is the Base Residual Auction.

[41] *Hughes*, 578 U.S. at 155–56; *see NJBPU*, 744 F.3d at 84.

[42] *Hughes*, 578 U.S. at 155–56; *see NJBPU*, 744 F.3d at 84.

[43] *NJBPU*, 744 F.3d at 85.

[44] *See* FERC Br. 14–15; PJM Br. 6; *NJBPU*, 744 F.3d at 88–89.

"[T]o address the concern that some market participants might have an incentive to depress market clearing prices by offering supply at less than a competitive level," the 2006 Settlement Order approved the implementation of the Minimum Offer Price Rule (MOPR).[45]

The MOPR established in the 2006 Settlement Order (2006 MOPR) was designed to detect bids suppressed through monopsony power. An offer that failed a multilevel screening process would be "mitigated," or administratively raised to a competitive level.[46] The 2006 MOPR applied only to new market entrants, excluding nuclear, coal, and hydroelectric resources as well as state-mandated resources.[47] In approving this mechanism, FERC concluded that the MOPR was a "reasonable method of assuring that net buyers do not exercise monopsony power by seeking to lower prices through self supply."[48] Moreover, FERC determined that the MOPR's exception for "reliability projects built under state mandate is reasonable because it enables states to meet their responsibilities to ensure local reliability."[49]

Within a few years, consistent with that responsibility, New Jersey and Maryland launched initiatives to develop new generation resources to address reliability and capacity

---

[45] 2011 Order at ¶ 6 (citing 2006 Settlement Order at ¶ 103).

[46] *NJBPU*, 744 F.3d at 85.

[47] *Id.* at 86 (explaining that state-mandated resources consisted of "any planned resource being developed in response to a state regulatory or legislative mandate to resolve a projected capacity shortfall").

[48] 2006 Settlement Order at ¶ 104; *see NJBPU*, 744 F.3d at 85.

[49] 2006 Settlement Order at ¶ 104.

concerns in their states.[50]    Both initiatives required new generation resources to sell capacity in the PJM markets, and both intended to offer the capacity a price below cost to ensure the new resources would clear.[51]

P3, who is also one of the Petitioners in this action, responded by filing a § 206 complaint with FERC, calling for an end to the state-mandated resources exception in addition to other modifications.[52]    PJM then filed a revised tariff pursuant to § 205, which FERC approved in 2011 with some alterations (2011 Order).    The 2011 MOPR eliminated the state-mandated resources exemption, "declin[ing] to accord states an opportunity to justify their initiatives on policy grounds, instead . . . requiring them to submit cost-based offers like other entrants or suffer the consequences of mitigation."[53]    At the same time, the new MOPR added exemptions for wind and solar resources, with the result that after 2011, only natural gas facilities were subject to mitigation.[54]

Several parties petitioned this Court for review of the 2011 Orders, which we denied in 2014.[55]    With respect to

---

[50] *NJBPU*, 744 F.3d at 87.

[51] *Id*.

[52] *Id*.

[53] *Id*. at 91 ("FERC . . . conclud[ed] that the exemption needed to be eliminated due to 'mounting evidence of risk from what was previously only a theoretical weakness in the MOPR rules,' namely, that state-subsidized resources would suppress auction prices.").

[54] *Id*. at 106.

[55] *Id*. at 112.    During the pendency of this Court's decision in *NJBPU*, aspects of the 2011 tariff not relevant to the instant

FERC's elimination of the state-mandated resources exemption on the grounds that they would suppress auction prices, we observed that while "it could easily be argued that this danger was foreseeable in 2006 when the MOPR was first approved, FERC has adequately advanced a rationale for its about-face . . . . As such, it cannot be said that FERC acted without substantial evidence."[56]

In 2016, power suppliers filed a § 206 complaint with FERC, challenging the MOPR's exclusive application to new market entrants. They argued that such a limitation was unjust and unreasonable because it "allowed below-cost offers from existing resources under newly-enacted state subsidy programs to unjustly displace non-subsidized resources."[57] A three-year process culminated with FERC's two-to-one vote in December 2019, ordering PJM to extend the MOPR to mitigate offers from "both new and existing resources" and any resource either receiving or eligible to receive a state subsidy (2019 MOPR).[58] The goal, FERC said, of this dramatic expansion was to "protect PJM's capacity market from the price-suppressive effects of resources receiving out-of-market support by ensuring that such resources are not able to offer below a competitive price."[59] The sole opposing Commissioner issued a dissent, arguing, among other things, that while "the MOPR once targeted efforts to exercise market power on behalf of

---

matter were amended in a compromise approved by FERC order in 2013. *See id.* at 93–94.

[56] *Id.* at 102.

[57] P3 Br. 15; *see Calpine Corp. v. PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,239 (hereinafter 2019 Order).

[58] 2019 Order at ¶¶ 1–2, 5; *see* EPSA Br. 8; FERC Br. 18–19.

[59] 2019 Order ¶ 5.

load and directly reduce the capacity market price, it now targets state resource decisionmaking, and particularly state efforts to address the externalities of electricity generation."[60]

The 2019 MOPR prompted swift opposition.[61]  Dozens of parties sought to overturn the 2019 MOPR, including "consumer advocate groups, state public utility agencies, electric cooperatives [and] generators, clean energy organizations, and environmental groups."[62]  These appeals were consolidated in the Seventh Circuit and remain in abeyance pending this action.[63]

On July 30, 2021, PJM made another § 205 filing, setting forth a revised MOPR (2021 MOPR) to replace the expansive one it set forth in 2019.  PJM acknowledged that, over the previous three years, state investments in renewable and nuclear resources had proliferated, in part because of states' unabated and legitimate interest in "address[ing] externalities that are not accounted for in PJM's wholesale markets."[64]  By "pricing out resources from the capacity market" and failing to account for those resources when committing capacity, PJM stated, the 2019 MOPR was distorting market signals by "incentiv[izing] resources to be built that are not needed to maintain reliability" in light of those investments.[65]  Moreover, the 2019 MOPR was incenting

---

[60] 2019 Order (Glick, dissenting), ¶ 16.
[61] FERC Br. 20.
[62] FERC Br. 20.
[63] FERC Br. 20–21; *see Ill. Commerce Comm'n v. FERC*, Nos. 20-1645, *et al.* (7th Cir.).
[64] JA0178.
[65] JA0178, 181.

market participants to exit the capacity market to "meet their policy and business objectives,"[66] a shift that threatened to "exacerbate[]the very price suppression issue [that the 2019 MOPR] seeks to mitigate."[67]   The result for consumers, PJM concluded, would be that those in states providing subsidies would "pay[] twice, i.e., for both the excluded resources and the resource committed through the auction because the excluded resource did not clear"  while those in other states would see "a capacity cost increase, when . . . the auction commits a resource that had a higher Sell Offer than the excluded resource's original offer."[68]   PJM concluded:

> [W]hile state policies favoring certain generation resources may ultimately cause a reduction in capacity clearing prices, such an outcome "should not be interpreted as a harmful secondary impact of one state's policies on other states. Rather, the reduction in prices is a natural consequence of the PJM market appropriately reflecting state policies and consumer preferences for certain types of resources.  Such state subsidies only lower total costs for consumers in other states."[69]

PJM explained that the 2021 MOPR would return to "its original purpose by focusing on prohibiting and mitigating the exercise of buyer-side market power."[70] The 2021 "focused" MOPR would "generally accommodate both state policies

---

[66] JA0182.

[67] JA0185.

[68] JA0179–80.

[69] JA0180.

[70] JA0171.

regarding generation resource mix and the long-standing business models of public power entities,"[71] while nonetheless barring state action, such as those that New Jersey and Maryland had pursued in 2011, that would "directly interfere with the auction clearing outcomes."[72]  To this end, the 2021 MOPR would mitigate offers in just two situations: "(1) where a capacity resource has the ability and incentive to exercise buyer-side market power, and (2) where a capacity resource receives state subsidies under a state program that is likely preempted by the Federal Power Act."[73]

When the 2021 MOPR was filed, FERC had four sitting commissioners.  The commissioners deadlocked two-to-two on the new tariff, failing to issue an order accepting or denying the change within sixty days.  On September 29, 2021, the Commission issued a secretarial notice stating that the new 2021 MOPR was in effect by operation of law.  Consistent with § 205(g)(1)(B), two commissioners (including the chair) filed a Joint Statement articulating their reasons for supporting the new tariff, while the other commissioners filed separate statements explaining their opposition.

All rehearing requests were denied without an order on November 29, 2021.  This petition followed.

## II.    Standing

An organization suing on its members' behalf must establish associational standing, demonstrating that "(1) at

---

[71] JA0194.

[72] JA0190.

[73] JA0173; *see* FERC Br. 22; PJM Br. 23.

least one of its members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of [its] individual members.'"[74]  To meet the first element of associational standing, the organization must establish the three familiar components that form "the irreducible constitutional minimum of standing":  injury-in-fact, causation, and redressability.[75]

The Petitioners have met their burden.  FERC observes that the Generators do not articulate any injuries in their opening briefs.[76]  Nevertheless, the Joint Appendix incorporates records from the Generators' protest before FERC that demonstrate that their members suffered economic losses as a result of the 2021 MOPR.  An affidavit attached to P3's reply brief elaborates on these harms.[77]  We find that the

---

[74] *See Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016); *see also Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) ("Where there are multiple plaintiffs who assert overlapping arguments, at least one petitioner must have standing to seek each form of relief requested in the petitions for review." (citing *Nat'l Ass'n of Regul. Util. Commissioners v. FERC*, 964 F.3d 1177, 1184 (D.C. Cir. 2020))).

[75] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) (citations omitted)).

[76] FERC Br. 35.

[77] P3 Reply Br. 3, Attachment A (Decl. Glen Thomas).

Generators have met their burden to articulate a concrete and particularized injury, and that the cause of their injuries is traceable to FERC's approval, by operation of law, of the 2021 MOPR.[78] We also hold that the State Entities have met their burden to establish a cognizable injury, having demonstrated that they "represent the interests of the states in protecting their citizens and electric ratepayers in the traditional government field of utility regulation."[79]

FERC also argues that the Petitioners failed to establish that their purported injuries are redressable in this action. Specifically, FERC argues that even if we were to vacate the order by operation of law that allowed the 2021 MOPR to go into effect, the 2021 MOPR would remain in effect until a new tariff could be established upon remand.[80] We disagree. Contrary to FERC's assertion, "[v]acating or rescinding invalidly promulgated regulations has the effect of reinstating prior regulations."[81]    While these potentially "disruptive

---

[78] *See Belmont Mun. Light Dep't,* 38 F.4th at 185.

[79] *Id.* at 186 (citing *Maryland People's Counsel v. FERC,* 760 F.2d 318, 321 (D.C. Cir. 1985)); *see* State Entities Reply Br. 5–6.

[80] FERC Br. 39.

[81] *Abington Mem'l Hosp. v. Heckler,* 750 F.2d 242, 244 (3d Cir. 1984); *Prometheus Radio Project v. F.C.C.* (*Prometheus I*), 652 F.3d 431, 453 n.25 (3d Cir. 2011) ("Because we vacate the NBCO rule in the *2008 Order*, the rule in existence prior to that order will remain in effect until the FCC promulgates new cross-ownership regulations."); *see Council Tree Commc'ns, Inc. v. F.C.C.,* 619 F.3d 235, 258 (3d Cir. 2010) ("vacating [an FCC] rule will mean that" the prior rule "will once again" govern the regulated activity); *Paulsen v. Daniels,* 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an

consequences"[82] may militate toward less drastic solutions,[83] such a remedy is nonetheless within the scope of our statutory authority.

## III.    Standard of Review

At the threshold, the parties dispute the applicable standard and scope of judicial review upon a petition proceeding under § 205(g).

---

agency rule is to reinstate the rule previously in force."); *Action on Smoking and Health v. CAB,* 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam) ("To 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.' . . . . [T]he judgment of this court had the effect of reinstating the rules previously in force.").

[82] *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 584 (D.C. Cir. 2018) (quoting *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013)); s*ee Prometheus Radio Project v. Fed. Commc'ns Comm'n* (*Prometheus II*), 824 F.3d 33, 52 (3d Cir. 2016).

[83] *See, e.g., Black Oak Energy*, 725 F.3d at 244 ("Although we remand, we do so without vacating . . . [after performing the disruption analysis] we deem it better to preserve the status quo as FERC reconsiders"); *Ameren Servs. Co.*, 880 F.3d at 584 (vacating because "we are troubled by the prospect of allowing the orders to continue"); *see Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187–88 (D.C. Cir. 2022) (determining that a FERC order is severable and vacating only one component).

We review FERC orders under § 313(b) of the FPA and § 10(e) of the APA.[84]  The FPA directs that FERC's factual findings, "if supported by substantial evidence, shall be conclusive."[85]  Substantial evidence exists where the administrative record contains "more than a scintilla, but . . . something less than a preponderance of the evidence."[86]  Under the APA, we must "hold unlawful and set aside" agency action that is deficient for reasons including that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[87]  In short, we affirm FERC orders as long as the administrative record shows the Commission "examined the relevant data and

---

[84] 16 U.S.C. § 825*l*(b); 5 U.S.C. § 706(2).

[85] 16 U.S.C. § 825*l*(b)*.

[86] *NJBPU*, 744 F. 3d at 94 (quoting *La. PSC v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008)); *accord Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011) ("Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citations and quotations omitted)).  *See also NJBPU*, 744 F.3d at 94 ("The question we must answer ... is not whether record evidence supports [petitioner]'s version of events, but whether it supports FERC's." (quoting *Fla. Mun. Power Agency v. FERC,* 315 F.3d 362, 368 (D.C. Cir. 2003))).

[87] 5 U.S.C. § 706(2); *see City of Newark v. FERC*, 763 F.2d 533, 545 (3d Cir. 1985) (court must determine "whether a rational basis exists for [FERC's] conclusion, whether there has been an abuse of discretion, or . . . whether the Commission's order is arbitrary or capricious or not in accordance with the purpose of the [FPA].").

articulated a rational connection between the facts found and the choice made."[88]

FERC urges, and we agree, that § 205(g) did not alter these familiar standards.[89]  Rather, the provision clarified the universe of action subject to our review.  Prior to its enactment, the plain text of the FPA did not convey Congress's intent to allow our review of rate filings enacted by operation of law pursuant to § 205(d).  Congress addressed this deficiency with § 205(g), which unambiguously instructed that we construe FERC's inaction as an affirmative order "*for the purposes of § [313](a).*"[90]  Notably, Congress here referred to the very provision setting forth a party's right to seek the Commission's rehearing of an order by majority vote, which in turn provides the basis for judicial review.[91]  Indeed, § 205(g) specifies that

---

[88] *NJBPU*, 744 F.3d at 94 (quoting *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010)); *see also Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 532 (2008) ("The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions."); *N. Penn. Gas Co. v. FERC*, 707 F.2d 763, 766 (3d Cir. 1983) (FERC's exercise of its expertise carries "a presumption of validity").

[89] *See* FERC Br. 34–35, 49.  While we generally defer to an agency's reasonable interpretation of ambiguity in a statute it administers "through application of its expertise," no deference doctrine controls the scope of a court's jurisdiction.  *See Allegheny Def. Project v. FERC*, 964 F.3d 1, 11 (D.C. Cir. 2020).

[90] § 205(g) (emphasis added); *see* 16 U.S.C. § 825*l*(a).

[91] *See* 16 U.S.C. § 825*l*(b) ("Any party to a proceeding under this chapter aggrieved by an order issued by the Commission

if the "Commission fails to act on the merits of the rehearing request" within 30 days because the deadlock continues, "such person may appeal under § [313](b)."[92]  Thus, by reference, the standard of review set forth in the FPA[93] applies to FERC orders issued by operation of law pursuant to § 205(d).[94]

We reject the State Entities' argument that we must review "on a de novo basis, whether the tariff change is just and reasonable as a predicate to deciding whether [FERC's] discretion to approve was properly exercised."[95]  This reading contradicts the well-settled administrative law principle, reflected in both the FPA and APA, that "'a court is not to substitute its judgment for that of the agency.'"[96]  Moreover, the sole authority cited by the State Entities to support its reading concerns an inapposite statute (the Indian Gaming Regulatory Act or IGRA), which at least one sister court has rejected as an appropriate analog for the FPA because the IGRA *requires* agency action while the FPA gives the agency discretion to act.[97]

---

in such proceeding may obtain a review of such order in the United States court of appeals . . . .").

[92] *Id*. § 824d(g)(2); *see id*. § 825*l*(b).

[93] *See id.* § 825*l*(b).

[94] § 205(g).

[95] State Entities Br. 21–22 (citing *Amador County, Cal. v. Salazar*, 640 F.3d 373, 375 (D.C. Cir. 2011)).

[96] *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[97] *Compare* State Entities Br. 22, *with Public Citizen*, 839 F.3d at 1173 ("Section 205(a)'s statement concerning the unlawfulness of unjust and unreasonable rates does not rise to an inexorable command like that found in IGRA").

To carry out Congress's directive to construe FERC inaction as an affirmative order, we must next determine what constitutes evidence of the agency's reasoning for the purposes of § 205(g).[98]  The Generators insist that *nothing* does, arguing that a deadlocked Commission can produce "no institutional findings of fact or conclusions of law to which this Court might defer."[99]  While they acknowledge Congress's mandate in § 205(g)(1)(B) that the members of a deadlocked Commission must enter their reasoning into the record, they argue that these statements are unattributable to the agency and are intended only to "facilitate compromises" and promote transparency and good government.[100]  Because *any* order arising by operation of law would, by the Generators' logic, lack *any* agency rationale, they conclude that *any* petition for rehearing pursuant to § 205(g) must "inevitably"[101] lead us to find such an order arbitrary and capricious.[102]

---

[98] *See Sprint Nextel Corp. v. F.C.C.*, 508 F.3d 1129, 1132 (D.C. Cir. 2007) ("When the Commission failed to [act] within the statutory period, Congress's decision—not the agency's—took effect.").

[99] P3 Br. 29, 34–36 ("[a]ctions of the Commission shall be determined by a majority vote of the members present" (citing 42 U.S.C. § 7171(e)); *accord* EPSA Br. 18, 21, 23; State Entities Br. 29–30 (citing *Public Citizen*, 839 F.3d at 1169).

[100] P3 Br. 36–37; *see* EPSA Br. 18, 23, 27 (quoting *F.C.C. v. Prometheus Radio Project* (*Prometheus III*), 141 S. Ct. 1150, 1158 (2021)); *see* State Entities Br. 29.

[101] EPSA Br. 19–20; P3 Br. 33–35.

[102] The Generators also wrongly contend that because orders by operation of law are necessarily arbitrary and capricious, they *must* be set aside.  *See* P3 Br. 29, 35 ("[J]udicial review of

The Generators' argument is inconsistent with our responsibility to avoid interpreting statutory provisions in ways that "render statutory language a nullity and leave entire operative clauses with 'no job to do.'"[103] Congress established in § 205(d), and underscored in § 205(g), that a tariff may change by operation of law,[104] consistent with the principle that

---

deadlocked FERC proceedings would *inevitably* end in vacatur." (emphasis added)); EPSA Br. 15 n. 3 (incorporating by reference P3's arguments concerning vacatur); EPSA Br. 16, 25, 43. But vacatur is never a foregone conclusion. First, the plain text of the FPA authorizes us not only to vacate, but also to modify an improper order. 16 U.S.C. § 825*l*(b). Second, to determine the appropriateness of vacatur, we conduct a fact-sensitive analysis accounting for "the gravity of the orders' flaws, and the 'disruptive consequences' that may result." *Ameren Servs. Co.*, 880 F.3d at 584 (quoting *Black Oak Energy, LLC*, 725 F.3d at 244; *see Prometheus II*, 824 F.3d at 52; *Belmont Mun. Light Dep't*, 38 F.4th at 187–88 (determining that a FERC order is severable and vacating only one component). We further observe that while vacatur is the Generators' preferred remedy here, to adopt their theory globally risks hampering the claims of future litigants seeking redress by modification, and not vacatur. Accordingly, we reject the Generators' reading.

[103] *Allegheny*, 964 F.3d at 15 (quoting *Doe v. Chao*, 540 U.S. 614, 623 (2004)).

[104] § 824d(d) ("*No change shall be made by any public utility in any such rate*, . . . rule, regulation, or contract relating thereto, *except after sixty days' notice* to the Commission and to the public." (emphasis added)); § 824d(g) ("With respect to *a change described in subsection (d),* if the Commission permits the 60-day period established therein to expire without

the "power to initiate rate changes rests with the utility and cannot be appropriated by FERC in the absence of a finding that the existing rate was unlawful."[105]  The Generators' theory would flip § 205(d)'s protective intent on its head, enabling *any* aggrieved party to invalidate *any* rate change by operation of law simply by virtue of requesting judicial review—a process the Generators' theory reduces to a mechanical exercise with only one possible outcome.  This cannot be right.  If Congress's purpose were indeed to strip utilities of the protections afforded by § 205(d), or to otherwise invalidate orders by operation of law, it would have amended that portion of the statute accordingly, not created a cumbersome workaround via § 205(g).

Moreover, the Generators' reading would sap § 205(g)(1)(B) of purpose.  It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[106]  Here, § 205(g)(1)(B) appears as part of an enumerated list of provisions concerning aggrieved parties' right to seek rehearing and judicial review of a change arising from agency inaction.  It makes little sense to argue, as P3 does, that Congress's purpose in requiring the Commissioners to add statements explaining their reasoning to the administrative record could have been to "facilitate compromises" and

---

issuing an order accepting or denying the change . . . the failure . . . shall be considered to be an order issued by the Commission accepting the change for purposes of" judicial review (emphasis added)).

[105] *Atl. City Elec. Co.*, 295 U.S. at 10.

[106] *King v. Burwell*, 576 U.S. 473, 492 (2015) (quoting *Util. Air Reg. Grp. V. EPA.*, 573 U.S. 302, 320 (2014)).

promote transparency and good government *only*.[107]  The right to judicial review accrues *after* a party has been aggrieved by a change, and therefore after the time for compromise has passed.[108]

We agree with FERC that Congress intended "the Commissioners' statements [to] play an integral role in the Court's review."[109]  Here, the statements of the deadlocked Commissioners do more than record each person's individual rationale for affirming or rejecting the rate filing. Collectively, they illuminate the agency's reasons for inaction, which Congress has instructed us to construe as an affirmative order.[110]  Because FERC must accept a § 205 rate filing absent "a finding that the existing rate was unlawful,"[111] our thorough consideration of the entire record must ensure that the

---

[107] P3 Br. 37.

[108] Notably, in neither of § 205(g)'s two enumerated clauses did Congress qualify "change" with any adjective (e.g., "proposed" or "potential") to indicate that such change was pending, and not already in effect.  Rather, the text plainly refers to the change in tariff effected by the agency's inaction, pursuant to § 205(d).

[109] FERC Br. 4.

[110] P3 repeatedly asks us to vacate the September 29, 2021 Notice, treating that document as if it were a FERC order.  P3 confuses the nature of that instrument, which does not itself constitute reviewable FERC action but rather memorialized the results, already in effect, of the Commission's inaction.

[111] *Atl. City Elec. Co.*, 295 F.3d at 10; *see Public Citizen*, 839 F.3d at 1174 (noting the FPA does "not compel FERC to either set the disputed rates for hearing or affirmatively disapprove any unjust or unreasonable rates through the Section 205 process.").

Commissioners who did not find the 2021 MOPR unlawful engaged in "decisionmaking [that was] reasoned, principled, and based upon the record."[112]

While unusual, such a reading has precedent. In the Federal Election Commission Act, Congress similarly incorporated language making clear that a party aggrieved "by a failure of the Commission to act" may seek administrative appeal and judicial review.[113]   As the D.C. Circuit Court of Appeals explained in *Public Citizen*, when the Federal Election Commission deadlocks over whether to exercise its discretion to act, "[t]o make judicial review a meaningful exercise,' [the court must] treat the statements of the Commissioners voting to dismiss the complaint as the administrative record."[114]  The court in *Public Citizen* declined to follow this approach because, at the time, the FPA did not contain "a similar congressional indication" about how to construe agency deadlock.[115]  With § 205(g), Congress filled that gap.[116]

---

[112] *W. Res., Inc. v. FERC*, 9 F.3d 1568, 1572 (D.C. Cir. 1993) (quoting *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 593 (D.C. Cir. 1979)); *see Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992) (these commissioners "constitute a controlling group for purposes of the decision[ and] their rationale necessarily states the agency's reasons for acting as it did.").

[113] 52 U.S.C. § 30109(a)(8)(A).

[114] *Public Citizen*, 839 F.3d at 1170 (citing *Fed. Election Comm'n*, 966 F.2d at 1476); *see Common Cause v. Fed. Election Comm'n.*, 842 F.2d 436, 450 (D.C. Cir. 1988).

[115] *Public Citizen*, 839 F.3d at 1171.

[116] For this reason, P3 errs by relying on *Public Citizen*, which turned on the absence of such an indication, for the proposition

We disagree that § 205(g) contradicts the Commission's enabling statute as codified at 42 U.S.C. § 7171(e), which states that "[a]ctions of the Commission shall be determined by a majority vote of the members present."[117]   Section 205(g) concerns only how agency inaction should be construed for the limited purposes of rehearing and review but does not illuminate what constitutes agency action per se.[118]   Even if § 205(g) did contradict § 7171(e), traditional rules of statutory interpretation counsel that "[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling."[119]   Here, Congress identified narrow circumstances under which to construe inaction, in a particular way, for a specific purpose.[120]

---

that FERC inaction cannot be construed as action for the purposes of judicial review.

[117] P3 Br. 29, 34–36 (citing 42 U.S.C. § 7171(e) ("[a]ctions of the Commission shall be determined by a majority vote of the members present"); *accord* EPSA Br. 18, 21, 23; State Entities Br. 29–30 (citing *Public Citizen*, 839 F.3d at 1169).

[118] *See* 42 U.S.C. §7171(e).

[119] *Superior Oil Co. v. Andrus*, 656 F.2d 33, 36 (3d Cir. 1981)) (quoting *Fourco Glass Co. v. Transmirra Corp.*, 353 U.S. 222, 228–29 (1957)).

[120] We have no "grave constitutional concern" that a single Commissioner's views could stand for all when a rate filing takes effect because the Commission has deadlocked.  EPSA Br. 27.  Under the terms of the statute, this circumstance would always result in two Commissioners' views controlling—the same number that would constitute an unobjectionable majority among a quorum of three Commissioners.  Nevertheless, we do not decide today whether a constitutional

For the foregoing reasons, we hold first that where a quorum of FERC Commissioners deadlocks two-to-two on a § 205 rate filing, our review of the resulting order must adhere to the same standard that would govern our review of an order approved by a FERC majority.[121]  Second, we hold that our review properly encompasses the entire record, including the four Commissioners' § 205(g)(1)(B) statements.

## IV.    Merits

We now reach the substance of the parties' dispute. Construing the agency's deadlocked vote on the 2021 MOPR as an affirmative order consistent with § 205(g), and considering the Commissioners' recorded statements, we conclude that the rationale set forth in the Joint Statement for approving the 2021 MOPR was neither arbitrary nor capricious and was supported by substantial evidence in the record.  We are not persuaded otherwise by the arguments set forth in the other Commissioners' statements.  Accordingly, we will deny the Generators' petitions on the merits.[122]

---

concern might arise when a rate filing goes into effect in the absence of a quorum, in which case the "views of a single Commissioner [could] . . . gain the force of law."  EPSA Br. 27, 28 (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2201 (2020)).

[121] *NJBPU*, 744 F.3d at 94 (citing *Sacramento Mun. Util. Dist.*, 616 F.3d at 528).

[122] P3 suggests that FERC's order by operation of law pursuant to § 205 was facially improper because it overturned a tariff ordered by FERC under § 206, professing to be "unaware of any authority that permits a public utility to change rates

In reviewing FERC's orders, we consider only "whether a rational basis exists for a conclusion, whether there has been an abuse of discretion, or . . . whether the Commission's order is arbitrary or capricious or not in accordance with the purpose of the [FPA]."[123]  "[B]ecause issues of rate design . . . involve policy judgments that lie at the core of the regulatory mission, our review of whether a particular rate design is just and

imposed on that utility by FERC under FPA section 206."  P3 Br. 31, 33 ("[T]he Notice must be vacated because it disregards the text and structure of the FPA by elevating a mere filing under section 205 above FERC orders under section 206."). The State Entities similarly suggest the existence of a "higher Section 206 standard," State Entities Br. 28, insisting that as a per se matter, "FERC cannot overturn its prior precedent through inaction," State Entities Br. 28.   Both parties are incorrect.   It is well-settled that "[n]othing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes."  *Atl. City Elec. Co.*, 295 F.3d at 10 (collecting cases).  Indeed, "courts have repeatedly held that FERC has no power to force public utilities to file particular rates unless it first finds the existing filed rates unlawful . . . . Nor may FERC prohibit public utilities from filing changes in the first instance."  *Id.*  As intervenors for the respondent note, P3's interpretation would erode the careful balance that Congress has achieved in the statute by "gradually eliminat[ing] the utility's rights under Section 205 . . . to set the rates it will charge prospective customers, and change them at will, subject to review by the Commission."  Respondent-Intervenors Br. 29 (quoting *Atl. City Elec. Co.*, 295 F.3d at 10) (cleaned up).  Accordingly, we reject P3's suggestion that a § 205 filing cannot displace a tariff set by § 206.
[123] *City of Newark*, 763 F.2d at 545.

reasonable is highly deferential."[124]   The MOPR dispute concerns precisely such a judgment:  How best to protect the integrity of the capacity market, in view of the diverse and legitimate interests of its myriad stakeholders and the innumerable factors that influence price.

FERC has approved various approaches to this conundrum since 2006.  We have previously observed that "FERC is permitted to weigh the danger of price suppression against the counter-danger of over-mitigation, and determine where it wishes to strike the balance."[125]   Here, the 2021 MOPR reflected a shift away from the regime embraced in the 2019 MOPR, at least arguably toward the purpose of "address[ing] the concern that some market participants might have an incentive to depress market clearing prices by offering supply at less than a competitive level."[126]

Such shifts are permissible.  An agency may alter its "view of what is in the public interest."[127]   The fact that contrary agency precedent exists "gives us no more power than usual to question the Commission's substantive determinations."[128]   The agency need not establish that "the

---

[124] *Md. Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1286 (D.C. Cir. 2011).

[125] *NJBPU*, 744 F.3d at 109.

[126] 2011 Order at ¶ 6 (citing 2006 Settlement Order at ¶ 103).

[127] *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (quoting *Greater Bos. Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *see NJPBU*, 744 F.3d at 100.

[128] *NJPBU*, 744 F.3d at 100 (quoting *Nat'l Cable & Telecomms. Ass'n v. F.C.C.*, 567 F.3d 659, 669 (D.C. Cir. 2009)); *see also Elec. Consumers Res. Council v. FERC*, 407

reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better."[129]

We hold that FERC met these criteria in constructively approving the 2021 MOPR. The eighty-six-page Joint Statement acknowledged that the 2021 MOPR reflects a change in policy and identified reasons for finding the change just and reasonable.[130] Specifically, the authoring

---

F.3d 1232, 1239 (D.C. Cir. 2005) (stating that a court's deference to FERC on complex rate market design "is based on the understanding that the Commission will monitor its experiment and review it accordingly").

[129] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[130] The two commissioners who concluded the 2021 MOPR was not just and reasonable issued separate statements articulating their views. While non-identical, the commissioners reached the same core conclusion: The 2021 MOPR did not meet the just and reasonable standard because it was anti-competitive. *See* JA0129 (Christie Statement) ("[T]he PJM MOPR Proposal, now in effect by operation of law, forfeits any remaining credibility to the claim that the PJM capacity market is based on actual competition or is run for the benefit of consumers"); JA0169 (Danly Statement) ("PJM's proposal eliminating all mitigation of the price-suppressive effects of state subsidies is irredeemably inconsistent with FPA section 205's requirement that proposed rates must be just and reasonable."). As discussed herein, these policy concerns are addressed in the Joint Statement, along with the authoring commissioners' reasons for not adopting them, reasons which

Commissioners asserted that a more narrowly targeted MOPR would benefit "investors and consumers alike" by "more accurately reflect[ing] the facts and realities on the ground,"[131] while "provid[ing] a sufficient opportunity for resources to recover their costs."[132]  The Joint Statement noted that its policy might result in lower prices on the capacity market than under the expanded 2019 MOPR but concluded that such a result is "just and reasonable because the market will reflect supply and demand fundamentals,"[133] which include state policies alongside federal policies, "[s]iting policies, tax rules, and labor regulations," among others.[134]  According to the Joint Statement, the 2019 MOPR allowed for an "artificially inflated price [that] will falsely signal that new entry is needed or that existing resources should forestall retirement," with potentially "detrimental effects on PJM's energy and ancillary services markets."[135]

The Joint Statement identified specific changed circumstances to support these conclusions, including a proliferation of state policies to shape the resource mix that had occurred over the prior three years, largely to "address externalities that are neither accounted for nor compensated in

---

are neither arbitrary nor capricious and are based on substantial evidence in the record.  Because it may not, our conclusion in this regard does not derive from our own policy preferences.  Rather, it accepts and reflects our role here as circumscribed by statute and precedent.

[131] JA0060 ¶ 44.

[132] JA0060 ¶ 45.

[133] JA0067 ¶ 55.

[134] JA0068 ¶¶ 56, 57.

[135] JA0067 ¶ 54.

PJM's wholesale markets."[136]  The Joint Statement noted that "[s]tates are playing a more active role in shaping the resource mix—including both entry and exit—than they were at the time the Commission issued previous orders addressing the scope and purpose of PJM's MOPR."[137]  Policies passed since 2018 alone could together "support the entry of more than 44,000 MW of capacity into PJM's capacity market over the next" fifteen years, the Joint Statement noted.[138]  The authoring Commissioners observed that failing to account for the contributions of these resources to capacity could cost consumers a total of $3.4 billion by 2030.[139]

The Joint Statement also analyzed the results of the first base residual auction held under the 2019 MOPR.  The authoring Commissioners noted that a generating station benefitting from one state's zero-emission credit failed to clear, and that "capacity prices likely increased by over $10/MW-day, or an additional $90 million in the ComEd zone, as a result"—harms that "can be expected to increase significantly as states continue to support resources that will not benefit from the [2019] MOPR's" exclusions.[140]  The Joint Statement also pointed to evidence that "several states have considered

---

[136] JA0057 ¶ 36.

[137] JA0070 ¶ 59.

[138] JA0084 ¶ 80.

[139] JA0064 ¶ 50. *See Constellation Energy Commodities Grp., Inc. v. FERC*, 457 F.3d 14, 24 (D.C. Cir. 2006) ("[I]t is within the scope of the agency's expertise to make . . . a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.") (cleaned up).

[140] JA0066 ¶ 52.

abandoning the capacity market altogether rather than have the resources needed to meet their public policy goals be subjected to mitigation," an outcome that would threaten the purpose and structure of the market itself.[141]

Petitioner EPSA contends that the Joint Statement failed to address the validity of any potential reliance interests, arguing the "parties demonstrated that investors have sunk many billions of dollars into constructing new power plants and maintaining existing ones, all in reliance on the existence of PJM market mechanisms that ensure a competitive marketplace, rather than a marketplace skewed by the participation of un-economic resources."[142] But an agency not "writing on a blank slate" is required only to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."[143]  Here, the Commissioners considered "arguments that the Expanded [2019] MOPR must be preserved because investors relied on it" but determined these did not "tilt the balance" against their articulated policy concerns, in light of the fact that the 2019 MOPR had been in place for a relatively short period during which it was "well-publicized" that "PJM was exploring the possibility of replacing the Expanded MOPR."[144]  As we concluded in 2014, responding to similar arguments, "we are not unsympathetic to [investor's] arguments that they reasonably relied" on the terms of the prior MOPR, but nevertheless "find no fault with

---

[141] JA0070 ¶ 58.

[142] EPSA Br. 30.

[143] *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020).

[144] JA0071 ¶ 61.

FERC's ability to, and reasons for" constructively approving the new one.[145]

P3 challenges various technical provisions of the 2021 MOPR, devised by PJM to accomplish its twin policy objectives of mitigating offers resulting from the exercise of buy-side market power and conditioned state support. From these objections,[146] P3 concludes that because PJM's proposed mechanism fails to ensure adequately that "neither buyer nor seller have market power, 'the prevailing price in the marketplace cannot be the final measure of "just and reasonable" rates mandated by the Act.'"[147]

_____

[145] *NJBPU*, 744 F.3d at 100.

[146] P3 generally alleges that both prongs are "unjust, unreasonable, and unduly discriminatory," without articulating precisely how. With respect to the Buyer Side Market Power and Conditioned State Support provisions, including that (1) PJM's proposed self-certification process is insufficiently robust, (2) that its requirement that sellers self-certify their intent is "easily evaded" and runs counter to prior policy approved by FERC; (3) the tests required upon review by the PJM and/or Independent Market Monitor are evadable and rely on concepts rejected, with FERC approval, in earlier MOPRs; and (4) the test is insufficiently transparent and affords too much discretion to PJM and the Independent Market Monitor. *See* P3 Br. 51–54. With respect to the provisions related to Conditioned State Support, P3 argues that these are "riddled with practical defects," improperly exempts existing policies, and only mitigates state actions are already unlawful under the Supreme Court's decision in *Hughes v. Talen Energy Mktg, LLC*, 578 U.S. 150 (2016). P3 Br. 49–50.

[147] P3 Br. 47 (quoting *FPC v. Texaco Inc.*, 417 U.S. 380, 397

We disagree. "The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition,"[148] and "FERC's authority to determine whether wholesale rates are 'just and reasonable' is exclusive."[149] We "properly defer[] to policy determinations invoking the Commission's expertise in evaluating complex market conditions."[150] Although "courts have never given regulators carte blanche,"[151] our review is "limited to ensuring that the Commission has made a principled and reasoned decision supported by the evidentiary record."[152] Here, the Joint Statement responds to both the technical and policy criticisms levelled by P3, concluding that the mechanisms proposed by PJM were sufficient to mitigate anti-competitive offers while "appropriately balanc[ing] the risk of under- and over-

---

(1974)); *see* P3 Br. 47–48 (stating that the new rules "do virtually nothing to prevent the exercise of state-sponsored market power. Instead, they establish an opaque and toothless process of exclusions and exceptions that 'is *even worse* than having no MOPR at all.'") (quoting Comm'r Christie Statement, JA0125–26 ¶ 3).

[148] *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 532 (2008).

[149] *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1011 (9th Cir. 2004) (quoting *Miss. Power & Light Co. v. Mississippi*, 487 U.S. 354, 371 (1988)).

[150] *Tenn. Gas Pipeline Co. v. FERC,* 400 F.3d 23, 27 (D.C. Cir. 2005).

[151] *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (quoting *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984)).

[152] *Id.* (quoting *S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 181 (D.C. Cir. 2013)).

mitigation."[153]   We cannot conclude on this record that the Commission's constructive acceptance of PJM's § 205 filing as just and reasonable was arbitrary or capricious.

Finally, we reject P3's argument that the 2021 MOPR "unlawfully discriminates against competitive power suppliers," as compared to state-sponsored resources, by "reduc[ing] market prices below just and reasonable levels."[154] As discussed above in depth, the Joint Statement set forth an adequate rationale for permitting PJM to implement a less expansive MOPR.[155]   Moreover, as FERC argues, the FPA

---

[153] JA0096 ¶¶ 103, 105–06); *see generally* JA0100 ¶¶ 85–163.

[154] P3 Br. 39.

[155] Judge Roth also disagrees with the Generators' contention that the 2021 MOPR is unlawfully discriminatory because it allows states to ""impose [their] own policy choice on neighboring States' or otherwise intrude upon the 'autonomy of [other] States within their respective spheres.'" P3 Br. 42–43 (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 571 (1996)) (quotations omitted); EPSA Br. 34–47.   Rather, Judge Roth would conclude, consistent with *New Jersey Board of Public Utilities v. FERC*, "what FERC has actually done here is permit states to develop whatever capacity resources they wish, and to use those resources to any extent that they wish, while approving rules that prevent the state's choices from adversely affecting wholesale capacity rates." *NJBPU*, 744 F.3d at 98; *accord Hughes*, 578 U.S. at 166 ("Nothing in this opinion should be read to foreclose . . . States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'"); *see Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015) (rejecting a dormant Commerce Clause

---

unambiguously authorizes the agency to take state policies into account to the extent that such policies affect its statutorily prescribed area of focus:  the justness and reasonableness of wholesale rates.

## V.     Conclusion

For the forgoing reasons, we conclude that FERC's constructive acceptance of the 2021 MOPR was neither arbitrary nor capricious and was supported by substantial evidence in the record.  We will accordingly deny the petitions for review.

---

challenge to a state's renewable energy mandate).  Judge Roth particularly disapproves of EPSA's assertion, citing no relevant authority, that "FERC must therefore play the role of federal referee for state intrusions into other States' jurisdiction," EPSA Br. 42.